Gerardo CASTILLO, et. al., Plaintiffs,

v.

CASE FARMS OF OHIO, INC., et. al., Defendants.

No. Civ. A. DR 97–CA–89.

United States District Court, W.D. Texas, Del Rio Division.

Dec. 1, 1999.

Hernandez, Jesus Mejia, Joseph Cooper, Guadalupe Zamorano, Jose Guadalupe Estrada, Rafael Gonzalez, Raul Zavala, Ricardo Zamorano, Efrain Leal, Gustavo Caballero, Edgar A. Chavez, Americo Galvan, Carlos A. Gonzalez, Juan Piente, Tomas Solis, Juan Carlos Verastegui, plaintiffs.

Rodolfo D. Sanchez, Texas Rural Legal Aid, Inc., Weslaco, TX, for Yolanda Leura, plaintiff.

Richard O. Gonzales, Uvalde, TX, Rodolfo D. Sanchez, Texas Rural Legal Aid, Inc., Weslaco, TX, for Edna Chong, plaintiff.

Selena N. Solis, Texas Rural Legal Aid, Farm worker Div., Weslaco, TX, Lisa J. D'Souza, Dept. of Justice, Employment Litigation Section, Civil Rights Div., Washington, DC, Rodolfo D. Sanchez, Texas Rural Legal Aid, Inc., Weslaco, TX, for plaintiffs.

Robert D. Kilgore, Cox & Smith Inc., San Antonio, TX, Dean E. Westman, Jeffrey J. Weber, Jill C. Boland, Millisor & Nobil, Cleveland, OH, for Case Farms of Ohio, Inc., defendant.

## MEMORANDUM OPINION

JUSTICE, Senior District Judge.

The above-entitled and numbered civil action was filed on December 19, 1997, by a group of migrant farm workers, claiming violations of the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), the Fair Labor Standards Act ("FLSA"), and various state laws. The primary defendant is Case Farms of Ohio, a chicken processing plant located in Winesburg, Ohio.

A bench trial in this civil action commenced on March 29, 1999,[1] and was completed on April 1, 1999. In accordance with Federal Rule of Civil Procedure 52(a),

Javier Riojas, Texas Rural Legal Aid, Eagle Pass, TX, Rodolfo D. Sanchez, Texas Rural Legal Aid, Inc., Weslaco, TX, for Gerardo Castillo, Michelle Galvan, Eloy Cantu, Hugo Hernandez, Esperanza Hernandez, Martin Hernandez, Sergio

---

1. This court has subject matter jurisdiction over this civil action pursuant to 29 U.S.C. § 1854(a), 29 U.S.C. § 216(b), and 28 U.S.C. § 1331, and § 1337. Supplemental jurisdiction over the plaintiffs' common law claims may be exercised accordant to 28 U.S.C. § 1367.

the following memorandum opinion constitutes the court's findings of fact and conclusions of law in this civil action.

## TABLE OF CONTENTS

INTRODUCTION
 I. Background Facts
 II. Trial Procedure
PART I: AN OVERVIEW OF THE LAW
PART II: GENERAL APPLICABLE LIABILITY PRINCIPLES
 I. Case Farms' Liability as to the 1996 Plaintiffs
 A. An Agricultural Employer's Liability Under the AWPA
 *The Joint Employer Doctrine*
 *Case Farms and ATC as Joint Employers*
 *The Implications of Joint Employer Status*
 B. An Agricultural Employer's Liability Under Common Law Agency Principles
 *ATC's Agency*
 *Hernandez's Agency*
 C. Case Farms' Liability for the Actions of ATC and Alvaro Hernandez
 II. Case Farms' Liability as to the 1997 Plaintiffs
PART III: ALLEGED VIOLATIONS OF THE AWPA
 I. Unregistered Farm Labor Contractors' Alleged Violations of 29 U.S.C. § 1842
 A. The Law
 B. 1996 Plaintiffs
 C. 1997 Plaintiffs
 II. Written Disclosures: Alleged Violations of 29 U.S.C. § 1821(a)
 A. The Law
 B. The 1996 Plaintiffs
 C. The 1997 Plaintiffs
 III. False or Misleading Information: Alleged Violations of 29 U.S.C. § 1821(f)
 A. The Law
 B. The 1996 Plaintiffs
 C. The 1997 Plaintiffs
 IV. Compliance with the Terms of the Working Arrangement: Alleged Violations of 29 U.S.C. § 1822(c)
 A. The Law
 B. The 1996 Plaintiffs
 C. The 1997 Plaintiffs
 V. Housing Health and Safety Codes: Alleged Violations of 29 U.S.C. § 1823(a)
 A. The Law
 B. The 1996 Plaintiffs
 C. The 1997 Plaintiffs
 VI. Posted Certificate of Occupancy: Alleged Violations of 29 U.S.C. § 1823(b)
 VII. Posted Terms and Conditions of Housing Occupancy: Alleged Violations of 29 U.S.C. § 1821(c)
 VIII. Insurance and Inspection of Vehicles: Alleged Violations of 29 U.S.C. § 1841(b)
 A. The Law
 B. The 1996 Plaintiffs
 C. The 1997 Plaintiffs
 IX. Proper Pay Statements: Alleged Violations of 29 U.S.C. § 1821(d)(2)
 X. Paid Wages When Due: Alleged Violations of 29 U.S.C. § 1822(a)
 XI. Damages for Violations of the AWPA
 A. The Assessment of Statutory Damages
 B. The Assessment of Actual Damages
 C. The Plaintiffs' Damages
 1. Use of Unregistered Farm Labor Contractors
 2. Failure to Provide Written Disclosures
 3. Providing False or Misleading Information
 4. Failure to Comply with the Terms of the Working Agreement
 5. Failure to Comply with Housing Health and Safety Codes
 6. Failure to Secure the Certificate of Occupancy
 7. Failure to Post the Terms and Conditions of Housing Occupancy

8. Failure to Insure and Inspect Vehicles
9. Failure to Provide Proper Pay Statements
10. Failure to Provide Wages When Due

PART IV: ALLEGED VIOLATIONS OF THE FLSA
I. The Fair Labor Standards Act
II. The Rules for Calculating Minimum Wage Violations
III. Case Farms' Alleged Minimum Wage Violations
IV. Case Farms' Alleged Overtime Wage Violations
 A. The 1996 Plaintiffs' Overtime Allegations
 B. The 1997 Plaintiffs' Overtime Allegations

PART V: ALLEGED VIOLATIONS OF STATE LAW
I. Case Farms' Alleged Breach of Contract
II. Case Farms' Alleged Negligence
III. Case Farms' Alleged Fraud

CONCLUSION

## INTRODUCTION

### I. Background [2]

Defendant Case Farms of Ohio, Inc. ("Case Farms"), is a chicken processing plant in Winesburg, Ohio. At this facility, approximately 400,000 live chickens per week, year-round, are live-hung, slaughtered, eviscerated, cleaned, cut and deboned, and ultimately packaged for market. Case Farms employees perform a range of jobs, which include eviscerating, deboning, receiving, grading, wrapping, weighing, and washing chickens.

In consideration of its historically high turnover rate, Case Farms actively recruited workers for its processing plant during 1996 and 1997. Andy Cilona, primarily responsible for recruiting workers for Case Farms, served as Case Farms' Human Resources Director from his date of hire until February 1996, and as Case Farms' Director of Corporate Development, from February 1996 until mid–1997. During one of his recruiting trips in Florida, Cilona initiated contact with a labor agency for temporary employees, America's Tempcorps ("ATC").[3] In conformity with an unwritten agreement with Case Farms, ATC worked in Texas, recruiting and hiring a number of people to work at

Case Farms' chicken processing plant in Ohio. During this recruitment process, ATC gave some of its recruits the telephone number of Alvaro Hernandez, a Case Farms employee, and instructed them to call Hernandez upon their arrival in Ohio. ATC also usually gave its recruits a free bus ticket or other free transportation to Ohio, as well as $20.00 each in traveling expenses. Case Farms ceased doing business with ATC in February 1996.

There are two groups of plaintiffs in this civil action. Those workers recruited by ATC in McAllen, Texas, make up the "1996 plaintiffs."[4] The "1996 plaintiffs," sixteen in number, are as follows: Eloy Cantu, Gerardo Castillo, Edna Mae Chong (representing the estate of deceased plaintiff Josephine Tijerina), Efrain Leal, Rafael Gonzalez, Sergio Hernandez, Jose Guadalupe Estrada, Martin Hernandez, Esperanza Hernandez, Joseph Cooper, Hugo Hernandez, Jesus Mejia, Guadalupe Zamorano, Ricardo Zamorano, Raul Zavala, and Michelle Galvan.

The second group of plaintiffs, the eleven "1997 plaintiffs," were provided recruitment information by Cilona, Case Farms' employee, or by Alberto Garcia, an em-

---

2. For the most part, these introductory facts were culled from the list of "facts and issues not in genuine dispute" provided by the parties in their Joint Pre–Trial Order.

3. Also named as defendants are D & S Career Service, Inc., doing business as America's

TempCorps, and Patricia L. Daum, doing business as America's TempCorps, ("ATC defendants"). The plaintiffs were unable to locate and serve the ATC defendants.

4. The plaintiffs may be conveniently separated into two groups, based on when, how, and by whom they were recruited.

ployee of the Texas Workforce Commission, in Eagle Pass, Texas. Most of the 1997 plaintiffs traveled to Ohio by bus and were, upon their respective arrivals in Ohio, without their own vehicles. This second group of plaintiffs was comprised of Gustavo Caballero, Estela Carreon, Carlos Gonzalez, Jose A. Guevara, Juan A. Jimenez, Yolanda Leura (representing the estate of her deceased son, Daniel Leura), Aurora Navarro, Carlos Reyna, Tomas Solis, Israel Trevino, and Urbana Zavala.

Most of the twenty-seven plaintiffs [5] worked for some period of time at the Case Farms plant.[6] Whether recruited by ATC, Cilona, or Garcia, all plaintiffs who worked at Case Farms' plant were supervised by Case Farms employees.

Both sets of plaintiffs generally claim that they were recruited in Texas to work at Case Farms' Winesburg facility, and that, upon arriving at Case Farms, they discovered that the actual terms and conditions of their employment, transportation, and housing in Ohio did not coincide with the promises made to them in Texas. At the trial of this case, plaintiffs testified to the inadequate housing conditions and transportation provisions they encountered upon arrival in Ohio.

Thus, the bases for this civil action are the defendants' alleged misrepresentations and mistreatment of the plaintiffs in the recruitment process in Texas, and, as well, the working and living conditions afforded them in Ohio. Plaintiffs contend that defendants violated a number of the statutory rights of employees created by the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. § 1801 et seq., and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b).[7] Plaintiffs further allege that defendants were guilty of breach of contract, fraud, and negligent misrepresentation with regard to the bases of plaintiffs' claims.

Defendant Case Farms responded to these allegations with primarily legal defenses.[8] Generally speaking, rather than refute the veracity of most of the plaintiffs'

---

5. Between the filing of the initial pleadings and the commencement of trial in this civil action, several plaintiffs dismissed their claims against the defendants. The plaintiffs listed here are those remaining at the time of trial.

6. The following times of employment for various plaintiffs were agreed to by the parties: Plaintiffs Jesus Mejia, Guadalupe Zamorano, Ricardo Zamorano, and Raul Zavala worked on Case Farms' processing line during 1996. Plaintiffs Joseph Cooper, Eloy Cantu, and Sergio Hernandez did not work at the Case Farms plant. Plaintiff Hugo Hernandez worked at Case Farms' processing plant for approximately one-and-a-half weeks between January 26, 1996, and February 6, 1996. Plaintiff Esperanza Hernandez worked at Case Farms' processing plant for approximately ten weeks, between January 26, 1996, and April 13, 1996. Plaintiff Juan Jimenez was employed by Case Farms for approximately six months, beginning in January 1997. Plaintiff Carlos Gonzalez was employed by Case Farms for approximately one month, beginning in March 1997. Plaintiff Jose Guevara was employed by Case Farms for approximately five months, between March 15, 1997, and September 20, 1997. Plaintiffs Aurora Navarro and Urbana Zavala were employed by Case Farms for approximately eight months between November 29, 1996, and July 1997. Plaintiff Carlos Reyna was employed by Case Farms for approximately one week in August 1997. Plaintiff Tomas Solis was employed by Case Farms for approximately one week in March 1997. Plaintiffs Israel Trevino and Estela Carreon were employed by Case Farms for approximately three weeks in May 1997.

7. Among the various statutory violations alleged by the plaintiffs are the utilization of an unregistered farm labor contractor, failure to provide written disclosures, violations of the terms of the working agreement, the use of false and misleading information, failure to post or to provide a statement of the terms and conditions of the housing, failure to ensure that the housing met applicable health and safety codes, failure to secure certification that the housing met the applicable health and safety codes, failure to properly insure and inspect transportation vehicles, the use of improper pay statements, "wages owed when due" violations, FLSA minimum wage violations, and FLSA overtime violations.

8. Case Farms' contention that the plaintiffs in this civil action are not "migrant or seasonal workers," and are therefore ineligible for the protections afforded by the AWPA, was rejected by this court in its disposition of the parties' summary judgment arguments.

factual claims, Case Farms' primary defense at trial was that it cannot be held legally responsible for the plaintiffs' alleged mistreatment.

## II. Trial Procedure

The necessity of individually considering the evidence pertinent to the approximately fifteen legal claims brought by each of twenty-seven plaintiffs has made for a cumbersome record (and final judgment) in this civil action. In the course of this litigation, resolution of over 400 legal claims was required.

Certain adjustments to standard trial procedure were made in this civil action to assist in expediting its disposition. By agreement of the parties and the court, only four plaintiffs (Martin Hernandez, Michelle Galvan, Carlos Gonzalez, and Israel Trevino) actually testified in person on direct examination at the trial. Fourteen of the remaining plaintiffs presented their direct testimony by means of designated deposition excerpts and affidavits, and were then made available for in-person cross-examination by Case Farms. The ten remaining plaintiffs did not testify at all on direct examination. For most of those individuals, however, parts of their deposition testimony were made a part of the record and submitted into evidence by Case Farms.[9]

Although it is acknowledged that such a procedure is less than ideal, it is also recognized that, in the interest of the efficient disposition of justice, such variations from standard routine may be necessary. However, as other courts have made manifest, it is preferable to have "live testimony, which allows [the court] to judge the sincerity and credibility of plaintiffs' claims and allows the parties to fill in the gaps other methods of proof often leave." *Bue-*

*no v. Mattner,* 633 F.Supp. 1446, 1453 (W.D.Mich.1986). As other courts have also made clear, however, the ends of justice, at times, require a combination of live and written testimony. *See Beliz v. W.H. McLeod & Sons Packing Co.,* 765 F.2d 1317, 1331 (5th Cir.1985); *Castillo v. Givens,* 704 F.2d 181, 195 (5th Cir.1983); *Donovan v. Kaszycki & Sons Contractors, Inc.,* 599 F.Supp. 860, 868 (S.D.N.Y.1984).

## PART I:

## AN OVERVIEW OF THE LAW

The Migrant and Seasonal Agricultural Worker Protection Act ("AWPA") is a broad-ranging network of migrant and seasonal worker protections that requires, in part, written and forthright disclosures, in the workers' language, of working conditions at the time of recruitment. It prohibits false and misleading representations concerning employment policies and practices, housing conditions, and transportation arrangements for workers. It also regulates housing and transportation standards for covered workers. 29 U.S.C. § 1801, *et seq.*

The AWPA was enacted in 1983 to replace Congress' previous attempt (with the Farm Labor Contract Registration Act of 1963 ("FLCRA")) "to protect agricultural workers whose employment had been historically characterized by low wages, long hours and poor working conditions...." H.R. REP. NO. 97–885, at 1 (1982), *reprinted* in 1982 U.S.C.C.A.N. 4547. According to Congressional records, the FLCRA "failed to reverse the historical pattern of abuse and exploitation of migrant and seasonal farm workers," 1982 U.S.C.C.A.N. 4549, and Congress reformulated its migrant and seasonal worker protections in the AWPA.[10] In the Congres-

9. The non-testifying plaintiffs included: 1996 plaintiffs Esperanza Hernandez, Hugo Hernandez, Ricard Zamorano, and Raul Zavala; and 1997 plaintiffs Estela Carreon, Yolanda Leura, A. Navarro, and Tomas Solis.

10. One of the primary areas of expansion of migrant worker protections afforded by the AWPA is that the statutory duties were ex-

panded from applying only to "farm labor contractors" (under the FLCRA), to applying to any person recruiting, employing, housing, or transporting workers, so long as such person was either a "farm labor contractor," or one of the two newly defined entities called "agricultural employers" and "agricultural associations." *See* 29 U.S.C. § 1802(1) & (2).

sional record, it is stated that, "evidence received by the committee confirms that many migrant and seasonal agricultural workers remain today, as in the past, the most abused of all workers in the United States." H.R. REP. NO. 97–885, at 2 (1982), *reprinted* in 1982 U.S.C.C.A.N. 4547.

The bulk of the plaintiffs' claims arise out of the AWPA's statutory protections. The specific statutory provisions of the AWPA that are at issue in this civil action are as follows:

1) utilization of an unregistered farm labor contractor [29 U.S.C. §§ 1842, 1802(6)],

2) failure to provide written disclosures [29 U.S.C. § 1821(a) and (g)],

3) the use of false and misleading information [29 U.S.C. §§ 1821(f) and 1854],

4) violations of the terms of the working agreement [29 U.S.C. § 1822(c)],

5) failure to ensure that the housing met applicable health and safety codes [29 U.S.C. § 1823(a), 29 C.F.R. § 1910.142 *et seq.*, 20 C.F.R. § 654.406 *et seq.*, 29 C.F.R. § 500.130 *et seq.*],

6) failure to secure certification that the housing met the applicable health and safety codes [29 U.S.C. § 1823(b)(1)],

7) failure to post or to provide a statement of the terms and conditions of housing [29 U.S.C. § 1821(c)],

8) failure to properly insure and inspect transportation vehicles [29 U.S.C. § 1841(b)(1), 29 C.F.R. §§ 500.70(c), 500.100(a)],

9) failure to ensure that each plaintiff received a proper pay statement [29 U.S.C. § 1821(d)(2)], and

10) "wages owed when due" violations [29 U.S.C. § 1822(a), 29 C.F.R. § 531.35].

In the event of violation of these provisions, the AWPA provides for statutory or actual damages, or equitable relief, at the discretion of the court. 29 U.S.C. § 1854(c).

Plaintiffs also allege violations of the minimum wage, and overtime wage, provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* The FLSA establishes a minimum wage, maximum working hours, record keeping and reporting requirements, and child labor prohibitions, as well as a system of civil and criminal penalties for its violation.

The remainder of the plaintiffs' claims, for breach of contract, fraud, and negligent misrepresentation, are based on state law.

## PART II:

## GENERAL APPLICABLE LIABILITY PRINCIPLES

The distressing and deplorable conditions allegedly encountered and endured by both groups of plaintiffs upon arriving in Ohio stand largely unrefuted. Often with little more than the $20.00 they were given for food during the three day bus ride from the Rio Grande Valley, the majority of the plaintiffs left behind their homes and families in Texas for the promise of suitable work in Ohio. Once there, many of the plaintiffs found themselves sleeping on floors in bare houses or apartments, often with a dozen or more other workers. One young woman described the frightening experience of sleeping in a unfurnished, one-bathroom house with approximately seventeen other people, mostly men. From the stand, she expressed her gratitude to several other male recruits, whom she had met just days before living with them in Ohio, for their willingness to allow her to sleep between them and the wall for protection. Another plaintiff testified that he and his sister were forced to sleep outside their apartment on concrete steps to escape the stench of the raw sewage that was seeping into their apartment. Other plaintiffs described their unremitting encounters with cockroaches and rats. With harrowing detail, plaintiffs related the discomfort and dangerousness of traveling to work in an overcrowded van that not only had only boards laid on cement blocks in lieu of seats, but which also was filled with ex-

haust fumes. For the most part, these disturbing and unsettling accounts were uncontested by Case Farms.

There can be no doubt that such living and transportation conditions were appalling, and would be, in many contexts, illegal. The plaintiffs' express challenge in this civil action, however, was to establish Case Farms' liability for such conditions. That is, before considering each of the many statutory violations alleged by the plaintiffs, an important threshold issue must be resolved. Does the law allow the plaintiffs to recover for their maltreatment from Case Farms? Can the 1996 plaintiffs, recruited and purportedly "employed" by ATC, recover from Case Farms? Can the 1997 plaintiffs, recruited either by Case Farms and/or the Texas Workforce Commission, hold Case Farms liable for the wretched conditions they endured after their arrival in Pennsylvania?

## I. Case Farms' Liability as to the 1996 Plaintiffs

### A. An Agricultural Employer's Liability Under the AWPA

#### *The Joint Employer Doctrine*

Because a basic tenet of Case Farms' defense is that its liability as to the 1996 plaintiffs' claims is limited by the intermediary role of ATC, determining liability in this civil action must begin with the oral contract between Case Farms and ATC. The oral agreement between Case Farms and ATC was not complicated: Case Farms would pay ATC for each hour of work ATC's recruits performed in Case Farms' plant. ATC's role was simply to recruit and supply workers. It is uncontested that ATC recruited, hired, and paid these plaintiffs. It is also uncontested that Case Farms did not cover the 1996 plaintiffs with a workers' compensation policy while they worked on Case Farms' processing line prior to February 1996. Based on this arrangement, by which ATC employees worked in Case Farms' processing plant, it is Case Farms' position that it cannot be held liable for any violation of the AWPA committed by ATC.

In a very real sense, the history of statutory protections for migrant workers in America is a history of Congress's evolving attempts to prevent agricultural owners and operators from shielding themselves from liability for mistreating employees. By hiring (and thereby shifting liability to) intermediary "independent contractors" to recruit and/or oversee workers, agricultural owners have, at times, sought to create a buffer between themselves and their workers. *See, e.g., Castillo v. Givens*, 704 F.2d 181, 188 (5th Cir.1983); *Charles v. Burton*, 857 F.Supp. 1574 (M.D.Ga.1994); *Haywood v. Barnes*, 109 F.R.D. 568, 585 (E.D.N.C.1986); *Marshall v. Presidio Valley Farms, Inc.*, 512 F.Supp. 1195, 1197 (W.D.Tex.1981). In the interests of justice, however, courts have frequently "pierced" this independent contractor "veil" with the invocation of the "joint employer doctrine." *See, e.g., Antenor v. D&S Farms*, 88 F.3d 925, 929–931 (11th Cir.1996); *Brennan v. Correa*, 513 F.2d 161, 163 (8th Cir.1975).

Almost three decades ago, the Fifth Circuit formalized the joint employer doctrine in *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235 (5th Cir.1973), holding, in the context of the FLSA, that "even if the [crew leaders] are independent contractors, this does not, as a matter of law, negate the possibility that [a farmer] may be a joint employer of the ... workers." *Id.* at 237. Hence, "[i]ndependent contractor status does not necessarily imply the contractor is solely responsible for his employees.... Another employer may be jointly responsible for the contractor's employees." *Id.* In making such a determination, the Fifth Circuit emphasized the importance of considering "the circumstances of the whole activity" and the "economic reality" of the situation. *Id.* Thus, as stated in another Fifth Circuit decision, the "determination of [the nature of an employment relationship] is not circumscribed by formalistic labels or common-law notions of the employment relationship, instead, our analysis must focus upon the totality of the circumstances, underscoring the economic

realities of the [workers'] employment." *Donovan v. Sabine Irrigation Co., Inc.,* 695 F.2d 190, 194 (5th Cir.1983).

Today, this potent response to agricultural employers' attempts to avoid liability for mistreatment of migrant workers has been incorporated into the AWPA (via the AWPA's incorporation of FLSA definitions). As stated in the legislative history of the Act, the Congressional purpose in enacting the AWPA was "to reverse the historical pattern of abuse and exploitation of migrant and seasonal farm workers..." which would only be accomplished by "advanc[ing] ... a completely new approach." H. REP. No. 97–885, at 6, *reprinted in* 1982 U.S.C.C.A.N. 4547. The joint employer doctrine represents precisely such a "completely new approach," as the AWPA explicitly states that two or more employees may be found liable for violating its provisions. 29 C.F.R. § 500.20(h)(5) (1998). The doctrine is a "central foundation" of the AWPA, and the "indivisible hinge between certain important duties imposed for the protection of migrant and seasonal workers and those liable for any breach of those duties." H. REP. No. 97–885, at 13, *reprinted in* 1982 U.S.C.C.A.N. 4547, 4552.

Under the AWPA regulations, "joint employment means a condition in which a single individual stands in the relation of an employee to two or more persons at the same time." 29 C.F.R. § 500.20(h)(5) (1998). It is, in fact, the Fifth Circuit's "*Griffin & Brand* factors" that are cited as guidelines for determining the existence of a joint employment relationship under the AWPA. 29 C.F.R. § 500.20(h)(5)(ii) (1998). In reference to applying the *Griffin & Brand* formulation, the regulations state:

Congress stated that this formulation should be controlling in situations "where an agricultural employer ... asserts that the agricultural workers in question are the sole employees of an independent contractor/crewleader," and that the "decision makes clear that even if a farm labor contractor is found to be a bona fide independent contractor, ... this status does not as a matter of law negate the possibility that an agricultural employer may be a joint employer ... of the harvest workers" together with the farm labor contractor. Further, regarding the joint employer doctrine and the *Griffin & Brand* formulation, Congress stated that "the absence of evidence on any of the criteria listed does not preclude a finding that an agricultural association or agricultural employer was a joint employer along with the crewleader", and that "it is expected that the special aspects of agricultural employment be kept in mind" when applying the tests and criteria set forth in the case law and legislative history.

29 C.F.R. § 500.20(h)(5)(ii) (1998). Thus, the AWPA "envisions situations where a single employee may have the necessary employment relationship with not only one employer but simultaneously such a relationship with an employer and an independent contractor." *Charles v. Burton,* 169 F.3d 1322, 1328 (11th Cir.1999) (quoting *Antenor,* 88 F.3d at 932 (quoting H.R. REP. NO. 97–885, at 7, *reprinted in* 1982 U.S.C.C.A.N. 4547, 4553)).[11] Again, under the AWPA, the specific point in issue is still the "economic reality" of the situation:

In determining whether or not an employment relationship exists between the agricultural employer/association and the agricultural worker, the ultimate

---

11. As previously stated, this statutory framework was created, in part, to address the all-too-common problem of agricultural employers evading legal liability for mistreatment of workers by the insertion of a farm labor contractor between the main employer and the worker. *E.g., Torres–Lopez v. May,* 111 F.3d 633, 639–40 (9th Cir.1997); *Antenor,* 88 F.3d at 932; *Beliz v. W.H. McLeod & Sons Packing*

Co., 765 F.2d 1317 (5th Cir.1985); *Castillo,* 704 F.2d 181; *Hodgson v. Okada,* 472 F.2d 965 (10th Cir.1973); *Hodgson v. Griffin and Brand,* 471 F.2d 235. Case Farms' arrangement with ATC has a number of the characteristics of just such an impermissible attempt to limit Case Farms liability for mistreatment of its employees.

question to be determined is the economic reality-whether the worker is so economically dependent upon the agricultural employer/association as to be considered its employee.

29 C.F.R. § 500.20(h)(5)(iii) (1998).

### Case Farms and ATC as Joint Employers

■ As is made clear from these regulations and legislative history, Congress established the structure of its migrant worker protections through the AWPA's definitions. It is agreed, for the purposes of this civil action, that Case Farms was an "agricultural employer" under the AWPA.[12] It is further agreed that ATC was a "farm labor contractor" under the statute's definitions.[13] Again, these terms are each given broad definition.[14]

In spite of Case Farms' somewhat unique arrangement, in which it never actually passed money to the "ATC employees," the economic reality of the facts at hand clearly reveals Case Farms and ATC to be "joint employers" of the "ATC employees." Case Farms has apparently stipulated to this designation. Def. Resp. to Pl. Post–Trial Brf., at 14. Among the factors that make this fact abundantly clear are: (1) Case Farms exercised a high degree of control over the 1996 plaintiffs; (2) the plaintiffs performed a specialty job which was an integral part of Case Farms' overall production process; (3) Case Farms owned and controlled the property

and facilities where the 1996 plaintiffs' work took place; (4) Case Farms had the ability to determine the wage rates or the method of payment of the 1996 plaintiffs; (5) the terms of employment of the 1996 plaintiffs did not vary in any material way when they were placed on Case Farms' payroll; (6) the 1996 plaintiffs were not part of a business organization which shifted as a unit from one workplace to another; and (7) little skill or initiative was required to perform the chicken processing work done by the plaintiffs.

The "economic reality" of the ATC/Case Farms relationship is that these workers worked in a Case Farm plant alongside Case Farms workers, were supervised by Case Farms supervisors, and produced Case Farms products. Thus, as acknowledged by Case Farms, ATC and Case Farms were "joint employers" of the 1996 plaintiffs.

### The Implications of Joint Employer Status

The critical issue before this court, therefore, is the joint employer doctrine's implications, rather than its definitions. Does the fact that Case Farms and ATC were joint employers of the 1996 plaintiffs make Case Farms liable for ATC's violations of the AWPA? While each specific legal claim of the sixteen 1996 plaintiffs will be considered below, several general conclusions about the effects of this joint

---

12. An "agricultural employer" is "any person who owns or operates a farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, and who either recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(2); see Mendoza v. Wight Vineyard Management, 783 F.2d 941, 942 (9th Cir. 1986). Case Farms clearly qualifies as an "agricultural employer" for the purposes of the AWPA.

13. A "farm labor contractor" is "any person, other than any agricultural employer, an agricultural association, or an employee of an agricultural employer or agricultural association, who, for any money or other valuable consideration paid or promised to be paid,

performs any farm labor contracting activity." 29 U.S.C. § 1802(7). A "farm labor contracting activity" is "recruiting, soliciting, hiring, employing, furnishing, or transporting any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(6); see Soliz v. Plunkett, 615 F.2d 272, 275 (5th Cir.1980); Almendárez v. Barrett–Fisher Co., 762 F.2d 1275 (5th Cir. 1985). ATC clearly qualifies as a "farm labor contractor" for the purposes of the AWPA.

14. "Inherent in this expansive interpretation is the intent of the Committee that the terms 'employee,' 'employer,' and 'independent contractor' not be construed in their limiting common law sense." H. REP. NO. 97–885, at 6, reprinted in 1982 U.S.C.C.A.N. 4547, 4552.

employer relationship can be made at this point.

Case Farms is correct that "[n]owhere in the AWPA is it stated than an agricultural employer is automatically liable for every violation committed by a farm labor contractor." Def. Post–Trial Brf., at 3. The AWPA does distinguish between areas in which an agricultural employer can be found automatically liable for a farm labor contractor's action, and those instances in which it cannot. *See, e.g.*, 29 C.F.R. § 500.70(b), (c) & (d) (1998).

These regulations do not, however, as Case Farms seems to imply, *preclude* an agricultural employer's liability for housing or transportation arranged or provided by a farm labor contractor. On the contrary, these regulations put agricultural employers on notice that they may, in some instances, be held liable for farm labor contractors' violations of the AWPA. The AWPA holds an agricultural employer automatically liable for the violations committed by a farm labor contractor in relation to wage issues, and the AWPA *may*, in certain instances, hold an agricultural employer liable for housing and transportation violations committed by a farm labor contractor. *See Howard v. Malcolm*, 852 F.2d 101, 106 (4th Cir.1988); *Rodriguez v. Carlson*, 943 F.Supp. 1263, 1267–1268 (E.D.Wash.1996). For example, as to housing related protections, the regulations provide that "[a]ny agricultural employer...which has a farm labor contractor operate housing which it owns or controls is responsible, as well as the farm labor contractor, for insuring compli-

ance with the housing safety and health provisions of these regulations."[15] 29 C.F.R. § 500.70(d) (1998). *See, e.g. Hernandez v. Ruiz*, 812 F.Supp. 734, 735 (S.D.Tex.1993) (holding an agricultural employer liable for housing violations under the AWPA); *Adams Fruit Co., Inc., v. Barrett*, 494 U.S. 638, 644, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990) (holding an agricultural employer liable for transportation violations under the AWPA).

Thus, although Case Farms has acknowledged its status as a "joint employer" of the 1996 plaintiffs, that stipulation by no means resolves all of the legal claims in this civil action. Regarding certain wage-related provisions of the AWPA, Case Farms' "joint employer" status may indeed invoke automatic liability for ATC's alleged illegal actions. For other of the plaintiffs' claims, however, a "joint employer" may or may not be held liable for the actions of a farm labor contractor. Case Farms' liability for the several alleged violations of the AWPA by ATC, therefore, will depend both on the objective truth of plaintiffs' claims that ATC violated the AWPA, and the standards set forth by the specific federal regulation at issue. Consequently, each of the plaintiffs' claims will be considered individually.

■ Before doing so, however, it is necessary to address another, independent but overlapping, theory of Case Farms' liability for ATC's actions. Case Farms, somewhat hyperbolically, argues that the AWPA prohibits the plaintiffs from recovering "against Case Farms for non-wage

---

**15.** A similar example supporting the proposition that AWPA's regulations are designed to give agricultural employers notice of their potential liability can be found in the regulations regarding transportation safety, which provide, in part:

these regulations do not impose responsibility on an agricultural employer or agricultural association for a farm labor contractor's failure to adhere to the safety provisions provided in these regulations when the farm labor contractor is providing the vehicles and directing their use. *However, when an agricultural employer or*

*agricultural association specifically directs or requests a farm labor contractor to use the contractor's vehicle to carry out a task for the agricultural employer or agricultural association, such direction constitutes causing the vehicle to be used and the agricultural employer or agricultural association is jointly responsible with the farm labor contractor* for assuring that the vehicle meets the insurance, and safety and health provisions of these regulations.

29 C.F.R. § 500.70(c) (1998) (emphasis added).

related AWPA violations unless they prove that Case Farms itself committed the alleged violations." Def. Post Tr. Brf. at 5. Such a statement overlooks the very foundation, under the common law, for the joint employment doctrine. Under common law agency rules, the actions of an agent may, in certain circumstances, be said to have been committed by the agent's principal.

### B. An Agricultural Employer's Liability Under Common Law Agency Principles

■ The fact that Congress has created a statutory framework of protections for migrant workers in no way exempts agricultural employers, recruiters, and overseers from common law agency principles. *Montelongo v. Meese*, 803 F.2d 1341, 1349 (5th Cir.1986) (agency principles apply fully under the FLCRA, the predecessor to the AWPA); *Escobar v. Baker*, 814 F.Supp. 1491, 1503–04 (W.D.Wash.1993), citing *Bueno v. Mattner*, 829 F.2d 1380, 1384 (6th Cir.1987). Rather, the protections afforded by the AWPA are designed to supplement traditional common law principles. H.R. REP. NO. 97–885, at 7, *reprinted in* 1982 U.S.C.C.A.N. at 4560. Thus, one theory under which the plaintiffs could prove that Case Farms itself committed the alleged violations would be to demonstrate that the ATC defendants' misdeeds were committed by ATC within the scope of its role as an agent of Case Farms.

### ATC's Agency

Plaintiffs' supplementary theory of Case Farms liability is, therefore, based on traditional, pre-AWPA common law tenets of agency. Plaintiffs argue that an agency relationship existed between ATC and Case Farms, and that the scope of that relationship included both the *express authority* to recruit and hire people to work at Case Farms' plant, and the *implied authority* to do all things proper, usual, and necessary to exercise that authority. Case Farms responds that to the extent any agency relationship existed between ATC and Case Farms, the scope of that agency was limited solely to informing recruits about the availability of work in Ohio at Case Farms' processing plant.

■ The fundamental precepts of the law of agency are well settled. At common law, a principal may be held liable for the acts of its purported agent based on an actual agency relationship created by the principal's express or implied delegation of authority to the agent. *Wells Fargo Business v. Ben Kozloff, Inc.*, 695 F.2d 940, 944–45 (5th Cir.1983); *Esso Intern., Inc. v. S.S. Captain John*, 443 F.2d 1144, 1146 (5th Cir.1971). Both forms of agency are at issue here. *Express actual authority* exists "where the principal has made it clear to the agent that he [or she] wants the act under scrutiny to be done." *Pasant v. Jackson Nat'l Life Ins. Co.*, 52 F.3d 94, 97 (5th Cir.1995). Further, giving an agent express authority to undertake a certain act also includes the *implied authority* to do all things proper, usual, and necessary to exercise that express authority. *Sheet Metal Workers Local Union 54 v. E.F. Etie Sheet Metal Co.*, 1 F.3d 1464, 1471 (5th Cir.1993); *Mechanical Wholesale, Inc. v. Universal–Rundle Corp.*, 432 F.2d 228, 230–31 (5th Cir.1970) ("An agent has apparent or implied authority to do those things which are usual and proper to conduct business which he is employed to conduct.")

■ Applying these principles, the plaintiffs assert that the scope of the agency relationship between Case Farms and ATC expressly authorized ATC to recruit and hire people to work at Case Farms' Ohio plant. Such a contention is certainly well-supported by the evidence. Former Case Farms' Director of Corporate Development, Andy Cilona, among others, testified that "the arrangement with ATC was for it to hire workers for Case Farms' production." Cilona Examination Tr. at 27–28; see Trial Tr. at 579, 598. Based on Case Farms' explicit agreement with ATC, it is found, by a preponderance of the evidence, that such an express agency relationship, the scope of which included re-

cruiting and hiring migrant workers to perform jobs at Case Farms' plant, did exist between Case Farms and ATC.

■ A principal is liable for the actions of an agent only if those actions are taken in the scope of the agent's employment. *See, Entente Mineral Co., v. Parker*, 956 F.2d 524, 526 (5th Cir.1992); see also RESTATEMENT (SECOND) OF AGENCY § 228 (1958). While Case Farms acknowledges that ATC was expressly authorized to recruit and hire workers for its plant, the chicken processing company maintains that the *scope* of that relationship was extremely narrow, and that the vagueness of the plaintiffs' claim that ATC was Case Farms' agent glosses over the exact nature of the relationship between ATC and Case Farms.[16] The plaintiffs, on the other hand, argue that the scope of ATC's express authority to recruit and hire people to work at Case Farms' plant included the implied authority to do all things proper, usual, and necessary to exercise that authority. *See, Wells Fargo Business Credit v. Ben Kozloff, Inc.*, 695 F.2d 940, 945 (5th Cir.1983).

A preponderance of the evidence supports the plaintiffs' contention. Credible evidence, adduced at trial, reveals that housing and transportation issues were well within the class of activities proper, usual, and necessary to recruit and hire workers for Case Farms' Ohio processing plant. It is uncontested that the combination of its high turnover rate,[17] and relative isolation from metropolitan areas,[18] complicates Case Farms' recruitment process. For Case Farms, recruitment was, at all relevant times, an on-going, virtually nation-wide undertaking. The very fact that this Ohio chicken processing plant was recruiting workers in Florida and Texas attests to the difficulties it faces finding workers. Furthermore, once the workers arrived in Ohio, it was difficult for workers to find housing on their own because of language barriers, lack of personal transportation, and their unfamiliarity with the area. So, it was essential to the success of Case Farms' hiring practices to assist out-of-state workers with housing. Cilona Examination Tr. at 15–18, 21–22. Case Farms, before any relationship with ATC, actually did assist incoming workers with housing and transportation in Ohio. Cilona Ex. Tr. at 28. Furthermore, it was clear from the evidence adduced at trial that Case Farms meant for ATC to perform these duties. Trial Tr. at 598; Cilona Ex. Tr. at 28. Thus, it is found that Case Farms knew that these duties were proper, usual, and necessary in order to recruit and retain a workforce primarily migrating from out-of-state.

Case Farms points out, and places much weight on the fact, that its representatives Cilona and Kohli both testified that ATC was not authorized to hire workers and make them full fledged "Case Farms" employees. Def. Resp. to Pl. Post–Trial Brf. at 3. Rather, under the arrangement with ATC, the workers would supposedly remain "ATC employees," despite the fact that they worked in the Case Farms plant, doing the same work, at the same rate of pay, under the supervision of the same supervisors, as Case Farms workers.

Whether or not a plaintiff would become a "full-fledged" Case Farms employee, however, cannot be dispositive of the agency issue at hand. At issue in this civil action is precisely the question of whether superficial differences (such as which com-

**16.** This court again notes with some astonishment that the entire relationship between Case Farms and ATC was oral. No written contract or record of this agreement exists. Such an agreement, of course, would have been invaluable in the resolution of these issues.

**17.** Pursuant to a Stipulated Protective Order provided to this court on December 21, 1998, exhibits and affidavits containing turn-over rates have been filed under seal as summary judgment Exhibits 36–38.

**18.** Among the factors presented as contributing to the high turnover rates at the Ohio plant are its location 30 to 40 miles from Canton, Ohio (where the closest practical housing is located), Cilona Dep., at 93–95, and its isolation in the midst of several Amish and Mennonite communities, Kohli Dep., at 112–113.

pany's name appeared on a plaintiff's pay stub) somehow immunize the company that owns and operates the plant from liability. Given the fact that housing and transportation were necessary components of Case Farms' recruitment process, ATC's actions in those arenas were within the scope of its relationship as an agent of Case Farms.

■ For the foregoing reasons, it is found that the ATC defendants were clearly acting as Case Farms' agent in all of their actions relating to the recruitment and hiring of workers for Case Farms' chicken processing plant in Winesburg, Ohio. And, under the AWPA, recruitment by an agricultural employer includes recruitment through an agent. H.R. RPT. No. 97–885, at 14, *reprinted in* 1982 U.S.C.C.A.N. 4560; *Bueno,* 829 F.2d 1380; *Montelongo,* 803 F.2d 1341. Hence, ATC's interactions with the 1996 plaintiffs may be attributed to Case Farms for the purpose of assessing compliance with AWPA.

### Hernandez's Agency

■ Another threshold issue, that should be resolved before the individual legal claims are considered, is whether Case Farms may be held responsible for the actions of Alvaro Hernandez. The evidence shows that Case Farms' own employee, Alvaro Hernandez, who also apparently worked for ATC, had express and implied authority to assist ATC workers with housing and transportation.

Alvaro Hernandez was a line leader supervisor at the Case Farms' plant.[19] ATC provided recruits with Hernandez's phone number and instructed them to call him upon their arrival in Ohio. As an example of his role at the plant, credible evidence

was presented that Alvaro Hernandez took plaintiffs Martin Hernandez and his sister, Esperanza Hernandez, to the plant on their first day of work, issued them their supplies, showed them how to punch in their time cards, and showed them where they would be working. Trial Tr. at 33–35. Alvaro Hernandez also assisted those two plaintiffs with obtaining a shift change, and with receiving their pay in cash.

Similarly, Case Farms employee Alvaro Hernandez took an active and prominent role in situating plaintiff (and "ATC employee") Michelle Galvan upon her arrival in Ohio. Galvan first spoke with a Case Farms employee named "Shelly." Trial Tr. at 115–116. When Hernandez arrived at the plant, he told Galvan that he would take Galvan and her companions to a trailer, but that it had no electricity. Trial Tr. at 117. Galvan told Hernandez that she and the others preferred to stay at the plant rather than be put in a place without heat or electricity. Trial Tr. at 117. Hernandez responded that he had another house. Trial Tr. at 119. Galvan understood from Hernandez that the housing he put her in was temporary and that he would find another house for her and the other women, but he never did. Trial Tr. at 121. Galvan also testified that she understood from Hernandez that the van in which he drove her and others to and from work belonged to Case Farms. Trial Tr. at 135, 137. Galvan complained repeatedly to several Case Farms supervisors about the housing and the rides to work.[20] Trial Tr. at 138–39. On at least one occasion, Case Farms' Human Resources Director, Andy Cilona, told her to speak to Hernandez about the problem. Trial Tr. at 139.[21]

19. Hernandez's status as a line leader supervisor was denoted by his yellow hat. Trial Tr. at 137–138.

20. Alvaro Hernandez was one of several individuals who operated their own transportation services in which they would charge workers for a ride to work. Case Farms did not own any of the vans used to transport recruits.

21. In a particularly telling anecdote, Galvan asked Hernandez to take her to the store to buy food after she had received her first paycheck, but Hernandez refused. Trial Tr. at 170. After she complained to a Case Farms supervisor, Galvan was taken by Hernandez to buy groceries. Trial Tr. at 170–171. In another incident, Galvan accompanied a coworker (who had also been recruited by ATC in Texas) to Case Farms to seek medical assistance. Trial Tr. at 167–69. Galvan spoke with several Case Farm's employees, including Ci-

These facts indicate that Alvaro Hernandez was working as an agent of Case Farms.

As it did in with respect to ATC's role, Case Farms contends that the scope of Alvaro Hernandez's role was too limited to establish his role as an agent regarding these actions. Case Farms points to Cilona's testimony that Hernandez's job duties as a Case Farms employee did not include assisting ATC's employees outside the workplace. Case Farms's contention that "Mr. Cilona's testimony that any actions taken by Mr. Hernandez with respect to ATC's employees were not authorized by Case Farms, or within the scope of Mr. Hernandez's job duties at Case Farms remains unchallenged." Def. Resp. to Pl. Post–Trial Brf. at 23. Alvaro Hernandez did assist workers in finding housing for Case Farms, however. What activities were ultimately within the scope of that agency relationship, is a question for the court, not for Cilona.

For the purposes of determining his status as an agent of Case Farms, it is necessary to examine the actual instances of instruction from his supervisors and actual actions taken by Hernandez, rather than his theoretical job description. The fact that an agent's action, directed and approved by a principal, is not included in the agent's descriptive job summary does not immunize the principal from liability. The alleged agent's actual conduct, rather than his official descriptive duties, can establish liability of a principal for its agent's actions. From his actions, it is determined that Alvaro Hernandez was, in fact, working as an agent of Case Farms, along with agent ATC.

Furthermore, Case Farms' proposition that Hernandez's daily transportation of ATC employees to and from work was performed as an ATC employee, not a Case Farms employee, begs the question of Hernandez's apparent authority to act on Case Farms' behalf.[22] Whether he was working for ATC (an agent of Case Farms) or for Case Farms, his actions can, under common law agency principles, be attributed to Case Farms.

Based on the totality of the credible evidence adduced at trial, it is determined that Alvaro Hernandez was acting under the authorization and direction of Case Farms' employees, and that the functions he carried out with respect to the 1996 plaintiffs were done in his capacity as a Case Farms employee; thus, he was, perforce, an agent of Case Farms. In those instances where Hernandez may have acted on his own behalf for ATC, he would still be an agent of Case Farms via ATC. Case Farms may, therefore, be held responsible for Hernandez's housing and transportation activities in relation to the 1996 plaintiffs.

## C. Case Farms' Liability for the Actions of ATC and Alvaro Hernandez

It is against the background of these general principles of liability that the many claims brought by the 1996 plaintiffs in this civil action will be considered. The AWPA makes clear that Case Farms, as an agricultural employer and a joint employer of the 1996 plaintiffs, may be held liable for the actions, in certain instances, of its "farm labor contractor," ATC. At the same time, ATC's actions, under common law precepts of agency, can be attributed

---

lona. Cilona reportedly instructed another worker to call the hospital and let them know that two Case Farms employees were on their way, and another Case Farms employee reportedly ordered Hernandez to take Galvan and her companion to the hospital. Hernandez reportedly informed the receptionist at the hospital that he was dropping off two Case Farms' employees. Trial Tr. at 168–169.

Case Farms rebuts the implications of these incidents by asserting that Hernandez was merely doing a "decent" or "courteous" favor for the plaintiffs. The purported good will of Hernandez or Case Farms does not change the fact that Hernandez's actions may be legally said to have been the actions of Case Farms.

22. The fact that some of the 1996 plaintiffs identified Alvaro Hernandez as an employee of ATC is similarly nondispositive of the agency issue.

directly to Case Farms ·for the purpose of assessing compliance with the AWPA. The combined effect of the AWPA's statutory worker protections, and these common law principles, is that "[d]efendants cannot escape liability under the Act, by arguing that they never explicitly authorized others to perform farm labor contracting activities [*i.e.*, recruiting, housing, and transporting] on their behalf when they accepted the benefit of migrant labor brought to their farm by other workers," *Bueno,* 829 F.2d 1380, 1384, and when such activities were necessary components of ATC's agency.

## II. Case Farms' Liability as to the 1997 Plaintiffs

The 1997 plaintiffs were recruited, generally speaking, by Case Farms' employee Andy Cilona. Given the absence of an intermediary (like ATC) in the recruitment of these plaintiffs, the issues of Case Farms' potential liability for AWPA violations is much more straightforward.[23] Case Farms accepts responsibility for the actions of its agent Andy Cilona. ·The battleground for the 1997 plaintiffs, therefore, is largely factual, and will be addressed in the context of each legal claim brought by this group of plaintiffs.

## PART III:

## ALLEGED VIOLATIONS OF THE AWPA

The two sets of plaintiffs have brought three types of legal claims. The first, and most extensive, involves alleged violations of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801, *et seq.* This statute establishes wide-ranging protections and remedies for migrant and seasonal workers through its regulation of, and requirements for, agricultural employers and farm labor contractors. Plaintiffs have brought claims under ten separate provisions of the AWPA.

## I. Unregistered Farm Labor Contractors: Alleged Violations of 29 U.S.C. § 1842

### A. The Law

One of the central functions· of the AWPA is its creation and implementation of a registration system for entities that recruit workers covered under the Act. The AWPA prohibits an employer's utilization of the services of a farm labor contractor to supply any migrant or seasonal agricultural worker without first taking reasonable steps to determine that the farm labor contractor possesses a certificate of registration which is valid, and which authorizes the activity for which the contractor is utilized. 29 U.S.C. § 1842.[24] The purpose of this provision is to make the employer who uses a farm labor contractor (and not just the contractor) liable for guaranteeing the contractor's compliance with the housing and transportation safety protections of the AWPA. See *Charles,* 169 F.3d at 1328; *Howard v. Malcolm,* 852 F.2d 101 (4th Cir.·1988).

As mentioned above, Case Farms has stipulated that ATC qualifies as a "farm labor contractor" under the AWPA. It is undisputed that ATC recruited, hired, employed, and furnished the 1996 plaintiffs and other migrant workers, for work at Case Farms. Uncon. Facts ¶ 36. Furthermore, the evidence adduced at· trial reveals that Case Farms utilized ATC for

---

**23.** An exception to this proposition is the involvement of Texas Workforce Commission employee Albert Garcia. The effect of his actions on Case Farms' liability will be discussed in the context of each relevant legal claim set out hereafter.

**24.** In its entirety, 29 U.S.C. § 1842 provides: No person shall utilize the services of any farm labor contractor to supply any migrant or seasonal agricultural worker un- · less the person first takes reasonable steps to determine that the farm labor contractor possesses a certificate of registration which is valid and which authorizes the activity for which the contractor is utilized. In making that determination, the person may rely upon either possession of a certificate of registration, or confirmation of such registration by the Department of Labor. The Secretary shall maintain· a central public registry of all persons issued a certificate of registration.

the specific purposes of recruiting, soliciting, hiring, employing, and furnishing workers. These are all "farm labor contracting activities" as defined by the AWPA. 29 U.S.C. § 1802(6). Case Farms clearly provided ATC valuable consideration, in the form of $8.00 per hour of work performed by each worker, in return for its services.[25]

Case Farms also does not dispute that ATC was not registered with the United States Department of Labor ("DOL") as a farm labor contractor. Nor was ATC authorized by DOL to house or transport workers. See Trial Exh. P–47. In most instances, compliance with this threshold requirement will ensure an agricultural employer's conformity with the AWPA generally. It is clear that if Case Farms had taken any steps to verify ATC's registration or authorization to house or transport workers, this civil action would probably not have been filed. The harms allegedly suffered by the plaintiffs in this civil action stem from precisely the types of mistreatment that the AWPA's registration requirements are designed to prevent.

### B. The 1996 Plaintiffs

Case Farms concedes that it did not determine whether ATC possessed a valid

**25.** Cilona and Kohli testified that ATC was compensated, as per the oral agreement, at a rate of $8.00 per hour for every hour that an ATC worker worked in the Case Farms plant up to 40 hours in a workweek, and a rate of $12.00 per hour for every hour that an ATC worker worked in excess of 40 hours in a single workweek. Trial Tr. at 579; Cilona Examination Tr. at 56, 88.

**26.** The factual bases for this concession are presented at Tab 1 of the Plaintiffs' Amended Post–Trial Brief.

**27.** The relevant provision of the AWPA prescribes the following:

Each farm labor contractor, agricultural worker, and agricultural association which recruits any migrant agricultural worker shall ascertain and disclose in writing to each such worker who is recruited for employment the following information at the time of the worker's recruitment:

certificate of registration.[26] Plaintiffs Eloy Cantu, Gerardo Castillo, Edna Mae Chong, Efrain Leal, Rafael Gonzalez, Sergio Hernandez, Jose Estrada, Martin Hernandez, Esperanza Hernandez, Joseph Cooper, Hugo Hernandez, Jesus Mejia, Guadalupe Zamorano. Ricard Zamorano, Raul Zavala, and Michelle Galvan, therefore, have established a violation of 29 U.S.C. § 1821(a). These plaintiffs' entitlement to damages for these violations will be considered, *infra*, Part III, Section XI.

### C. The 1997 Plaintiffs

ATC's registration is not at issue in regards to the 1997 plaintiffs. Because none of the 1997 plaintiffs were recruited by ATC, they have no valid claim under 29 U.S.C. § 1842.

### II. Written Disclosures: Alleged Violations of 29 U.S.C. § 1821(a)

### A. The Law

As part of its overarching purpose of assuring "necessary protections for migrant and seasonal workers," 29 U.S.C. § 1801, the AWPA dictates what information each agricultural employer must ascertain, and disclose in writing, to migrant workers at the time of recruitment. 29 U.S.C. § 1821(a).[27] *Contreras v. Mt.*

(1) the place of employment;
(2) the wage rates to be paid;
(3) the crops and kinds of activities on which the worker may be employed;
(4) the period of employment;
(5) the transportation, housing, and any other employee benefits to be provided, if any, and any costs to be charged for each of them;
(6) the existence of any strike or other concerted work stoppage, slowdown, or interruption of operations by employees at the place of employment;
(7) the existence of any arrangements with any owner or agent of any establishment in the area of employment under which the farm labor contractor, the agricultural employer, or the agricultural association is to receive a commission or any other benefit resulting from any sales by such establishment to the workers; and
(8) whether state workers' compensation insurance is provided, and, if so, the

*Adams Orchard Corp.*, 744 F.Supp. 1007 (E.D.Wash.1990); *Rodriguez v. Jackson*, 1988 WL 150697, 110 Lab. Cas. (CCH) ¶ 35,137 (D.Ariz.1988); *Escobar*, 814 F.Supp. at 1503. The AWPA also demands that such written disclosures be provided in a language commonly understood by the migrant agricultural workers. 29 U.S.C. § 1821(g). In this civil action, many of the plaintiff migrant workers speak only Spanish.

Although the particular shortcomings of Case Farms' disclosures to each particular plaintiff, if any, must be culled independently from the evidence before this court, the plaintiffs allege, generally, that Case Farms, at times through its agent ATC, failed to comply with this provision of the AWPA by neglecting to provide the plaintiffs with various legally-mandated written disclosures. Case Farms' response to this allegation is, first, that many of the plaintiffs did not establish that they failed to receive written disclosures, and, second, that such disclosures were, in this instance, as to the 1996 plaintiffs, the responsibility of ATC, not of Case Farms.

## B. The 1996 Plaintiffs

■■■■ Case Farms contends that even if the 1996 plaintiffs had produced evidence that they did not receive the required written disclosures, Case Farms would not be liable under the AWPA, because 29 U.S.C. § 1821(a) refers only to entities that "recruit" workers (such as ATC), not to all entities that employ those workers (such as Case Farms). Such an argument fails, however, for two reasons. First, as has already been detailed, in its recruitment

and hiring of the plaintiffs in this civil action, ATC was acting within the scope of its duties as an agent of Case Farms. In effect, this agency relationship erases the superficial, if not wholly artificial, delineation between Case Farms and ATC that is repeatedly urged by the defendant.[28]

Second, although the term "recruit" is not defined by the AWPA,[29] its meaning was clearly meant to be expansive. The meaning of the term "recruits," according to the AWPA's legislative history, "runs the spectrum from the actual pre-employment discussions between the recruiter and the migrant worker to the filing of job orders with the interstate recruitment system established by the Wagner–Peyser Act." H.R. REP. No. 97–885 at 13, *reprinted in* 1982 U.S.C.C.A.N. at 4559. "Recruit," simply and directly stated, means "to hire or otherwise obtain or secure the services of ... and include[s] all pre-employment discussions that relate to a worker's employment." *Contreras*, 744 F.Supp. 1007. "Recruit" also includes indirect recruitment in the form of word-of mouth recruitment through other workers. *Flores v. Rios*, 36 F.3d 507, 514–15 (6th Cir.1994); *Rodriguez v. Jackson*, 1988 WL 150697, 110 Lab. Cas. (CCH) ¶ 35, 137 (D.Ariz.1988). The AWPA intended agricultural employers to be liable for acts of recruiting when using a third party or intermediary, since recruitment by an agricultural employer also includes recruitment by an agent. 1982 U.S.C.C.A.N. at 4560; *Montelongo*, 803 F.2d 1341; *Soliz*, 615 F.2d at 276.

name of the state workers' compensation insurance carrier, the name of the policyholder of such insurance, the name and the telephone number of each person who must be notified of an injury or death, and the time period in which such notice must be given.

29 U.S.C. § 1821(a).

**28.** The fact that common law principles of agency require this court to conflate the roles of ATC and Case Farms in the recruitment and employment of the plaintiffs in this civil

action makes moot Case Farms' several arguments pointing out the AWPA's differing requirements of agricultural employers and farm labor contractors.

**29.** As the AWPA itself does not define the term "recruit," the term should be given its ordinary meaning. In the unabridged edition of Webster's New International Dictionary, the word "recruit" is defined as "to hire or otherwise obtain to perform services." *Soliz v. Plunkett*, 615 F.2d 272, 276 (5th Cir.1980).

Under even a relatively narrow definition of "recruit," ATC was involved in the recruitment of workers under 29 U.S.C. § 1821(a). ATC caused radio advertisements to be broadcast inviting interested individuals to information sessions at a hotel. ATC explained the job opportunities to the 1996 plaintiffs, and, in many instances, put them on a bus to Ohio. It is beyond contention that ATC recruited the 1996 plaintiffs.

Thus, based on the fact that ATC's actions to recruit and hire workers are, under the common law, attributable to Case Farms, it is determined that, as a matter of law, Case Farms "recruited" the 1996 Plaintiffs. "The duty [to provide written disclosures], while contingent on the activity of the recruitment, is not exclusive to one entity in the chain between the agricultural worker and the ultimate employer, although each entity need not independently provide such information." 1982 U.S.C.C.A.N. at 4560. Case Farms can, therefore, be held liable for violation of 29 U.S.C. § 1821(a), if a plaintiff meets his or her burden of proof.

Case Farms also contends that the plaintiffs have not, as a factual matter, met their burdens of proof, alleging that only two of the 1996 Plaintiffs, Rafael Gonzalez and Joseph Cooper, "testified that they were not provided with a written disclosure form by ATC in Texas." Def. Post–Tr. Brf. at 12. This statement, by itself, is misleading. Although not all of the 1996 plaintiffs testified that they did not receive the required disclosures, many of them did testify that the documents they were given were limited to a pamphlet showing a map and phone number. A document substantially similar, if not replicating, this pamphlet was admitted into evidence as Plaintiff's Exhibit 1.[30] Uncontroverted evidence that a plaintiff received *only* a non-compli-

ant document easily meets the plaintiff's burden of showing, by a preponderance of the evidence, that he or she did not receive the mandated information.

Hence, the following findings of fact and conclusions of law are warranted:

**Eloy Cantu.** Plaintiff Cantu, via his depositions, testified that the only papers he received when he was recruited was a paper with a Florida telephone number on it. Cantu Dep. at 10–11. Case Farms presented no evidence to the contrary. It is found, therefore, by a preponderance of the evidence, that Case Farms failed to provide Cantu with the written disclosures required by AWPA, under 29 U.S.C. § 1821(a).

**Gerardo Castillo and Efrain Leal.** When they were recruited, plaintiffs Castillo and Leal were provided only a document that was very similar to Plaintiff's Exhibit 1 mentioned above. Castillo Dep. at 26. It is found, therefore, by a preponderance of the evidence, that Case Farms failed to provide Castillo and Leal with the written disclosures required by the AWPA, as provided by 29 U.S.C. § 1821(a).

**Edna Mae Chong (representing the estate of Josephine Tijerina) and Michelle Galvan.** Plaintiff Galvan provided uncontested testimony that the only written document she and Tijerina received at the time they were recruited to work for Case Farms was a document similar to Plaintiff's Exhibit 1. Trial Tr. at 111. It is found by a preponderance of the evidence, that Case Farms failed to provide Tijerina and Galvan with the written disclosures required by AWPA, under 29 U.S.C. § 1821(a).

**Rafael Gonzalez.** This plaintiff testified by deposition that when he was recruited to work in Ohio, he did not

---

30. This one-page, one-column document is titled "Holmes County: Home of the Amish," and would be more appropriately described as an advertising flyer for chicken buyers than a work-available announcement. It describes Case Farms' chickens as having "been raised the old-fashioned way with tender loving care in Ohio's Amish country," and provides a map, centered around Millersburg, Ohio, showing routes to Winesburg, Ohio. On the copies entered into evidence, the 800–number printed on the flyer is crossed out and two 800 numbers in Florida, and another number for "Alvaro" are written in.

receive any papers. R. Gonzalez Dep. at 11, 16–17. Defendant Case Farms did not contest this testimony. It is found by a preponderance of the evidence that Case Farms failed to provide Gonzalez with the written disclosures required by AWPA, under 29 U.S.C. § 1821(a).

**Sergio Hernandez.** Plaintiff Hernandez testified that he received only one piece of paper when he was recruited in McAllen, Texas, to work for Case Farms. S. Hernandez Dep. at 12–13. Although this plaintiff's testimony is lacking in detail, the plaintiff asks this court to infer that this paper was similar to Plaintiff's Exhibit 1. Case Farms argues that such an inference would be "rank speculation," and that if this plaintiff had not received the required disclosures, he could have included that in his testimony. In the context of the whole of the many plaintiffs' evidence before the court, it is certainly more likely than not that this one page document was the same one-page, non-compliant flyer that each of the other plaintiffs received. The fact that the merit of each plaintiff's individual claims must be considered separately does not mean that each plaintiff's testimony must be viewed in isolation. It is found by a preponderance of the evidence, that Case Farms failed to provide Hernandez with the written disclosures required by 29 U.S.C. § 1821.

**Jose Estrada.** This plaintiff testified by deposition that when he was recruited to work in Ohio, he did not receive any papers. There was no evidence to the contrary. Estrada Dep. at 11. It is found by a preponderance of the evidence, that Case Farms failed to provide Estrada with the written disclosures required by AWPA, 29 U.S.C. § 1821(a).

**Martin Hernandez and Esperanza Hernandez.** Plaintiff Hernandez testified as to his experience, and that of his sister, Esperanza Hernandez. He testified that the only document he received when he was recruited was that represented by Plaintiff's Exhibit 1. Trial Tr. at 18–19. It is found by a preponderance of the evidence, that Case Farms failed to provide Martin Hernandez and Esperanza Hernandez with the written disclosures required by 29 U.S.C. § 1821(a).

**Joseph Cooper.** Plaintiff Cooper also testified that he received only a document like the "Amish Country" flyer entered as Plaintiff's Exhibit 1. Case Farms did not contest this testimony. It is found by a preponderance of the evidence, that Case Farms failed to provide Cooper with the written disclosures required by AWPA.

**Guadalupe Zamorano, Ricardo Zamorano, Hugo Hernandez, and Raul Zavala.** Plaintiff Guadalupe Zamorano testified that the only document he received was a map with Alvaro's name on it, and that he was not provided with any written information about work. G. Zamorano Aff. ¶ 2; G. Zamorano Dep. at 23. Guadalupe Zamorano also testified that he, Hugo Hernandez, Ricardo Zamorano, and Raul Zavala were recruited together, and that the only documentation they received was that which is represented by Plaintiff's Exhibit 1. Defendant's claim that Guadalupe Zamorano's testimony is unclear as to who was in the room is found to be without merit. Ricard Zamorano clearly used the phrase "all of us" to refer to this group of plaintiffs. R. Zamorano at 23. The combination of the testimony of witnesses and circumstantial evidence illustrates to the court's satisfaction that these plaintiffs received the same, non-AWPA-compliant flyer. It is found by a preponderance of the evidence, that Case Farms failed to provide Guadalupe Zamorano, Ricard Zamorano, Hernandez and Zavala and with the written disclosures required by AWPA, under 29 U.S.C. § 1821(a).

**Jesus Mejia.** Case Farms did not dispute Mejia's testimony that when he was recruited in McAllen, Texas, to work in Ohio, he was not shown or given any written documents. It is found by a preponderance of the evidence, that

Case Farms failed to provide Mejia with the written disclosures required by AWPA under 29 U.S.C. § 1821(a).

## C. The 1997 Plaintiffs

The 1997 plaintiffs' claims that Case Farms violated 29 U.S.C. § 1821(a) are complicated by the fact that not all of this group were recruited in the same manner.[31] Case Farms has presented general defenses to the 1997 plaintiffs' allegations regarding 29 U.S.C. § 1821(a) by grouping the plaintiffs according to how they were recruited.

For example, two plaintiffs, Aurora Navarro and Urbana Zavala, went directly to Case Farms from another workplace in Ohio. A. Navarro Dep. at 15–16; U. Zavala Dep. at 36–38. Case Farms maintains that these plaintiffs were not recruited, "in any sense of the word, by anybody," and that they "both admittedly never spoke to neither Cilona nor Garcia regarding work at Case Farms." Def. Post–Trial Brf. at 15. This proposition is not, however, supported by the evidence. Both of these plaintiffs did speak to Cilona prior to their employment with Case Farms. Zavala Aff. ¶ 3.

Furthermore, as has been discussed previously, the legislative history of the AWPA indicates that recruitment covers a broad range of times and activities. Recruitment can certainly occur *en route* to another job. See 1982 U.S.C.C.A.N. at 4560. According to the uncontested testimony of Urbana Zavala, she and Aurora Navarro were told by Cilona about housing and transportation arrangements at Case Farms while in the car with Cilona after

he picked them up in Chillicothe, Ohio. Zavala Aff. ¶ 3.

■■■ Case Farms correctly contends, however, that the evidence indicates that both Aurora Navarro and Urbana Zavala "had made the decision to become employed at Case Farms without ever having met either Mr. Garcia or Mr. Cilona." Def. Post–Trial Brf. at 15. The question before this court, therefore, is whether the AWPA disclosure requirements apply when the worker decides, independently of any action on the part of the agricultural employer, on his or her own to come work for that employer.

In light of the intended broad definition of "recruit" under the AWPA discussed earlier,[32] "recruit" should not be limited to a meaning that includes *changing a worker's mind.* Rather, "to recruit" should be given its dictionary meaning of "to secure the services of...." *Webster's New Collegiate Dictionary* 959 (1979). Similar to the facts in *Bueno*, both Aurora Navarro and Urbana Zavala personally talked to Cilona before their services were secured, and, therefore, Case Farms was "required to disclose the information listed in section 1821(a)." *Bueno*, 633 F.Supp. at 1466.

As provided for by the AWPA, a "potential employee needs information concerning the terms and conditions of employment to make an informed judgment concerning the desirability of the employment opportunity." *Id.* Plaintiffs Aurora Navarro and Urbana Zavala were, therefore, recruited for the purposes of the AWPA.[33] The following findings are warranted:

**31.** Plaintiffs G. Cabellero, Carlos Gonzalez, Jose Guevara, Daniel Leura, Tomas Solis and former plaintiff Cruz Martinez were recruited by then-Case Farms employee Andy Cilona in Eagle Pass, Texas. Plaintiffs Estela Carreon, Juan Jimenez, Carlos Reyna, and Israel Trevino learned of Case Farms through Alberto Garcia, of the Texas Workforce Commission. Two others, A. Navarro and Urbana Zavala went directly to Case Farms from another workplace in Ohio.

**32.** Once again, the Act's legislative history indicates that the term "recruits" encompass-

es activities that run "the spectrum from the actual pre-employment discussions between the recruiter and the migrant worker to the filing of job orders with the interstate recruitment system...." H.R.REP. No. 97–885 at 13, *reprinted in* 1982 U.S.C.C.A.N.. at 4559. *Bueno*, 633 F.Supp. at 1464–65.

**33.** This determination does not, of course, guarantee the success of these plaintiffs' claims that Case Farms violated 29 U.S.C. § 1821(a). Whether or not these plaintiffs met that burden will be considered below.

**Urbana Zavala and Aurora Navarro.** Plaintiff Zavala described the experiences of both herself and Navarro. According to Zavala these two plaintiffs were referred to Case Farms by Alberto Garcia in a telephone conversation. After speaking with Garcia, Case Farms employee Cilona met both Zavala and Navarro at a pork processing plant and took them to Winesburg. Neither of these plaintiffs received written disclosures regarding the work they would do at Case Farms. It is found by a preponderance of the evidence that Case Farms violated 29 U.S.C. § 1821(a) of the AWPA by failing to provide Zavala and Navarro with the mandated written disclosures.

 As a second general defense, Case Farms argues that the several plaintiffs that learned of Case Farms' employment opportunities through the Texas Workforce Commission cannot bring AWPA claims against Case Farms "for the failure of the Texas Workforce Commission to provide the required written disclosures." Def. Post–Trial Brf. at 16. In particular, Case Farms maintains:

> The Texas Workforce Commission is not a farm labor contractor, and Case Farms is unaware of any cases in which an employer has been held liable for the acts or failures to act of a sovereign state government. Neither Case Farms nor any other employer can control the actions of agencies of sovereign state governments. Permitting workers to hold an employer liable because a state unemployment commission failed to comply with the requirements of a federal statute would discourage employers from using such commissions because they could be subject to liability due to factors completely beyond their control.

In their post-trial briefs to this court, the plaintiffs do not address this argument.[34] Giving consideration to the fact that the AWPA does not contemplate the role of government entities in the recruitment process, and also considering the strong persuasive power of the defendant's policy-based arguments in this regard, it is found that Case Farms cannot be held liable to those plaintiffs who received their recruitment/orientation from the TWC. Accordingly, the following findings are made:

**Israel Trevino and Estela Carreon.** Plaintiff Trevino testified that he and Carreon were recruited together in Eagle Pass, Texas, to work for Case Farms, and at the time of recruitment, neither of them received the required written disclosures regarding employment with Case Farms. By a preponderance of the evidence, the court finds such testimony to be factual. For the same reasons, however, no violations of the AWPA has occurred in regard to Trevino and Carreon's claims under 29 U.S.C. § 1821(a).

**Carlos Reyna.** Plaintiff Reyna's testimony that he received no documents from Garcia at the time he was recruited is uncontroverted, and accepted, by a preponderance of the evidence, as truthful. For the same reasons, however, no violation of the AWPA has occurred in regard to Reyna's claim under 29 U.S.C. § 1821(a).

**Juan Jimenez.** Similarly, plaintiff Jimenez was recruited by Garcia at TWC and received no written disclosures. For the same reasons, however, no violation of the AWPA has occurred in regard to Jimenez's claim under 29 U.S.C. § 1821(a).

The third subgroup of the 1997 plaintiffs is made up of the individuals who were recruited personally by Cilona. Whether these plaintiffs received the proper disclosure statements, or any written statements at all, is a contested issue of fact in this civil action. These several plaintiffs generally testified that they saw some papers,

---

34. Rather, plaintiffs rebut the legal significance of defendant's descriptive statement that this group of workers initiated contact with the TWC. Pl. Resp. at 8. The initiation of contact with a recruiter, according to the court's reading of Case Farms' briefs, was not the gravamen of its argument.

but were not provided with the required disclosures. Case Farms, through the testimony of Cilona, argues that these plaintiffs did, in fact, receive written disclosure statements. According to Cilona, he provided the Employee Information Sheet[35] to all employees he recruited after, at the latest, November 1, 1996. Plaintiff Cruz Martinez confirmed Cilona's testimony. Hence, this court is faced with weighing the testimony of the several plaintiffs against that of Cilona and Martinez. And, although there is insufficient evidence to conclude definitively that these plaintiffs did in fact receive the required disclosures, it is found that these plaintiffs have generally failed to meet their burden of proving by a preponderance of the evidence that they *did not* receive such disclosures.[36]

**Gustavo Caballero.** Plaintiff Caballero did recall signing some papers at the TWC, but denies that any such papers provided information about the job at Case Farms. In light of the evidence contradicting this testimony, it is found that Caballero has failed to meet his burden of showing, by a preponderance of the evidence, a violation of 29 U.S.C. § 1821(a), except as to item (8) of that provision, as conceded by Case Farms.

**Carlos Gonzalez.** Plaintiff Gonzalez testified that he did not recognize the "Employee Information Sheets" presented into evidence at trial. He also denied having received them and stated that he would have recognized such documents had he seen them before. Gonzalez did recall seeing a document listing various departments at Case Farms and their hourly rates of compensation. In light of the evidence contradicting this testimony, however, it is found that Gon-

zalez has failed to meet his burden of showing, by a preponderance of the evidence, a violation of 29 U.S.C. § 1821(a), except as to item (8) of that provision as conceded by Case Farms.

**Jose A. Guevara.** Plaintiff Guevara recalled a video orientation to Case Farms during his recruitment in Texas, but he testified that he did not receive any documents. In view of the evidence contradicting this testimony, it is found that Guevara has failed to meet his burden of showing, by a preponderance of the evidence, a violation of 29 U.S.C. § 1821(a), except as to item (8) of that provision, as conceded by Case Farms.

**Yolanda Leura (representing the estate of deceased plaintiff Daniel Leura).** Plaintiff Carlos Gonzalez lived with the Leura family at the time he was recruited to work for Case Farms, and was with plaintiff Leura when they were recruited. The evidence regarding Leura's claim that Case Farms violated 29 U.S.C. § 1821(a), therefore, is the same as that presented in reference to Gonzalez. For the same reasons, it is found that Leura's personal representative has failed to meet his burden of showing, by a preponderance of the evidence, a violation of 29 U.S.C. § 1821(a), except as to item (8) of that provision as conceded by Case Farms.

**Tomas Solis.** Similarly, plaintiff Carlos Gonzalez testified that he and Tomas Solis were recruited together at the TWC to work for Case Farms. In addition to that testimony, Solis represented in his deposition that the only papers he received were papers that listed the hourly rates paid at Case Farms.

---

**35.** The various versions of these documents were admitted into evidence as Exhibits D–77, D–95, D–96, D–97, P–36, P–37, and P–41.

**36.** Although some of the 1997 plaintiffs have failed to meet their burden of proof in regard to their 29 U.S.C. § 1821(a) claim, Case Farms concedes that the Employee Information Sheets allegedly distributed to plaintiffs G. Cabellero, Carlos Gonzalez, Jose Guevara, Daniel Leura, and Tomas Solis did not fully

comply with the requirements of 29 U.S.C. § 1821(a), in that the documents omitted item (8) relating to the disclosure of workers' compensation coverage. In light of the minor nature of this violation and the lack of any showing of harm to any of the plaintiffs by this omission, Case Farms urges this court to consider such an omission a mere technicality. Such a determination will be made in the consideration of damages, *infra.*

Again, it is found that Solis has failed to meet his burden of showing, by a preponderance of the evidence, a violation of 29 U.S.C. § 1821(a), except as to item (8) of that provision, as conceded by Case Farms.

### III. False or Misleading Information: Alleged Violations of 29 U.S.C. § 1821(f)

#### A. The Law

The plaintiffs further allege that Case Farms violated the AWPA's prohibition against agricultural employers by knowingly providing false or misleading information to migrant agricultural workers regarding the terms, conditions, or existence of agricultural employment.[37] 29 U.S.C. §§ 1821(f) and 1854. *Calderon v. Witvoet,* 999 F.2d 1101, 1109 (7th Cir.1993); *Sanchez–Calderon v. Moorhouse Farms,* 995 F.Supp. 1098 (D.Or.1997); *Smith v. Bonds,* 1993 WL 556781 (E.D.N.C.1993); *Saintida v. Tyre L.,* 783 F.Supp. 1368, 1377 (S.D.Fla.1992); *Villalobos v. Vasquez–Campbell,* 1991 WL 311902 (W.D.Tex. 1991); *Colon v. Casco, Inc.,* 716 F.Supp. 688 (D.Mass.1989). Such a prohibition is intended to protect "[a]gricultural workers, who are generally poor people, from wasting their time and resources by traveling long distances in pursuit of publicly offered employment opportunities which, as described, they would be capable of procuring and satisfactorily performing." *Bernett v. Hepburn Orchards, Inc.,* 1987 WL 16939 (D.Md.1987).

The disclosure requirements under the AWPA are expansive. Congress clearly intended that the AWPA-imposed duty "to provide truthful information shall be a duty which runs through the period beginning with recruitment and extending until the point that the records required to be maintained need no longer be maintained." H.R. REP. No. 97–885, at 16, *reprinted in* 1982 U.S.C.C.A.N. 4547; see *Barajas v. Bermudez,* 43 F.3d 1251, 1260 (9th Cir. 1994) (noting importance and duration of AWPA's disclosure requirements); *Sanchez–Calderon v. Moorhouse Farms,* 995 F.Supp. 1098 (D.Or.1997)

Unlike many other AWPA provisions, section 1821(f) calls for the "knowing" dissemination of false information. Therefore, in regard to this claim, the plaintiffs must show that the defendant, or its agents, had knowledge of the misleading nature, or falsity, of the promises made.

According to the evidence given by both sets of plaintiffs, when they were recruited, they were promised free housing and transportation in Ohio. It is noted that it is not uncommon for agricultural employers to provide transportation and housing for workers as a further inducement to work. And, for many of the plaintiffs in the instant civil action, the provision of housing and transportation was a necessary component of any job that would take them from Texas to Ohio without their families, cars, and furniture.

#### B. The 1996 Plaintiffs

The plaintiffs' theory that Case Farms had "knowledge" of misleading or false promises is based on the proposition that ATC's alleged promises of free transportation and housing were obviously false in light of ATC's slim profit margin. That is, part of the non-written agreement between Case Farms and ATC was that Case Farms would pay ATC $8.00 per hour for each hour worked in Case Farms' plant by a person recruited and hired by ATC. Trial Tr. at 579. The workers, in turn, would be paid $5.50 per hour, leaving profit to ATC of $2.50 per hour worked. In light of this small profit margin, the plaintiffs alleged that "it was unreasonable or incompetent of ATC to inform the 1996 plaintiffs that

---

**37.** In its entirety, the provision reads as follows:

(f) Prohibition on knowingly providing false or misleading information to workers. No farm labor contractor, agricultural employer, or agricultural association shall knowingly provide false or misleading information to any migrant agricultural worker concerning the terms, conditions, or existence of agricultural employment required to be disclosed by subsection (a), (b), (c), or (d).

free housing and transportation would be provided to them." This general proposition, as a matter of common sense, is uncontrovertible. And, as a matter of law, it is determined that such blatantly impossible promises do qualify as "known" falsehoods.

In many cases, the housing and transportation provided to the 1996 plaintiffs were, without question, wretched and loathsome. It goes without saying that "housing" that is dangerously overcrowded, or contaminated by raw sewage, the stench of which induces the occupants to sleep on stairs outside the apartment door, is not "housing" at all. To promise someone housing, and then have them sleep on the floor of an unfurnished room in a heatless and waterless house with a dozen other people, would only be morally reprehensible. Under the AWPA, however, when the promisor is an agricultural employer and the promisee is a migrant worker, such unconscionable treatment violates federal law.

In this regard, the following findings are made:

**Eloy Cantu, Sergio Hernandez, and Joseph Cooper.** Plaintiffs Cantu, Hernandez, and Cooper were promised a job and housing. Cantu Aff. ¶ 2; Cooper Aff. ¶¶ 3, 5, 7; Cooper Dep. at 16.. Once in Ohio, they were offered housing that had no heat, light, or furniture. Cantu Aff. ¶ 11, Cantu Dep. at 13; Cooper Aff. ¶ 11. S. Hernandez Dep. at 15. Plaintiff Cooper testified that he, Cantu, and Hernandez would have stayed and worked at Case Farms had they had suitable housing. Those three plaintiffs returned to Texas within a day of arriving in Ohio. Cantu Aff. ¶ 3. Cantu testified that he was unable to send money to his mother and felt very angry about the way he was treated. Cantu Aff. ¶ 3. These facts were virtually uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1821(f) as alleged by Cantu, Hernandez, and Cooper.

**Gerardo Castillo and Efrain Leal.** Plaintiff Castillo testified that when he was recruited by ATC for Case Farms, (along with Rafael Gonzalez and Leal), they were promised free transportation to and from the plant everyday, and free housing near the plant. Castillo Aff. ¶ 3; Castillo Dep. at 33, 45–46; Leal Aff. ¶ 2. Because he understood that the housing would be furnished, he took no furniture with him. Upon arrival in Ohio, Castillo and Leal discovered that the housing had no furniture, no heat, and no blankets. Castillo Aff., ¶ 6; Castillo Dep. at 88; Leal Aff. ¶ 3. Castillo was put in a house with 18 other people; the house had only one bathroom. Castillo Aff. ¶ 6. Castillo testified that he felt trapped and angry. Castillo Aff. at ¶ 7. Castillo was moved after approximately one week. The new location still had no furniture. It did, however, have heat. After complaining to his supervisor at Case Farms, Castillo was brought several pillows. Castillo Aff. ¶ 9. Castillo testified that he felt humiliated that he had to suffer such deplorable housing conditions and could not make enough money to send any home. Plaintiff Leal also testified to the humiliation he felt because he had to live under such conditions, and because he had to ask a local church for food to eat. Leal Aff. ¶ 5. These facts were virtually uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1821(f) as alleged by Castillo and Leal.

**Edna Mae Chong (representing the estate of Josephine Tijerina), and Michelle Galvan.** The evidence pertaining to plaintiff Tijerina's experiences with Case Farms was provided by plaintiff Galvan, who was recruited with, traveled with, and lived with Tijerina. These two plaintiffs were promised free transportation and free, furnished housing. They were promised that they would have their own apartment. Trial Tr. at 100–01. Galvan also testified that she was told by the recruiters not to bring her

car to Ohio because she would not need it. Trial Tr. at 106. According to her, these two plaintiffs traveled to Ohio based on these representations. Upon arrival, Alvaro Hernandez placed them in a one-bedroom, one-bathroom house in Ohio with eighteen people, including plaintiffs Efrain Leal, Rafael Gonzalez, Hugo Hernandez, Raul Zavala, and R. Zamarano. Trial Tr. at 120, 124–127, 131–134, 153. Photographs of this house were admitted into evidence as Plaintiff's Exhibit 3. Galvan testified that it was at times frightening for her and Tijerina to share a house with so many men who were strangers to them. Trial Tr. at 128. These two plaintiffs, along with another woman, attempted to sleep huddled together next to a wall with a male acquaintance on the outside for their protection. Trial Tr. at 121, 129. Those three women also went to the bathroom together, so that while one showered, and another used the toilet, the third could hold the door closed. Trial Tr. at 129. Galvan testified that neither she nor Tijerina could adjust to such miserable conditions, and that they constantly hoped Case Farms would find them another place to live. Trial Tr. at 130–131. Regarding transportation, Galvan testified that she and Tijerina were driven to work by Alvaro Hernandez (a Case Farms employee) or Juan Lopez in a dilapidated van that had wooden planks instead of seats. Trial Tr. at 135–137. As evidenced by Plaintiffs' Exhibit 4, money was deducted from these two plaintiffs' pay for these rides. Galvan believed that riding in the van was very dangerous, because exhaust fumes leaked in through the floor, and the view through the windshield was obscured. Trial Tr. at 139. These facts were virtually uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1821(f) as alleged by Tijerina and Galvan.

**Rafael Gonzalez.** When recruited, Gonzalez was promised free transportation and housing. Castillo Aff. ¶ 3; Cas-

tillo Dep. at 33, 45–46. The transportation was a crowded van with wooden benches, supported by cement blocks, for seats. R. Gonzalez Aff. ¶ 4–6. Gonzalez was taken to an empty house, with about 22 people. It had no heat, stove, refrigerator or beds when he arrived. R. Gonzalez Aff. ¶ 6. The bathroom had no water, so in order to flush the toilet, Gonzalez had to melt snow. R. Gonzalez Aff. ¶ 7. These facts were uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1821(f), as alleged by Gonzalez.

**Jose Guadalupe Estrada.** Plaintiff Estrada was promised housing in Ohio, and there was no mention that he would have to pay for it. Estrada Aff. ¶ 3; Estrada Dep. at 13. He was also told in Texas that transportation to and from work would be provided. Estrada Aff. ¶ 4. The housing provided to Estrada was a one bedroom house with no furniture, no stove, no refrigerator, no beds, and no heat. He shared the house with approximately 20 people. Estrada Aff. ¶¶ 8, 10. Estrada testified that he felt badly because he was unable to send money home to his family. Estrada Aff. ¶¶ 13–14. These facts were uncontested by Case Farms. It is found, therefore, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1821(f), as alleged by Estrada.

**Martin Hernandez and Esperanza Hernandez.** Plaintiff Hernandez testified on behalf of himself and his sister, Esperanza Hernandez. These two plaintiffs were recruited together, at which time they were promised housing with necessities such as beds and chairs. Trial Tr. at 20. They were also promised free transportation to and from work each day. Trial Tr. at 20. The housing furnished to these plaintiffs upon arrival in Ohio was outrageously squalid. Not only were they taken to an apartment with no heat, electricity or furniture, but water was leaking into the building through the walls. Hernan-

dez aptly described this location as a "cave." Trial Tr. at 20–22. He testified that he was reluctant to leave the place, because he and his sister do not speak English and they did not know where they were. After several days, Alvaro Hernandez came for these two plaintiffs and took them to a basement apartment owned by Georgia Lopez. Again there was no furniture, and Hernandez and his sister had to sleep on the floor. Trial Tr. at 28–29. After the sewage pipes in the building broke, raw sewage came into the basement apartment, and Hernandez and his sister had to sleep on the apartment stairs because they could not enter the apartment. Trial Tr. at 27. While they were eventually able to remove the sewage, they could not remove the odor. Trial Tr. at 27. Hernandez also testified that he and his sister were taken to work in a van that leaked exhaust into the passenger compartment, and which had wooden planks instead of seats. Trial Tr. at 53–54. Because they could not always find rides to work (although they had been promised them when recruited), Hernandez and his sister at times had to sleep in the processing plant itself. Trial Tr. at 56. Nevertheless, as evidenced by exhibit P–4, deductions for rides to work were taken from these plaintiffs' pay. Martin Hernandez testified that he and his sister are still traumatized by their experiences in Ohio. Trial Tr. at 28. These facts were virtually uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1821(f), as alleged by Martin Hernandez and Esperanza Hernandez.

**Jesus Mejia.** Plaintiff Mejia was also told at recruitment that he would have a furnished house close to the plant, and that he would receive rides to work. Mejia Aff. ¶ 2; Mejia Dep. at 22–23. Although expecting a house with necessary furnishings, he was put in a house with no furniture, and with only one bathroom for twenty people. Mejia Aff. ¶ 6. Mejia was taken to work in a van

with wooden boards on blocks instead of seats, along with more than 15 other workers. Mejia Aff. ¶ 9; Mejia Dep. at 39–41. These facts were virtually uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1821(f), as alleged by Mejia.

**Guadalupe Zamorano, Ricardo Zamorano, Hugo Hernandez, and Raul Zavala.** Plaintiff Guadalupe Zamorano was recruited with plaintiffs Ricard Zamorano, Hernandez, and Zavala. At that time, they were told that free transportation would be provided in Ohio and that rent would also be paid. G. Zamorano Aff. ¶ 4. Upon arriving in Ohio, these plaintiffs were taken to an unfurnished house that already had 10 people living in it. G. Zamorano Aff. ¶ 7. The house had no stove or refrigerator, and had water only in the bathroom. G. Zamorano Aff. ¶ 10. Plaintiff Guadalupe Zamorano testified that he had wanted to return home to Texas immediately, but that he, Zamorano, Hernandez, and Zavala did not have enough money to make the trip back. As a result, the four plaintiffs lived in the crowded house (with plaintiffs Michelle Galvan, Josephine Tijerina, Gerardo Castillo, and Efrain Leal) for two and half weeks. Guadalupe Zamorano further testified that he traveled to work in a crowded van with wooden seats and no seat belts. G. Zamorano Aff. ¶ 11,12. These facts were virtually uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1821(f) as alleged by Guadalupe Zamorano, Ricard Zamorano, Hernandez, and Zavala.

## C. The 1997 Plaintiffs

Similarly to the 1996 plaintiffs, the 1997 plaintiffs assert that the housing provided to them was grossly substandard, and that no consistent transportation was provided for them, despite the fact that they were promised suitable housing and transportation at the time they were recruited in Texas by either Andy Cilona or Alberto

Garcia. Case Farms directly rebuts the assertion that these plaintiffs were promised free housing and transportation.

The merit of each of the 1997 plaintiff's legal claims under 29 U.S.C. § 1821(f) must be determined in the context of Case Farms employee Cilona's contention that he provided an Employee Information Sheet to all of the employees whom he recruited personally. It is uncontested that those documents, if they were provided to a plaintiff, informed the plaintiffs:

1) that employees would be responsible for their own housing, but that Case Farms would advance the first month's rent and security deposit to employees and would then deduct this amount from paychecks at the rate of $25.00/month;

2) that the apartments available in the area were not furnished;

3) that Case Farms would provide assistance in helping workers find rides to work but that the responsibility for finding such rides would lie with each individual employee; and

4) that employees would have to locate and pay for their own transportation to and from work.

Exhibits D-77, D-95, D-97; C. Martinez Dep., at 37. Such information, if provided to the plaintiffs, would be exactly the types of disclosures required by the AWPA.

In regard to transportation, Cilona testified that Case Farms does not provide daily transportation for any of its workers, but that the workforce nevertheless arrives for work every day. It is noted that such testimony is irrelevant to the allegations of false promises of free transportation. Cilona also testified that he attempted to assist employees find carpool arrangements.

One arena of contention in regard to the 1997 plaintiffs' section 1821(f) claims, therefore, is whether or not the Employee Information Sheets were, in fact, provided to the workers during recruitment. Cilona's account of events was verified by at least one plaintiff, Tomas Solis, who testified that he was told he would have to pay for housing. More specifically, Tomas Solis testified that he understood that the company would advance him the first month's rent and security deposit, but that the company would then get that money back over a period of time by making payroll deductions of $25 a week.[38] T. Solis Dep. at 34.

Another area of contention in regards to the 1997 plaintiffs' section 1821(f) claims is whether Cilona knowingly made misrepresentations to the plaintiffs. It is clear that Cilona pre-arranged housing for the recruits with Lopez. Cilona Examination Tr. at 18–19. It is also apparent that, at least after the initial recruitment, Cilona knew about the overcrowding in the houses, although Cilona testified that he did not witness overcrowding himself. Cilona Examination Tr. at 87. Of course, these facts, alone, do not establish that Cilona knowingly made false or misleading promises to the plaintiffs.

Cilona also knew the apartments were unfurnished. Cilona Examination Tr. at 32, 85. There is virtually no evidence, however, that Cilona explicitly promised any plaintiff furnished apartments. It is conceivable, of course, that a promise that suitable housing would be provided could include the implication that the housing would be furnished, or would at the least have beds. Furthermore, it is manifest that Cilona had knowledge that the plaintiffs were, for the most part, traveling to Ohio without furniture on a bus.[39] Simi-

---

**38.** The testimony of Yolanda Leura (mother of deceased plaintiff Daniel Leura) indicates that TWC employee Garcia (and Case Farms employee Cilona) told at least some of the plaintiffs who were recruited at TWC that they would have to pay for their own housing and that the company would deduct $25/week from their paychecks. Y. Leura Dep., at 6–8, 10, 15, 16.

**39.** In its post-trial brief, Case Farms asserts, "[c]ertainly, Plaintiffs could not have loaded beds on a bus, but bedrolls or sleeping bags certainly would have been possible, and, since Case Farms intended that these employees

larly, Cilona knew that most plaintiffs would not have their own transportation in Ohio.[40]

Each individual plaintiff's legal claims under section 1821(f) will be considered against these background facts and contentions. The following findings are made:

**Aurora Navarro and Urbana Zavala.** These plaintiffs testified that they were initially told about Case Farms' employment opportunities not by Case Farms itself, but by an individual named Javier Rodriguez, a co-worker of theirs at a bacon-packing plant. Dep. of A. Navarro, p. 15–16; Aff. of Zavala. According to Zavala these two plaintiffs were referred to Case Farms by Alberto Garcia in a phone conversation. After speaking with Garcia, Case Farms employee Cilona picked up both Zavala and Navarro at the pork processing plant in Chillicothe and took them to Winesburg. Cilona allegedly told plaintiffs Navarro and Zavala, that Case Farms would provide them with an apartment and that rides to work would not be a problem. Zavala Aff. ¶ 3. Again, the legislative history of the AWPA indicates that the concept of recruitment covers a broad range of times and activities which might indeed occur en route. 1982 U.S.C.C.A.N. at 4560. Furthermore, Case Farms' contention that "[t]here was no evidence presented that either Navarro or Zavala had first hand knowledge of any information provided by either Garcia or Cilona" is incorrect. It is uncontested that plaintiffs Navarro and Zavala were put in an apartment without beds, with a broken toilet, and where cockroaches were endemic. Zavala Aff. ¶¶ 7–9. Both of these plaintiffs missed work because they had trouble obtaining rides to work. Zavala Aff. ¶ 11. The

testimony of Navarro and Zavala is found to be credible in all respects. Aside from the general assertion by Cilona that he provided Employee Information Sheets to all of the employees he recruited personally, Case Farms was did not contradict these two plaintiffs' testimony. These plaintiffs' testimony, however, lacks the specificity required to find that Case Farms, more likely than not, knowingly made false or misleading promises in their recruitment, in violation of 29 U.S.C. § 1841(f).

**Gustavo Caballero.** Plaintiff Caballero testified that, at the time of recruitment, he was promised both suitable housing and transportation, and that he was told that only three people would be assigned to each apartment. Caballero Aff. ¶ 2–7. The credibility of this testimony, however, is questionable, in that no other plaintiff ever claimed that similar promises had been made to them by Cilona. For example, plaintiff Cabellero testified that he was told he would be given rides to work "in buses, like school buses." Caballero Aff., ¶ 2. Plaintiff Caballero's testimony was impeached by his own deposition, where he admitted that Cilona had told him in Texas that he would have to pay for his own housing. It is clear, nonetheless, that upon arriving in Ohio, plaintiff Caballero shared an unfurnished, heatless apartment with nine other people and only one bathroom. He missed work because Case Farms consistently failed to arrange rides for him. Caballero Aff. ¶¶ 3–7. The apartment was infested with cockroaches, which would crawl over the plaintiff at night. Caballero Aff. ¶ 3. While this court is again taken aback by the squalid conditions of the housing provided to this plaintiff, Ca-

---

would stay for a long time, purchases of other household items could have been accomplished over time as the employees settled in up in Ohio." Def. Resp. to Pl. Post–Trial Brf. at 21.

**40.** The court disagrees with Case Farms that "Cilona had every incentive not to lie about

workers' ability to obtain rides to and from work." Def. Response to Pl. Post–Trial Brf. at 21 n.5. The AWPA was enacted largely in response to unscrupulous agricultural employers who would promise such provisions, only to refuse to provide them once the workers had invested the time, expense, and effort to travel great distances to the work site.

ballero has not met his burden of establishing, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1821(f) in the process of recruiting him.

**Estela Carreon and Israel Trevino.** Plaintiff Trevino testified as to the experience of himself and plaintiff Carreon. According to Trevino, these two plaintiffs were told that housing and transportation would be provided for them. Plaintiff Trevino acknowledged, however, that he was not told that his housing would be free, or that he would be given free rides. In Ohio, Case Farms failed to provide or arrange daily transportation for them, and on two occasions they started to walk the 30 miles to their apartment. No apartment having been provided for them, contrary to what they had been promised, plaintiffs Trevino and Carreon had to implore workers already crowded into Lopez's apartment to allow them to stay there. It is uncontested that, for three weeks, these two plaintiffs lived in overcrowded and filthy apartments, and slept on a floor teeming with cockroaches. Case Farms' primary defense in this regard is that these two plaintiffs were not "recruited" at all, but rather "initiated contact" themselves with TWC employee Garcia. Given the expansive notion of "recruitment" discussed above, it is found that the determination of who "initiated contact" is not dispositive of these issues. Because it has been determined, however, that TWC's recruitment efforts cannot be said to represent an agency relationship with Case Farms, Case Farms cannot be held liable for misrepresentations made by employees of the TWC, and plaintiffs Carreon and Trevino's claims that Case Farms violated 29 U.S.C. § 1821(f) must fail.

**Carlos Gonzalez, Yolanda Leura (for the estate of Daniel Leura), and Tomas Solis.** Plaintiff Gonzalez testified that when he, Leura, and Solis were recruited, Cilona promised to provide housing and transportation, and Cilona implied that the housing would be suitable. Trial Tr. at 238, 244–245. Plaintiff Solis, however, testified that Cilona did explain that the plaintiffs would have to pay for housing. Solis Dep. P. 34. Plaintiff Leura's mother also testified that these plaintiffs were told about having to pay for housing. Y. Leura Dep. pp. 6–8, 10, 15, 16. Credible evidence was presented, however, that the housing was less than suitable. These three plaintiffs had to sleep on the floor in a house with no heat and only one bathroom for ten people. Trial Tr. at 249–256. Inhabitants of the house were plagued by cockroaches. Trial Tr. at 253–256. Except for the first two days of work when Lopez transported them to the plant, these three plaintiffs had to arrange their own transportation to work. Trial Tr. at 258–59, 283. They, at times, rode the 30 to 40 miles to the plant in the bed of a pick-up truck with about eight other workers. Trial Tr. at 259. While it is found that the housing these plaintiffs received was flagrantly substandard, it is also found that Gonzalez, Leura, and Solis have not met their burden of showing Case Farms' violation of 29 U.S.C. § 1821(f) by a preponderance of the evidence.

**Juan Jimenez.** Plaintiff Jimenez testified that TWC employee Garcia told him that he would live very well in the Lopez apartments in Ohio, and that suitable housing and free transportation would be provided by Case Farms. Jimenez Aff. ¶ 3; Jimenez Dep. at 15. Instead, Jimenez found himself on a floor of a cold apartment that had a frequently non-functioning toilet. Jimenez Aff. ¶ 6. Cockroaches crawled over him at night. Jimenez Aff. ¶ 6. Case Farms presented little evidence directly contradicting Jimenez's claims, depending instead on Cilona's general assertion that he always disclosed the conditions of housing and transportation to his recruits. While Jimenez's testimony is found to be credible, and the court, once again, finds that this plaintiff was placed in abominable housing conditions, Jime-

nez's testimony does not, by a preponderance of the evidence, prove Case Farms' violation of 29 U.S.C. § 1821(f).

**Jose Guevara.** Plaintiff Guevara testified that Cilona promised that Case Farms would provide suitable apartments and free rides to work and back. Guevara Aff. ¶ 3; Guevara Dep. at 28. Instead, he was placed in substandard conditions in a crowded house, and made to pay $25 per week for rides to and from work. Guevara Aff. ¶ 8, 12; Guevara Dep. at 19. Guevara reports that his house was infested with rats and cockroaches, and that a rat bit his finger. Guevara Aff. ¶ 8. Plaintiff Guevara complained to Case Farms employees about his housing conditions, but was ignored. Without providing specific rebuttals to this plaintiff's testimony, Case Farms contends that Guevara "clearly exaggerated the promises made to him..." Def. Post–Trial Brf. at 23 n.8. Such clear exaggeration is not found by this court. In light of Cilona's assertion that he did in fact provide honest disclosures to all recruits, however, Guevara's testimony does not, by a preponderance of the evidence, prove Case Farms violation of 29 U.S.C. § 1821(f). Such a finding does not in any way condone Case Farms' shabby treatment of Guevara.

**Carlos Reyna.** Plaintiff Reyna was told by TWC employee Garcia that Case Farms would provide him with an apartment, free of rent for one month, and transportation to and from work. Reyna Aff. ¶ 2; Reyna Dep. at 12–14. Garcia also promised Reyna that he would receive an advance of $50.00 on his wages. Reyna Aff. ¶ 2. Like many other plaintiffs, however, the apartment provided for this plaintiff was entirely unsuitable for habitation. The only available water was in the bathtub, there were no beds, and the toilet did not function. Reyna Aff. ¶ 5. Because it has been determined, however, that TWC's recruitment efforts cannot be said to represent an agency relationship with Case Farms, it cannot be held liable for misrepresentations made by employees

of the TWC, and plaintiff Reyna's claims that Case Farms violated 29 U.S.C. § 1821(f) must fail.

## IV. Compliance with the Terms of the Working Arrangement: Alleged Violations of 29 U.S.C. § 1822(c)

### A. The Law

Both the 1996 and the 1997 plaintiffs alleged that Case Farms violated the terms of their working arrangement with the company, as prohibited by 29 U.S.C. § 1822(c). That provision of the AWPA states that "[n]o farm labor contractor, agricultural employer, or agricultural association shall, without justification, violate the terms of any working arrangement made by that contractor, employer, or association with any migrant agricultural worker." 29 U.S.C. § 1822(c). As the parties acknowledge, plaintiffs' allegations in regard to section 1822(c) are substantially similar to those made, and already discussed, in regard to section 1821(f).

The claims at issue here can largely be disposed of by reference to the earlier discussion of the plaintiffs' claims under section 1821(f). That is, under the facts of this civil action, the same conduct that would constitute a "false or misleading" promise under section 1821(f) of the AWPA would constitute a violation of the terms of a working arrangement under section 1922(c) of the AWPA. Plaintiffs allege that Case Farms failed to comply with the promises it made to provide suitable housing and transportation to the plaintiffs.

### B. 1996 Plaintiffs

As determined above, each of the 1996 plaintiffs proved, by a preponderance of the evidence, that they were given false or misleading information at recruitment, in violation of 29 U.S.C. § 1821(f). Because ATC was acting within the scope of its agency [and/or as a joint employer] for Case Farms, those promises also represent a "working arrangement made by that con-

tractor, employer, or association with any migrant agricultural worker." 29 U.S.C. § 1822(c). Hence, based on the same factual findings as delineated above in reference to section 1821(f), and the fact that Case Farms has asserted no justification for its failure to abide by the terms of the working arrangement, it is determined that each of the 1996 plaintiffs have proven, by a preponderance of the evidence, that Case Farms violated section 1822(c) of the AWPA.

### C. 1997 Plaintiffs

It has been determined that the 1997 plaintiffs did not prove, by a preponderance of the evidence, that Case Farms violated section 1821(f) of the AWPA. Generally speaking, the 1997 plaintiffs did not provide a quantity of factual evidence sufficient to meet their burden under that provision of the AWPA. Because the 1997 plaintiffs' section 1822(c) claims are factually premised on the same evidence as their misrepresentation claims raised under section 1821(f), the same insufficiencies undermine their claims under section 1822(c), Hence, based on the same factual findings as delineated above in reference to section 1821(f), it is determined that each of the 1997 plaintiffs have failed to prove, by a preponderance of the evidence, that Case Farms violated section 1822(c) of the AWPA.

### V. Housing Health and Safety Codes: Alleged Violations of 29 U.S.C. § 1823(a)

#### A. The Law

In addition to requiring fair dealings with recruited workers by certain employers, the AWPA incorporates substantive federal and state safety and health standards into its migrant worker protections. 29 U.S.C. § 1823(a); 29 C.F.R. § 1910.142 *et seq.;* 20 C.F.R. § 654.406 *et seq.* Section 1823(a) of the AWPA provides:

Except as provided in subsection (c), each person who owns or controls a facility or real property which is used as housing for migrant agricultural workers shall be responsible for ensuring that the facility or real property complies with substantive Federal and State safety and health standards applicable to that housing.[41]

As defendant Case Farms points out, unlike most other provisions of the AWPA, the housing provisions hold liable not only "agricultural employers" and "farm labor contractors" for violations, but also any person, including private landlords, who owns or controls housing. See 29 U.S.C. § 1823(a) and (b); 29 C.F.R. § 500.130(c) (1998). The regulations expressly provide that:

When the owner or operator of the housing is not an agricultural employer, agricultural association, or farm labor contractor, the owner is responsible for that housing meeting · the safety and health provisions under the Act and these regulations.

29 C.F.R. § 500.70(d).

The fact that much of the housing provided to the plaintiffs was in violation of federal codes is obvious. As discussed previously, plaintiffs slept on floors with a dozen or more other workers, encountered rats and cockroaches, struggled to cope with having no water, and even avoided the raw sewage in their apartment by sleeping on stairs. A number of the plaintiffs experienced housing conditions that were unhealthy, dangerous, and entirely demeaning.

According to Case Farms, however, all plaintiffs' claims under section 1823(a) fail, because no evidence has been evidence presented that is sufficient to show that Case Farms "owns or controls" the housing in which the plaintiffs lived. Accord-

---

**41.** Section 1823(c), in turn, provides:
This section does not apply to any person who, in the ordinary course of that person's business, regularly provides housing on a commercial basis to the general public and who provides housing to migrant agricultural workers of the same character and on the same or comparable terms and conditions as is provided to the general public.

ing to Case Farms, "[t]o the extent this leaves plaintiffs without a remedy for substandard housing conditions, it is only because they voluntarily elected not to bring an action against the responsible landlords." Def. Post–Trial Brf. at 27.

The fact that the housing provisions of the AWPA include landlords in the list of potentially liable entities does not, of course, necessarily alleviate an agricultural employer or farm labor contractor from responsibility. The pertinent regulations state that "[i]f more than one person is involved in providing the housing... both persons are responsible for ensuring that the facility or real property meets the applicable Federal and State housing standards." 29 C.F.R. § 500.130(a). That is, more than one entity may be deemed to have ownership or control of housing. And, any entity that owns or controls migrant housing can be held liable under the AWPA.[42]

Thus, especially in the context of this civil action, the statute's language begs an obvious question. What is meant by "control" of housing? According to the AWPA-derived regulations, an entity or person

> is in 'control' of a housing facility or real property, regardless of the location of such facility, if said person is in charge of or has the power or authority to oversee, manage, superintend or administer the housing facility or real property either personally or through an authorized agent or employee, irrespective of whether compensation is paid for engaging in any of the aforesaid capacities.

29 C.F.R. § 500.130(c) (1998). It is immediately clear that the term "controls" is intended to include broad-ranging activities. The disjunctive phrase—"authority to oversee, manage, superintend or administer" housing—sweeps in more activities than those traditionally relegated to a landlord.

In fact, the legislative history of the AWPA illustrates that Congress intended the protections of the housing provisions to be expansive. The Congressional Committee intended "that this section be interpreted with the broadest possible meaning to ensure that the person who owns or controls the facility used as housing ... is responsible for maintaining that facility in compliance with all substantive federal and state safety and health standards." H. REP. No. 97–885, at 17–18, *reprinted in* 1982 U.S.C.C.A.N. at 4563–4564; see *Rodriguez v. Carlson*, 943 F.Supp. 1263, 1267–1268 (E.D.Wash.1996); *Sanchez v. Overmyer*, 845 F.Supp. 1183 (N.D.Ohio, 1993); *Howard v. Malcolm*, 629 F.Supp. 952 (E.D.N.C.1986).

In conformity with the clear intent of Congress, courts have accepted that the housing provisions, like the AWPA itself, must be interpreted broadly. "[The] AWPA is a remedial statute and should be construed broadly to effect its humanitarian purpose." *Caro–Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1505 (11th Cir.1993); see *Bracamontes v. Weyerhaeuser Co.*, 840 F.2d 271, 276 (5th Cir. 1988). Regarding the definition of "controls" under the Farm Labor Contractor Registration Act, 7 U.S.C. § 2041, et seq., (the "FLCRA"), the predecessor of the AWPA, one district court explained that

> it is clear that a contractor need not acquire an ownership interest or ultimate authority over property in order to acquire control. Control of housing requires only direct supervisory authority to oversee, manage, superintend or administer its daily use by others. This is true regardless of any compensation the contractor may receive for his supervision or the fact that the actual owner of the property is empowered to immediately terminate his authority.

*Walcher v. Donovan*, 1982 WL 1990 (D.S.C.1982). Thus, in regard to the

---

**42.** "[T]he responsibility for compliance with substantive health and safety requirements can be joint and several." *Rodriguez v. Carl-* *son*, 943 F.Supp. 1263, 1268 (E.D.Wash. 1996).

**615**

AWPA's housing provisions, "[e]ven if the court were to find some ambiguity in the definition of 'owns or controls,' that ambiguity would have to be decided in favor of the plaintiffs, since the courts have, without exception, adopted an expansive interpretation of all the definitions and provisions contained in the AWPA and its statutory building-block, the FLSA." *Howard v. Malcolm,* 629 F.Supp. 952, 954–55 (E.D.N.C.1986); see also *Dunlop v. Carriage Carpet Co.,* 548 F.2d 139, 144 (6th Cir.1977); *Usery v. Pilgrim Equipment Co.,* 527 F.2d 1308, 1311 n. 6 (5th Cir.1976). While this court does find the statutory definition of "controls" slightly ambiguous, given Congress' clear intent that the word be defined broadly, that ambiguity appears to be intentional.[43] The housing-based claims of the 1996 and 1997 plaintiffs will be considered in the light of this broadly-defined legal background.

### B. The 1996 Plaintiffs

■ It has been previously established that ATC and Case Farms employee Alvaro Hernandez's activities regarding the 1996 plaintiffs' housing were performed within the scope of their duties as agents of Case Farms. Their actions can, therefore, be attributed to Case Farms. In light of this agency relationship, it is abundantly clear that Case Farms generally "controlled" the housing of the 1996 plaintiffs. In fact, Case Farms itself, in the context of its position that neither ATC nor Alvaro Hernandez were its agents, expressly acknowledges that ATC and Alvaro Hernandez exercised "control" over the housing of the 1996 plaintiffs at 607 Front Avenue. Def. Resp. to Pl. Post-Trial Brf., at 23.

One of Alvaro Hernandez's duties as an employee of Case Farms was to find and arrange for housing for migrant workers. As plaintiff Galvan testified, the landlord who apparently rented to most of the 1996 plaintiffs was Mary Perry.[44] (See also Exhibit D–13). According to Perry, Case Farms' employee Alvaro Hernandez began placing Case Farms' workers in her units in 1994, and continued to do so until mid–1997.

Alvaro Hernandez was deeply involved in the management of Case Farms' workers' housing provisions. It seems to have been a common practice for Perry to tell Alvaro Hernandez what units were available and for Alvaro Hernandez to assign them to an apartment (even if there were already dozens living there), to sign receipts for payment of rent, to sign the plaintiffs' rental agreements, and to place some workers into Perry's units without ever notifying her. See Perry Dep. at 85–87. Until late 1996, Alvaro Hernandez would give Perry cash to pay tenants' security deposit and first month's rent. Perry Dep. at 45. (It is worth noting that ATC terminated its relationship with Case Farms on March 1, 1996.)

When tenants were late with their rent, Perry would seek out Alvaro Hernandez because "he was the one that brings the units in." Perry Dep. at 57. Perry also testified that she was aware that Alvaro Hernandez was "bringing other tenants in and not putting them on the contract." Perry Dep. at 90. Perry claims that during the time of the 1996 plaintiffs' occupancy, she did not know how many people were living in the apartment at 607 Front Avenue because Alvaro Hernandez "would bring them in and move three or four out and three or four back in and never tell me that he's doing it." Perry Dep. at 21, 89–90.

**43.** "Where the language is not dispositive, the analysis must focus on the intent of Congress as revealed in the history and purposes of the statutory scheme." *Hernandez,* 812 F.Supp. at 735, citing *Adams Fruit Co. v. Barrett,* 494 U.S. 638, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990). Again the history and purposes of the statutory scheme are clearly to make agricultural employers and farm labor contractors responsible for the fair treatment of migrant workers.

**44.** Perry served as manager for seventy-two of Wesley Tolle's rental units. Perry Dep. at 135–136.

ATC itself was similarly involved in the management of the 1996 plaintiffs' housing. For example, ATC paid the 1996 plaintiffs' security deposits and first month's rent. Perry Dep. at 62–63, 76–77; Trial Exh. P–35. ATC negotiated housing arrangements with Perry before the 1996 plaintiffs even arrived in Ohio. Apparently suspecting that the housing arrangements might lead to legal problems, Perry arranged for ATC to execute an addendum to the rental lease for the unit at 607 Front Avenue to ensure that someone would be responsible in the event she had any problems with the City of New Philadelphia due to overcrowding at the property. Perry Dep. at 72–74, 91–92.

Under the facts adduced at trial and in the various depositions presented to the court, it is clear that Alvaro Hernandez and ATC "controlled" the housing provided to the 1996 plaintiffs. As mentioned previously, Case Farms does not contest this point. Rather, Case Farms points to the fact that it never put its name on any leases for the employees, and that it declined to sign a "Guarantee of Performance" for some of its employees living in Perry's units, as evidence that Case Farms did not own or control the housing. Perry Dep at 127–128.

The AWPA's regulations, however, define a controlling entity as one that "has the power or authority to oversee, manage, superintend or administer the housing facility or real property either personally or *through an authorized agent or employee* . . ." 29 C.F.R. § 500.130(c) (emphasis

added). It was Alvaro Hernandez, and to a lesser extent ATC, who managed, oversaw, and administered the 1996 housing arrangements. Because Alvaro Hernandez and ATC were agents of Case Farms working within the scope of their duties, Case Farms itself controlled the 1996 plaintiffs' housing.

As will be made clear by the following findings of fact, it is further determined that Case Farms housed the 1996 plaintiffs without first ensuring that the housing complied with applicable health and safety standards.[45] It is noted that, for the sake of clarity, some previously discussed evidence is included in the following findings:

**Eloy Cantu, Sergio Hernandez, Joseph Cooper.** Plaintiffs Cantu, Hernandez, and Cooper were offered housing that had no heat, light, or furniture. Cantu Aff. ¶ 11, Cantu Dep. at 13; Cooper Aff. ¶ 11. S. Hernandez Dep. at 15. Plaintiff Cooper testified that he, Cantu, and Hernandez would have stayed to work had they had suitable housing. Those three plaintiffs returned to Texas within a day of arriving in Ohio. Cantu Aff. ¶ 3. These facts were uncontested by Case Farms. Because these plaintiffs were not housed in Ohio, they have no claim that Case Farms violated 29 U.S.C. § 1823(a), and related provisions.

**Gerardo Castillo.** Upon arrival in Ohio, Castillo discovered that the housing had no furniture, no heat, and no blankets. Castillo Aff. ¶ 6; Castillo Dep. at 88. Castillo was put in a house with 18 other people; the house had

45. Among the applicable health and safety standards are the following: (1) the housing must be of adequate size so as to prevent overcrowding; (2) the housing must provide protection against the elements; (3) each room used for sleeping purposes must contain at least 50 square feet of floor space for each occupant; (4) beds, cots, or bunks and suitable storage facilities, such as wall lockers for clothing and personal articles, must be provided in each room used for sleeping purposes; (5) windows must open and close for purposes of ventilation; (6) the housing must have screens on the windows and self-closing screen doors; (7) in housing where cooking facilities are shared, there must be at least one stove per 10 occupants; (8) if housing is used during cold weather, adequate heat must be provided; (9) where restroom facilities are shared, there must be at least one handwashing basin per family or six unrelated occupants and one shower head per family or 10 unrelated occupants; (10) there must be an adequate and convenient water supply; and (11) effective measures must be taken to prevent infestation by and harborage of animals or insects. 29 U.S.C. § 1323(a); 29 C.F.R. § 1910.142 et seq.; 20 C.F.R. § 654.404, et seq.

only one bathroom. Everyone there slept on the floor. Castillo Aff. ¶ 6. Castillo was moved after approximately one week. The new location still had no furniture. It did, however, have heat. After complaining to his supervisor at Case Farms, Castillo was brought several pillows. Castillo Aff. ¶ 9. Castillo testified that he felt humiliated that he had to suffer such deplorable housing conditions and that he could not make enough money to send any home. These facts were uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions, as alleged by Castillo.

**Efrain Leal.** The house Leal and Gerardo Castillo lived in had no furniture, no heat, and no blankets or quilts. Leal Aff. ¶ 3; Castillo Aff. ¶ 6; Castillo Dep. at 88. The one bathroom house had more than 18 people living in it. Castillo Aff. ¶ 6; Castillo Dep. at 88. Plaintiff Leal testified to the humiliation he felt at having to live like this, and because he had to ask a local church for food to eat. Leal Aff. ¶ 5. These facts were uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions, as alleged by Leal.

**Edna Mae Chong (representing the estate of Josephine Tijerina), and Michelle Galvan.** The evidence pertaining to plaintiff Tijerina's experiences with Case Farms was provided by plaintiff Galvan, who was recruited with, traveled with, and lived with Tijerina. Upon arrival, Alvaro Hernandez placed them in a one-bedroom, one-bathroom house in Ohio with eighteen people, including plaintiffs Efrain Leal, Rafael Gonzalez, Hugo Hernandez, Zavala, and R. Zamarano. Trial Tr. at 120, 124–127, 131–134, 153. Photographs of this house were admitted into evidence as Plainitff's Exhibit 3. Galvan testified that is was at times frightening for her and Tijerina to share a house with so many men who were strangers to them. Trial Tr. at 128. These two plaintiffs, along with another woman, attempted to sleep huddled together next to a wall with a male acquaintance on the outside for their protection. Trial Tr. at 121, 129. Those three women also went to the bathroom together so that while one showered, and another used the bathroom, the third could hold the door closed. Trial Tr. at 129. Galvan testified that neither she nor Tijerina could adjust to such miserable conditions, and that they constantly hoped Case Farms would find them another place to live. Trial Tr. at 130–131. These facts were virtually uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions, as alleged by Tijerina and Galvan.

**Rafael Gonzalez.** Gonzalez was taken to an unfurnished house, with about 22 people. He, and others, had to sleep on the floor. R. Gonzalez Aff. ¶ 4–5. The house had no heat, stove, refrigerator or beds when he arrived. R. Gonzalez Aff. ¶ 6. The bathroom had no water, so in order to flush the toilet, Gonzalez had to melt snow. R. Gonzalez Aff. ¶ 7. These facts were virtually uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions, as alleged by Gonzalez.

**Jose Guadalupe Estrada.** The housing provided to Estrada was a one bedroom house with no furniture, no stove, no refrigerator, no beds, and no heat. He shared the house with approximately 20 people. Estrada Aff. ¶¶ 8, 10. Estrada testified that he felt badly because he was unable to send money home to his family. Estrada Aff. ¶¶ 13–14. These facts were uncontested by Case Farms. It is found, therefore, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions, as alleged by Estrada.

618

**Martin Hernandez and Esperanza Hernandez.** Plaintiff Martin Hernandez testified on behalf of he and his sister, Esperanza Hernandez. The treatment of these plaintiffs upon arrival in Ohio was revolting. Not only were they taken to an apartment with no heat or electricity or furniture, but water was leaking into the building through the walls. Martin Hernandez aptly described this location as a "cave." Trial Tr. at 20–22. Plaintiff Martin Hernandez testified that he was reluctant to leave the place, because he and his sister do not speak English and they did not know where they were. After several days, Alvaro Hernandez came for these two plaintiffs and took them to a basement apartment owned by Georgia Lopez. Again there was no furniture and Martin Hernandez and Esperanza Hernandez had to sleep on the floor. Trial Tr. at 28–29. After the sewage pipes in the building broke, raw sewage came into the basement apartment, and Hernandez and his sister had to sleep on the apartment stairs, because they could not enter the apartment. Trial Tr. at 27. While they were eventually able to remove the sewage, they could not remove the odor. Trial Tr. at 27. Hernandez testified that he and his sister are still traumatized by their experiences in Ohio. Trial Tr. at 28. These facts were uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions, as alleged by Martin Hernandez and Esperanza Hernandez.

**Jesus Mejia.** Expecting a house with necessary furnishings, plaintiff Mejia was put in a house with no furniture, and with only one bathroom for twenty people. Mejia Aff. ¶ 6. J. These facts were virtually uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions, as alleged by Mejia.

**Guadalupe Zamorano, Ricardo Zamorano, Hugo Hernandez, and Raul Zavala.** Upon arriving in Ohio, these plaintiffs were taken to an unfurnished house that already had 10 people living in it. G. Zamorano Aff. ¶ 7. The house had no stove or refrigerator, and had water only in the bathroom. G. Zamorano Aff. ¶ 10. There were eventually 18 people in the house. G. Zamorano Aff. ¶ 7. Plaintiff Guadalupe Zamorano testified that he had wanted to return home to Texas immediately, but that he, Ricard Zamorano, Hernandez, and Zavala did not have enough money to make the trip back. As a result, the four plaintiffs lived in the crowded house (with plaintiffs Michelle Galvan, Josephine Tijerina, Gerardo Castillo, and Efrain Leal) for two and half weeks. These facts were uncontested by Case Farms. It is found by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions, as alleged by Guadalupe Zamorano, Ricard Zamorano, Hernandez, and Zavala.

### C. The 1997 Plaintiffs

Like the 1996 plaintiffs, the 1997 plaintiffs' housing claims are premised on Case Farms' "control" of their housing through a Case Farms employee. While it may be a close question given the expansive definition of "control" under the AWPA, the actions of Former Human Resources Director Andy Cilona, were sufficiently different from those of Alvaro Hernandez to warrant a different outcome.

Cilona was the liaison between the 1997 plaintiffs and their landlords. These plaintiffs generally testified that the housing in which they lived was managed by Georgia Lopez. Unlike Alvaro Hernandez's relationship with Perry, Cilona seems to have left the administration of Lopez's units to Lopez.

Beginning in 1995, Case Farms would secure units for incoming workers with Lopez, prior to the workers' arrival. As part of this arrangement, Case Farms would pay Lopez for the employees' secu-

rity deposit and first month's rent. Trial Exh. P–29, P–34. It is undisputed that Case Farms did this for the 1997 plaintiffs, in particular. Apparently, Cilona would engage in a number of activities (reading classified ads, attending landlord meetings, etc.) in an attempt to locate landlords who would be willing to rent to out-of-state workers. Cilona would survey such landlords before a recruiting trip to see where units might be available for the incoming workers.

Cilona also sometimes negotiated the terms of the workers' lease with the landlords. Cilona Examination Tr. at 43. Under just such an agreement, Lopez charged each Case Farms worker $25 per person per week, regardless of the number of people per unit.[46] Cilona Examination Tr. at 20. Case Farms would then advance the first month's rent and security deposit for its employees.[47] (This money would later be taken out of their paycheck.) This practice ended when Cilona left Case Farms in 1997. Lopez Dep., 84–86. In some cases, Cilona was allowed to place Case Farms' workers in Lopez's apartments without paying in advance.

Although such arrangements begin to resemble "control" of the workers' housing, the fact that Case Farms' role in the 1997 plaintiffs' housing was limited to these negotiations and advances exculpates Case Farms from liability. Cilona did not have the right to assign workers to an apartment. Lopez Dep. at 117. He could not determine what rent would be paid.

He had no keys to any housing. After the first month, Lopez would collect rents directly from the workers, often going door to door. Lopez Dep. at 57–58. The 1997 plaintiffs made their complaints to Lopez, not to Cilona.[48] See, e.g., A. Navarro Dep. p. 31–32; T. Solis Dep. p. 37. In some cases, Lopez arranged housing with Case Farms workers without ever having spoken to Cilona, at all. Lopez Dep. at 47.

It is determined that these facts, in their totality, fail to demonstrate that Case Farms "controlled" the 1997 plaintiffs' housing. Against the background of this determination, the following findings are made:[49]

**Aurora Navarro and Urbana Zavala.** It is uncontested that plaintiffs Navarro and Zavala were put in an apartment without beds, with a broken toilet, and with numerous cockroaches. Zavala Aff. ¶¶ 7–9. Given, however, the plaintiffs' failure to establish that Case Farms controlled the housing, it is determined that Navarro and Zavala, have failed to prove, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions.

**Gustavo Caballero.** Upon arriving in Ohio, plaintiff Caballero shared an unfurnished, heatless apartment with nine other people and only one bathroom. He testified that in the month or so that he worked for Case Farms, he never had a bed to sleep in. Caballero Aff. ¶¶ 3–4. The apartment was infested

46. This practice was different from the way Georgia Lopez handled leases with the general public. According to Lopez, she made this special arrangement because out-of-state workers often had a difficult time getting utilities put in their name, and she would pay for the Case Farm workers' utilities. Lopez Dep. at 72–73. This court agrees that these terms provided an incentive to violate the substantive housing provisions of the AWPA. Under the facts at hand, however, it appears that Lopez, rather than Case Farms would be responsible for those violations.

47. Plaintiffs argue that these advances qualify as an "equitable interest [in the housing] retained by Case Farms which it could apply to

house a substitute worker if it chose." This court declines the plaintiffs' invitation to find such advances to represent "a legal or equitable interest in such a facility or real property" under 29 C.F.R. § 500.130(b).

48. Although Cilona testified that he would assist with problems whenever possible. Cilona Examination Tr. at 46–47. He received a number complaints about the availability of keys, Cilona Examination Tr. at 47, and about having to sleep on the floor. Cilona Examination Tr. at 87.

49. It is noted again that for the sake of clarity, some previously discussed evidence is included in these findings.

with cockroaches, that would crawl over the plaintiff at night. Caballero Aff. ¶ 3. Moreover, the heaters did not work. Caballero Aff. ¶¶ 3–4. These facts were uncontested by Case Farms. Given, however, the plaintiffs' failure to establish that Case Farms controlled the housing, it is determined that G. Caballero has failed to prove, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions.

**Estela Carreon and Israel Trevino.** Plaintiff Trevino testified as to the experiences of himself and plaintiff Carreon. Instead of being provided an apartment for the two of them as they were told, plaintiffs Trevino and Carreon had to implore workers already crowded into Lopez's apartment to allow them to stay there. It is uncontested that for three weeks, these two plaintiffs lived in overcrowded and filthy apartments, and slept on a floor infested with cockroaches. Trial Tr. at 295–300. These facts were uncontested by Case Farms. Given, however, the plaintiffs' failure to establish that Case Farms controlled the housing, it is determined that Carreon and Trevino have failed to prove, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions.

**Carlos Gonzalez, Yolanda Leura (for the estate of Daniel Leura), and Tomas Solis.** These three plaintiffs had to sleep on the floor in a house with no heat and only one bathroom for ten people. Trial Tr. at 249–256. The house was infested by cockroaches. Trial Tr. at 253–256. These facts were uncontested by Case Farms. Given, however, the plaintiffs' failure to establish that Case Farms controlled the housing, it is determined that Gonzalez, Leura, and Solis, have failed to prove, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions.

**Juan Jimenez.** Jimenez lived six months in an apartment, sleeping on a floor in a cold apartment that had an often-broken toilet. Jimenez Aff. ¶ 6. Cockroaches crawled over him at night. Jimenez Aff. ¶ 6. These facts were uncontested by Case Farms. Given, however, the plaintiffs' failure to establish that Case Farms controlled the housing, it is determined that Jimenez has failed to prove, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions.

**Jose Guevara.** Guevara reports that his house was infested with rats and cockroaches, and that a rat bit his finger. Guevara Aff. ¶ 8. Plaintiff Guevara complained to Case Farms employees about his housing conditions, but was ignored. He had no bed to sleep on, and no heat. Guevara Aff. ¶ 8; Guevara Dep. at 25. Case Farms did not contest this evidence. Given, however, the plaintiffs' failure to establish that Case Farms controlled the housing, it is determined that Guevara has failed to prove, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions.

**Carlos Reyna.** Plaintiff Reyna was provided an apartment in which the only available water was in the bathtub, there were no beds, and the toilet did not function. Reyna Aff. ¶ 5. These facts were uncontested by Case Farms. Given, however, the plaintiffs' failure to establish that Case Farms controlled the housing, it is determined that Reyna has failed to prove, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), and related provisions.

## VI. Posted Certificate of Occupancy: Alleged Violations of 29 U.S.C. § 1823(b)

In addition to section 1823(a)'s incorporation of substantive federal and state safety and health standards into its migrant housing provisions, section 1823(b) of the AWPA requires that agricultural employers who own or control housing that is used as housing for migrant workers must secure certification from either a state or local health authority, or other

appropriate agency, stating that the housing meets applicable safety and health standards.[50] 29 U.S.C. § 1823(b). Thus, the obligation to obtain certification is a separate requirement, in addition to the obligation to comply with housing and safety standards. 1982 U.S.C.C.A.N. at 4564.

It is uncontested that the housing provided to both sets of plaintiffs lacked such certification. Cilona testified that he did not see any such posting at any of the units. Cilona Examination Tr. at 31. Perry testified that the only inspection conducted at 607 Front Avenue occurred around 1993. Thus, there is no question that this provision was violated. The only question is whether Case Farms is responsible for that violation.

It has previously been determined that, in regard to the 1996 plaintiffs, Case Farms was in "control" of the housing. Such a finding makes Case Farms responsible for ensuring that the certification is obtained for the units housing the 1996 plaintiffs. Thus, the 1996 plaintiffs, with the exceptions of Joseph Cooper, Sergio Hernandez, and Eloy Cantu,[51] have proven, by a preponderance of the evidence, that Case Farms was in violation of 29 U.S.C. § 1823(b) of the AWPA. Gerardo Castillo, Edna Mae Chong, Efrain Leal.

Rafael Gonzalez, Jose Estrada, Martin Hernandez, Esperanza Hernandez, Hugo Hernandez, Jesus Mejia, Guadalupe Zamorano, Ricard Zamorano, Raul Zavala and Michelle Galvan may recover under this provision. A determination of such recovery will be taken up in Section XI, infra.

It was determined, however, that Case Farms did not control the housing for the 1997 plaintiffs. As a result, the 1997 plaintiffs have failed to meet their burden under 29 U.S.C. § 1823(b), and may not recover under this provision.

## VII. Posted Terms and Conditions of Housing Occupancy: Alleged Violations of 29 U.S.C. § 1821(c)

The AWPA also requires an agricultural employer who "provides housing for any migrant agricultural worker" to post in a conspicuous place, or present to each occupant, a statement of the terms and conditions of occupancy of the housing. 29 U.S.C. § 1821(c). The issue before this court, then, is whether or not Case Farms "provided" housing for the 1996 and/or 1997 plaintiffs.

Case Farms contends that "[t]hough the term 'provides' is not defined by the statute, the regulations suggest that the term essentially has the same meaning as the terms 'owns' or 'operates.'"[52] Def. Post–

50. The provision, in its entirety, reads as follows:
> (b) Certification that applicable safety and health standards are met; posting of certificate of occupancy; retention of certificate and availability for inspection and review; occupancy prior to inspection.
> (1) Except as provided in subsection (c) and paragraph (2) of this subsection, no facility or real property may be occupied by any migrant agricultural worker unless either a State or local health authority or other appropriate agency has certified that the facility or property meets applicable safety and health standards. No person who owns or controls any such facility or property shall permit it to be occupied by any migrant agricultural worker unless a copy of the certificate of occupancy is posted at the site. The receipt and posting of a certificate of occupancy does not relieve any person of responsibilities under subsection (a). Each such person shall retain the

> original certification for three years and shall make it available for inspection and review in accordance with section 512 [29 U.S.C. § 1862].
> (2) Notwithstanding paragraph (1) of this subsection, if a request for the inspection of a facility or real property is made to the appropriate State or local agency at least forty-five days prior to the date on which it is occupied by migrant agricultural workers and such agency has not conducted an inspection by such date, the facility or property may be so occupied.

51. These plaintiffs refused to remain in Ohio and traveled immediately back to Texas. Therefore, they have no housing-based claims against Case Farms.

52. Case Farms bases this argument on 29 C.F.R. § 500.130 which states, in pertinent part, as follows:
> If more than one person is involved in *providing* the housing for any migrant agri-

Trial Brf. at 35. Such a conclusion is unwarranted for several reasons. First, the word "provides" must be viewed in the context of all of the other provisions of the AWPA that do, in fact, use the phrase "owns and controls." It would be unlikely that Congress would abruptly switch to the word "provides" if it meant "owns and controls." Second, the straight-forward denotation of "provides" is considerably more expansive than "owns and controls." According to *Webster's New World Dictionary of the American Language,* the definition of "provide" includes "to get ready beforehand; obtain in advance" and "to make available; supply." These phrases clearly denote a broader set of activities than "own" or "control." Third, according to the relevant legislative history of this provision, "[t]o provide housing within the meaning of the AWPA, means to make housing available, procure housing, or furnish housing." 1982 U.S.C.C.A.N. at 4561. Again, these words have much broader meanings than "own" and "control." "Procure" is defined as "to obtain or secure." One may certainly "obtain" or "secure" housing without having to "own" or "control" that housing.

It has already been established that Case Farms controlled the housing of the 1996 plaintiffs for the purposes of the AWPA. Under the more expansive definition of "provides," and based on the same factual findings as the above consideration of Case Farms' "control" of the housing, it is beyond question that Case Farms provided housing to the 1996 plaintiffs. Those facts illustrate that Case Farms, on its own and through its agents, procured housing for the 1996 plaintiffs. It is, further, uncontested that there was no posting regarding the terms and conditions of occupancy of the housing in which the 1996 plaintiffs lived. Perry Dep. at 94–95. Thus, the 1996 plaintiffs, with the exceptions of Joseph Cooper, Sergio Hernandez, and Eloy Cantu, have proven, by a preponderance of the evidence, that Case Farms was in violation of 29 U.S.C. § 1821(c) of the AWPA. Accordingly, Gerardo Castillo, Edna Mae Chong, Efrain Leal, Rafael Gonzalez, Jose Estrada, Martin Hernandez, Esperanza Hernandez, Hugo Hernandez, Jesus Mejia, Guadalupe Zamorano, Ricard Zamorano, Raul Zavala and Michelle Galvan may recover under this provision.

The merit of the 1997 plaintiffs section 1821(c) claim is not so simply resolved. It has previously been determined that Case Farms did not control the 1997 plaintiffs' housing. Given the broader definition of "provides" than of "owns or controls," it is possible that Case Farms *provided* housing to the 1997 plaintiffs without *controlling* that housing. This is, in fact, precisely what occurred. Upon arriving in Ohio, the 1997 plaintiffs were met at the bus station either by a Case Farms representative, or by Lopez at the request of Cilona, and then taken to one of Lopez's apartment units. Case Farms would pay Lopez for the 1997 plaintiffs' security deposit and first month's rent shortly after these plaintiffs were placed in apartments. Cilona assisted in arranging for housing to be available when these workers arrived in Ohio. Hence, Cilona clearly procured, and therefore "provided" housing for these plaintiffs.

As with the Perry apartments, it is uncontested that there were no postings at the Lopez apartments regarding the terms and conditions of occupancy of the housing. Cilona Examination Tr. at 31; Trial Tr. at 310–311. Case Farms, as a provider of migrant housing, was therefore in violation of 29 U.S.C. § 1821(c) of the AWPA, as to each of the 1997 plaintiffs. Accordingly, Caballero, Estela Carreon, Gonzalez, Jose Guevara, Juan Jimenez, Yolanda Leura, A. Navarro, Carlos Reyna, Tomas Solis, Israel Trevino, and Urbana Zavala may recover under this provision. Such recovery will be considered, *infra,* Section XI.

cultural worker (for example, when an agricultural employer *owns* it and a farm labor contractor *operates* it) both persons are responsible for ensuring that the facility or real property meets the applicable Federal and State housing standards.
(emphasis added).

## VIII. Insurance and Inspection of Vehicles: Alleged Violations of 29 U.S.C. § 1841(b)

### A. The Law

Plaintiffs allege that Case Farms violated the AWPA by failing to ensure that the vehicles used to transport the plaintiffs were properly insured and inspected. The AWPA provides that an agricultural employer who uses, or causes to be used, any vehicle for providing transportation to migrant agricultural workers shall (A) ensure that such vehicle conforms to the standards prescribed by the Secretary, (B) ensure that each driver has a valid and appropriate license, and (C) have an insurance policy or liability bond that is in effect which insures the agricultural employer against liability. 29 U.S.C. § 1841(b)(1);[53] 29 C.F.R. §§ 500.70(c), 500.100(a). According to the applicable regulations, among the safety features required of any passenger automobile or station wagon used or caused to be used by any farm labor contractor or agricultural employer to transport any migrant agricultural worker are (1) an exhaust system which discharges carbon monoxide away from the passenger compartment and which is free of leaks into the passenger compartment, (2) a seat for each passenger which is securely fastened to the vehicle, and (3) windshield wipers that are operational to allow the operator full frontal vision in all weather conditions. 29 C.F.R. § 500.104.

As with several previous claims, the underlying facts of the plaintiffs' allegations are largely uncontested. For example, it is undisputed that some of the plaintiffs were, at times, crammed into a van with nothing but cinder blocks and boards to sit on, for example. The critical issue before this court, however, is, once again, whether Case Farms may be held liable for these violations under the AWPA.

While Case Farms is correct that the AWPA regulations "[do] not impose an affirmative duty on a farmer to ensure that a migrant laborer does not ever ride in some other vehicle," *Ricketts v. Vann*, 32 F.3d 71, 77 (4th Cir.1994), the area of responsibility under the AWPA's transportation provisions is quite broad. Not only is an employer responsible for complying with the AWPA transportation provisions when it "specifically directs or requires a farm labor contractor to use a vehicle to transport workers," *Alviso–Medrano v. Harloff,* 868 F.Supp. 1367, 1374 (M.D.Fla. 1994), but "[r]esponsibility for compliance with the motor vehicle safety and insurance provisions of [the AWPA] is imposed upon the person or persons using or *causing to be used,* any vehicle for transportation of migrant or seasonal agricultural workers." 29 C.F.R. § 500.70(c). Responsibility is not dependent on an employment relationship between the agricultural employer and the plaintiff. *See Deck v. Peter Romein's Sons, Inc.,* 109 F.3d 383, 391(7th Cir.1997).

Against this legal background, the transportation-based claims of each group of plaintiffs were considered.

---

**53.** In its entirety, this provisions reads:

(b) Applicability of standards, licensing, and insurance requirements; promulgation of regulations for standards; criteria, etc., for regulations; amount of insurance required. (1) When using, or causing to be used, any vehicle for providing transportation to which this section applies, each agricultural employer, agricultural association and farm labor contractor shall—

(A) ensure that such vehicle conforms to the standards prescribed by the Secretary under paragraph (2) of this subsection and other applicable Federal and State safety standards,

(B) ensure that each driver has a valid and appropriate license, as provided by State law, to operate the vehicle, and

(C) have an insurance policy or a liability bond that is in effect which insures the agricultural employer, the agricultural association, or the farm labor contractor against liability for damage to persons or property arising from the ownership, operation, or the causing to be operated, of any vehicle used to transport any migrant or seasonal agricultural worker.

29 U.S.C. § 1841(b).

## B. The 1996 Plaintiffs

■ Under at least three legal theories, Case Farms is liable for plaintiffs' alleged violations of the APWA's transportation safety provisions.

The first is agency law. In regard to the 1996 plaintiffs, Case Farms maintains that the AWPA regulations explicitly immunize it from liability when they provide:

Additionally, these regulations do not impose responsibility on an agricultural employer or agricultural association for a farm labor contractor's failure to adhere to the safety provisions provided in these regulations when the farm labor contractor is providing the vehicles and directing their use.

29 C.F.R. § 500.70(c). Case Farms maintains that "[i]t was ATC, not Case Farms, that was 'providing the vehicles and directing their use.'" Def. Post–Trial Brf. at 37 (quoting 29 C.F.R. § 500.70(c)).

Under many AWPA based civil actions, such an argument would be meritorious. Under this one, however, the facts have previously demonstrated that ATC and Alvaro Hernandez were working within the scope of their agency for Case Farms when ATC recruited and supplied workers for Case Farms' plant. As has been previously determined, in this case, the actions of ATC may, in fact, be said to be the actions of Case Farms. Thus, Case Farms did provide the vehicles and direct their use, through the activities of ATC.

Second, it is determined from the specific facts of this case that the arrangement of transportation for recruited workers was clearly a necessary element for obtaining workers for Case Farms' poultry processing operation. Other courts have likewise held that, under the AWPA-derived regulations, "[a]n employer is found to have caused the transportation of harvest workers by a farm labor contractor when this transportation is a 'necessary element in obtaining the workers' to harvest the grower's crop." *Saintida v. Tyre,* 783 F.Supp. 1368, 1373 (S.D.Fla.1992) (quoting *Frenel v. The Freezeland Orchard Company, Inc.,* 108 Lab. Cases (CCH) paragraph 35,016, at page 45,415, 28 WH Cases (BNA) 666,667 (E.D.Ca.1987)). In *Saintida,* the court found that few of the plaintiffs had vehicles, public transportation was unavailable, and that workers relied on assistance to get to the job site. *Id.* Almost identical facts are found here. Cilona testified that it was essential to assist recruited workers with transportation. He, and Case Farms, knew that the plaintiffs generally did not have their own cars in Ohio, Cilona Examination Tr. at 15–16, and that no public transportation was available to the Case Farms plant. Uncontested Facts ¶ 18. Case Farms began arranging transportation for workers in 1995 because it knew the difficulties its out-of-state workers had getting to the plant.[54] Cilona Examination Tr. at 15. Thus, because the arrangement of transportation was obviously a necessary element of obtaining the workers' labor, Case Farms may be held liable for the violations of the AWPA's vehicle safety provisions.[55]

**54.** According to Cilona, Case Farms arranged transportation for its recruited workers by arranging carpools and by providing a van or bus service and deducting the costs of this service from the workers' pay. Cilona Examination Tr. at 8–11.

**55.** Case Farms rebuts this theory by stating that "because every employee must get back and forth to work somehow, plaintiffs' argument would effectively eliminate the limitations contained in the statute and accompanying regulations." Def. Response to Pl. Post–Trial Brf., at 30. Defendant's contention misses the critical point that transportation was a *necessary* element of providing the workers. In a given situation, such as that in the *Saintida* case (or in this one), it may be found that providing transportation is a necessary element of providing workers. That is, without this assistance with transportation, the workers would not come to work.

Pointing to the phrase "to use the contractor's vehicle," Case Farms also argues that "the statute and regulations are clearly directed to the use of a specific vehicle and driver." Def. Response to Pl. Post–Trial Brf., at 30. This contention is found to be wholly unconvincing. The use of such an illustrative example does not preclude an agricultural employ-

The third theory under which Case Farms may be found responsible is that, even outside of common law agency principles, Case Farms, as an agricultural employer, directed and required its farm labor contractor, ATC, to use vehicles to transport the workers it recruited to Case Farms' plant. Cilona testified that he did not tell ATC how it was to run its business. At the same time, however, Cilona stated that ATC was instructed to "take care of everything" and do whatever was necessary to get the workers to the Case Farms' plant. Cilona Examination Tr. at 29. Alvaro Hernandez and Juan Lopez, both of whom were Case Farms' employees, transported workers. Cilona Examination Tr. at 26–278, 31–32. The fact that Cilona supervised Alvaro Hernandez only "loosely" does nothing to alleviate Case Farms' responsibility under the AWPA. So, under the AWPA's network of worker protections, Case Farms is responsible for any use of unqualified vehicles in transporting the 1996 plaintiffs.

The final over-arching issues to be determined are whether the vehicles that transported the 1996 plaintiffs conformed to appropriate safety regulations, and whether Case Farms failed to ensure that they were driven by licensed drivers and were properly insured. As will be detailed below, each of the 1996 plaintiffs was transported in a van driven by either Alvaro Hernandez or Juan Lopez. There seem to have been two vans used. One had wooden boards on cinder blocks rather than seats. See Trial Tr. at 136–137. Uncontested testimony was presented that it did not have operational windshield wipers, and the windshield was often covered with snow. It was further reported, without contradiction by Case Farms, that this same van had numerous holes in the floorboards through which exhaust fumes entered. Trial Tr. at 54. At times, this van carried 18–20 passengers. It is clear that this "ugly van," as it was called by one

plaintiff, violated a number of safety regulations.

It is further uncontested that Case Farms did not attempt to determine whether the transportation provided to the 1996 plaintiffs was properly insured, or whether Alvaro Hernandez or Juan Lopez had valid and appropriate drivers' licenses. Cilona Examination Tr. at 25–27.

It is against the background of these facts that the following findings are made:

**Gerardo Castillo.** Case Farms' employee Alvaro Hernandez drove this plaintiffs to work at Case Farms in a brownish-gray van that had boards instead of seats. Castillo Dep. at 55–59. Approximately 16 others were in the van at times. Passengers would have to hold onto each other because the van was so overcrowded. Plaintiff Castillo also reported the lack of windshield wipers to remove the ice, and that the driver had to put his hand outside the van to scrape off the ice. These facts were not disputed by Case Farms. In light of Case Farms' failure to ensure that the vehicle conformed to appropriate safety regulations, that the vehicle was driven by appropriately licensed drivers, and that the vehicle was properly insured, it is found that Castillo, by a preponderance of the evidence, has proven that Case Farms violated 29 U.S.C. § 1841(b).

**Edna Mae Chong (for the estate of Josephine Tijerina) and Michelle Galvan.** Plaintiffs Galvan and Tijerina were also transported in a van that had wooden planks instead of seats. Trial Tr. at 135–137. Galvan reported that riding in the van was very dangerous because exhaust fumes leaked in, and the ice that formed on the windshield obstructed the view of the driver. Trial Tr. at 139. These facts were not disputed by Case Farms. In light of Case Farms' failure to ensure that the vehicle

er's liability under the many other ways in which it might "use or cause to be used" vehicles to transport migrant workers.

conformed to appropriate safety regulations, and that the vehicle was driven by appropriately licensed drivers, and that the vehicle was properly insured, it is found that Chong and Galvan, by a preponderance of the evidence, have proven that Case Farms violated 29 U.S.C. § 1841(b).

**Guadalupe Zamorano, Ricardo Zamorano, Raul Zavala, and Hugo Hernandez.** These plaintiffs were transported together in a crowded van with wooden seats and no seat belts. G. Zamorano Aff. ¶ 12. These facts were not disputed by Case Farms. In light of Case Farms' failure to ensure that the vehicle conformed to appropriate safety regulations, and that the vehicle was driven by appropriately licensed drivers, and that the vehicle was properly insured, it is found that Guadalupe Zamorano, Ricard Zamorano, Zavala, and Hernandez, by a preponderance of the evidence, have proven that Case Farms violated 29 U.S.C. § 1841(b).

**Martin Hernandez and Esperanza Hernandez.** These two plaintiffs, brother and sister, were transported to work by Alvaro Hernandez in a van that leaked exhaust into the passenger compartment and that had wooden planks instead of seats. Trial Tr. at 53–56. These facts were not disputed by Case Farms. Because Case Farms failed to ensure that the vehicle conformed to appropriate safety regulations, that the vehicle was driven by appropriately licensed drivers, and that the vehicle was properly insured, it is found that Martin Hernandez and Esperanza Hernandez, by a preponderance of the evidence, have proven that Case Farms violated 29 U.S.C. § 1841(b).

**Jesus Mejia, Jose Estrada, and Rafael Gonzalez.** These three plaintiffs each testified, independently, that they rode in the van with wooden planks for seats. Plaintiff Mejia rode with more than 15 others in a single van driven by Alvaro Hernandez that had wooden boards on blocks instead of real sets. Estrada also rode in a van with wooden seats. The van was overcrowded. Estrada Aff. ¶ 10. Gonzalez was transported to work by Alvaro Hernandez in an overcrowded van that had wooden benches for seats. R. Gonzalez Aff. ¶ 11. These facts were not disputed by Case Farms. Since Case Farms failed to ensure that the vehicle conformed to appropriate safety regulations, that the vehicle was driven by appropriately licensed drivers, and that the vehicle was properly insured, it is found that Mejia, Estrada, and Gonzalez, by a preponderance of the evidence, have proven that Case Farms violated 29 U.S.C. § 1841(b).

**Efrain Leal.** This plaintiff testified that he was transported to work by Alvaro Hernandez in a van. It is inferred by this court that this was the same van that most of the other plaintiffs were transported in. These facts were not disputed by Case Farms. By reason of Case Farms' failure to ensure that the vehicle conformed to appropriate safety regulations, that the vehicle was driven by appropriately licensed drivers, and that the vehicle was properly insured, it is found that Leal, by a preponderance of the evidence, has proven that Case Farms violated 29 U.S.C. § 1841(b).

**Eloy Cantu, Joseph Cooper, and Sergio Hernandez.** These plaintiffs never worked at Case Farms and were never transported to Case Farms. They present no claim under 29 U.S.C. § 1841(b) of the AWPA, and cannot recover under this provision.

### C. The 1997 Plaintiffs

Plaintiffs similarly allege that Case Farms arranged and directed transportation for some of the 1997 plaintiffs, thereby "using or causing to be used" vehicles for the transportation of those plaintiffs. The 1997 plaintiffs, however, had no dealings with Case Farms' agent ATC, and instead were dealt with directly by Cilona. Cilona provided uncontradicted testimony that the 1997 plaintiffs were responsible for

arranging carpools and paying for those rides to work.

Several of the plaintiffs did ride to work in carpools. The AWPA expressly precludes worker-arranged carpooling from its scope, but "carpooling does not include any transportation arrangement in which a farm labor contractor participates or which is specifically directed or requested by an agricultural employer." 29 C.F.R. § 500.100(c) (emphasis added). Hence, one issue before this court is whether Case Farms "specifically directed or requested" a carpool arrangement. Plaintiffs presented no convincing evidence that Case Farms did so.

Cilona did, however, direct Lopez, the apartment manager, to transport workers on occasion. A few plaintiffs were transported by Lopez, on perhaps only one occasion, from the bus station to the apartment, not to and from work. The workers that received such transportation from Lopez testified that the vehicles were nice, newer vehicles, without obvious safety hazards. Case Farms concedes, however, that it did not verify Ms. Lopez's driver's license or insurance on her vehicle in connection with her transporting these few individuals. Lopez admitted that she was not registered to transport migrant agricultural workers. Case Farms submits, however, that if this is a violation at all, it "is the very definition of a *de minimus* violation of the AWPA." Def. Response to Pl. Post–Trial Brf. at 33.

Half of the 1997 plaintiffs (Estela Carreon, Juan Jimenez, Aurora Navarro, Carlos Reyna, Israel Trevino, and Urbana Zavala) have no section 1841(b) claims against Case Farms. As to the remaining plaintiffs, the following findings are made:

**Gustavo Caballero.** Plaintiff Caballero testified that he was transported by Lopez, and that his foreman at Case Farms arranged transportation to work for him. Case Farms, however, points out that at trial Caballero testified that he was only transported by Lopez on one occasion, when she picked him up from the bus station and took him to his apartment. Also, this plaintiff stated that his foreman simply placed him in contact with another employee who might be willing to provide him with transportation. It is found that Caballero, has proven by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1841(b) by directing Lopez to transport him without having checked her license or the insurance on the vehicle. The *de minimus* nature of this violation will be considered in the determination of damages, infra.

**Carlos Gonzalez, Daniel Leura, Tomas Solis.** This plaintiff testified that he, Leura, and Solis were, on one or two occasions, transported from the apartments to the Case Farms plant by Lopez. Trial Tr. 258. Case Farms contends that there was only one such occasion, and it was from the bus station to their apartment. Because such transportation came at the direction of Case Farms, It is found that Gonzalez, Leura, and Solis, have proven by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1841(b) by directing Lopez to transport him without having checked her license or the insurance on the vehicle. The *de minimus* nature of this violation will be considered in the determination of damages, infra.

**Jose Guevara.** Plaintiff Guevara testified that Cilona directed a man nicknamed "Capulina" to transport him back and forth to work. Guevara Aff. ¶ 12. However, this testimony was revealed to be mere speculation on cross-examination. Thus, Guevara has not met his burden of proving, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1841(b) by directing "Capulina" to transport him.

## IX. Proper Pay Statements: Alleged Violations of 29 U.S.C. 1821(d)(2)

In their third amended complaint, the 1996 plaintiffs allege that Case Farms violated the AWPA's recordkeeping provi-

sions by failing to make and provide to each 1996 worker for each pay period a proper pay statement. These provisions of the AWPA provide that "each farm labor contractor, agricultural employer, and agricultural association which employs any migrant agricultural worker shall" provide to each worker for each pay period an itemized written statement including information regarding the bases on which the wages are paid, the number of hours worked, the total pay period earnings, the specific sums withheld and the purpose of each sum withheld, and the net pay. 29 U.S.C. § 1821(d)(1) & (2). Although Case Farms argues they are not valid, the relevant regulations state that these pay statements must also include the employer's name, address, and identification number assigned by the Internal Revenue Service. 29 C.F.R. § 500.80(d).

Samples of plaintiffs' pay statements were introduced into evidence at trial. See Exhibit P–4. These sample stubs include all items required by section 1821(d)(1), including the bases on which the wages are earned (hourly rate of $5.50 straight time, $8.25 overtime), the number of hours worked, the total pay period earnings, the specific sums withheld and the purpose of each sum withheld, and the net pay.[56] Exhibit P–4. As Case Farms points out, plaintiff Rafael Gonzalez was the only 1996 plaintiff who claimed to have not received one of these pay stubs.[57] He acknowledged, however, having received notations on his envelope.

56. No piecework count was required, as the plaintiffs were paid on an hourly, rather than a piecework basis.

57. This plaintiff testified that, instead, there were notations regarding the deductions from his pay written on his pay envelope. Plaintiffs argue that the court may infer that the pay statements received by Rafael Gonzalez when he received pay from ATC were, at best, like those contained in Trial Exh. P–4, which are the pay statements received by other plaintiffs who were recruited, hired, and paid by ATC.

58. In this respect, the following findings are made:

Thus, both parties agree on what statements most of the 1996 plaintiffs received. And, Case Farms concedes that, as a joint employer of the "ATC employees" with respect to payroll related allegations, it is covered by section 1832(d)'s recordkeeping requirements. Case Farms contends, however, that the pay statements received by those 1996 plaintiffs that worked for Case Farms were in complete compliance with the AWPA.

It is determined by this court, if not conceded by the plaintiffs, that the pay statements, as presented to the 1996 plaintiffs, were in compliance with section 1821(d)(1), the provision of the statute that sets forth the information required to be on a pay statement.[58] All of these elements appear on each of the pay statements that were provided by ATC to the 1996 plaintiffs. Exhibit P–4.

The AWPA-derived *regulations,* however, establish that a payment statement must also include "the employer's name, address, and employer identification number assigned by the Internal Revenue Service." 29 C.F.R. § 500.80(d). It is clear that the payment statements at issue here did not comply with this regulation.

Case Farms contends that the requirements contained in 29 C.F.R. § 500.80(d) are invalid because "they clearly exceed the specific requirements of the statute." Def. Response to Pl. Post–Trial Brf. at 34. Case Farms cites a Gun Control Act case for the proposition that a regulation may

Gerardo Castillo, Michelle Galvan, Josephine Tijerina, Hugo Hernandez, Esperanza Hernandez, Martin Hernandez, Jesus Mejia, Guadalupe Zamorano, Jose Estrada, Rafael Gonzalez, Raul Zavala, Ricard Zamorano, and Efrain Leal received pay statements substantially similar to those represented by Exhibit P–4, containing the required information under section 1821(d)(1).

Eloy Cantu, Sergio Hernandez, and Joseph Cooper did not work at Case Farms, and never received a paycheck. Accordingly, they have no claim under section § 1821(d)(1) & (2).

not expand a statute's record keeping requirements. *See National Rifle Association v. Brady,* 914 F.2d 475, 484 (4th Cir. 1990). Defendant's invitation for this court to invalidate this federal regulation is declined.

 In critically examining statutorily-derived regulations, a court's review is governed by the standards set forth in *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and its progeny. The Supreme court there stated that "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. And, "where Congress has entrusted an agency with implementation of a statutory scheme, that agency's interpretation of the statutory terms is entitled to substantial deference." *Motley v. Heckler,* 800 F.2d 1253, 1254–55 (4th Cir.1986).

In regard to the AWPA, Congress's intent to protect migrant workers is clear. Furthermore, the AWPA itself specifically gives the Secretary power to provide specific requirements for compliance with the AWPA. See, e.g., 29 U.S.C. § 1841(b)(1)(A). It is determined that the requirements outlined by 29 C.F.R. § 500.80(d) are, in fact, valid, as legitimate derivations of the Congressional intent as outlined in the statute.

 Thus, insofar as the pay statements received by the 1996 plaintiffs fail to include "the employer's name, address, and employer identification number assigned by the Internal Revenue Service," [59] they are in violation of the AWPA. Gerardo Castillo, Michelle Galvan, Josephine Ti-

jerina, Hugo Hernandez, Esperanza Hernandez, Martin Hernandez, Jesus Mejia, Guadalupe Zamorano, Jose Estrada, Rafael Gonzalez, Raul Zavala, Ricard Zamorano, and Efrain Leal have, therefore, proven, by a preponderance of the evidence, that Case Farms has violated the AWPA by failing to comply with its recordkeeping provisions.[60] Such violations are, in this instance, merely technical. This fact will be considered in the determination of damages, infra, Section XI.

The 1997 plaintiffs have not alleged a violation of 29 U.S.C. § 1821(d)(2).

### X. Paid Wages When Due: Alleged Violations of 29 U.S.C. 1822(a)

The plaintiffs' final claim under the AWPA is brought under its payment of wages provision. Section 1822(a) states that "each farm labor contractor, agricultural employer, and agricultural association which employs any migrant agricultural worker shall pay the wages owed to such worker when due." 29 U.S.C. § 1822(a). The regulations clarify that the AWPA requires that employees must be paid "no less often than every two weeks (or semi-monthly)." 29 C.F.R. § 500.81.

Rather than allege that Case Farms waited more than two weeks to give them paychecks, the 1996 plaintiffs attempt to use these payment of wages provision of the AWPA to recover for Case Farms' alleged failure to provide them with a W–2 form. The plaintiffs' legal theory is summarized as follows:

Although each 1996 plaintiff that worked on Case Farms production line had Social Security taxes deducted from his/her pay, none received a W–2 form for these wages, showing that these amounts were

---

**59.** In this respect, the following findings are made:

Gerardo Castillo, Michelle Galvan, Josephine Tijerina, Hugo Hernandez, Esperanza Hernandez, Martin Hernandez, Jesus Mejia, Guadalupe Zamorano, Jose Estrada, Rafael Gonzalez, Raul Zavala, Ricard Zamorano, and Efrain Leal received pay statements substantially similar to those represented by Ex-

hibit P–4, which did not include the requirements of 29 C.F.R. § 500.80(d).

**60.** In the alternative, Case Farms argues that these violations of AWPA's record keeping provisions amount to only technical violations of the AWPA, and that the fact that the information listed in the statute itself was provided argues in favor of a minimal award. This court agrees.

in fact paid as taxes to the IRS. Thus, Case Farms as the joint employer of these plaintiffs, even when they were being paid by ATC, failed to provide them with pay statements as required by the AWPA, and failed to pay them their full wages owed—the Social Security taxes deducted but not paid to the IRS—when due.

Pl. Post–Tr. Brf. at 51.[61]

These plaintiffs point to Plaintiffs' Exhibit 4 as evidence that social security taxes were deducted from their pay. While these hand written pay statements include a column showing the deduction of state and local taxes, it is unclear whether social security taxes were deducted. Such evidence was not adduced from testimony at trial, either. Thus, without commenting on the viability of the 1996 plaintiffs' legal theory, it is determined that insufficient evidence has presented to find any violation, by Case Farms, of 29 U.S.C. § 1822(a).

## XI. Damages for Violations of the AWPA

■ A number of violations of the AWPA by Case Farms having been found, it is necessary to consider what damages are due to the plaintiffs. The determination of damages for violations of the AWPA is, generally, governed by 29 U.S.C. § 1854(c). This provision provides that a court may award "actual damages, statutory damages of up to $500 per plaintiff per violation, or other equitable relief. . . ." 29 U.S.C. § 1854(c)(1).[62] Thus, if a court awards statutory, rather than actual, damages, the award must be $500 or less for each violation of the AWPA. Actual damages, however, do not have a cap under the AWPA.[63]

Plaintiffs seek the maximum statutory damages for many of the violations, and lesser damages for those that can be termed "technical." Alternatively, in some cases, plaintiffs seek actual damages in excess of $500 for the mental anguish and humiliation they suffered as a result of the way they were housed and transported to and from work.

Case Farms, maintaining that the violations that occurred were merely "technical," responds that the maximum statutory awards are not warranted in this case. Case Farms also rejects the plaintiffs' contention that "actual damages" under the AWPA should include recovery for mental anguish and humiliation.

Before determining the types and amounts of damages appropriate for each of Case Farms' violations of the AWPA, it is necessary to establish the ground rules for assessing statutory and actual damages under the Act.

## A. The Assessment of Statutory Damages

■ A number of factors must go into a court's determination of statutory dam-

---

**61.** The plaintiffs cite several cases as supporting this theory of Case Farms' liability. (See Appx to Pl. Am. Post–Tr. Brf. at Tab 19 and 20).

**62.** The AWPA's damages provisions read as follows:

(c) Award of damages or other equitable relief; amount; criteria; appeal.

(1) If the court finds that the respondent has intentionally violated any provision of this Act or any regulation under this Act, it may award damages up to and including an amount equal to the amount of actual damages, or statutory damages of up to $500 per plaintiff per violation, or other equitable relief, except that (A) multiple infractions of a single provision of this Act or of regulations under this Act shall constitute only one violation for purposes of determining the amount of statutory damages due a plaintiff; and (B) if such complaint is certified as a class action, the court shall award no more than the lesser of up to $500 per plaintiff per violation, or up to $500,000 or other equitable relief.

(2) In determining the amount of damages to be awarded under paragraph (1), the court is authorized to considered whether an attempt was made to resolve the issues in dispute before the resort to litigation.

**63.** "There is no limit on the amount of actual damages that can be awarded." 128 Cong. Rec. 32463 (1982) (Senator Hatch).

ages under the AWPA. These include the nature and persistence of the violations, the extent of the defendant's culpability, damage awards in similar cases, the defendants' ability to prevent future violations of the Act, the substantive or technical nature of the violation, the circumstances of each case, the adequacy of an award to encourage workers to assert their rights, the total number of plaintiffs involved, the total number of violations, the total amount to be assessed against the defendant, any recovery by the plaintiffs on closely related claims joined in the same suit that will in part compensate damage caused by violations of the Act, and the total amount of the award. *Maldonado v. Lucca,* 636 F.Supp. 621 (D.N.J.1986) *citing Beliz,* 765 F.2d at 1332–33.

Using factors such as these, courts within the purview of the United States Court of Appeals for the Fifth Circuit have awarded widely ranging statutory damages, from $15 per violation to the maximum of $500. Awards of the maximum $500 are not uncommon. *See, e.g., Montelongo v. Meese,* 803 F.2d 1341, 1350 (5th Cir.1986); *Washington v. Miller,* 721 F.2d 797 (11th Cir.1983); *Bertrand v. Jorden,* 672 F.Supp. 1417 (M.D.Fla.1987); *Alzalde v. Ocanas,* 580 F.Supp. 1394 (D.Colo.1984). However, at least one federal district court in Texas has stated that "[t]he maximum... is not the norm." *Aviles v. Kunkle,* 765 F.Supp. 358, 368 (S.D.Tex.1991).

A court must also keep in mind that the primary purpose of the Act's statutory awards provisions is promoting compliance by agricultural employers, "and thereby deter[ring] and correct[ing] the exploitative practices that have historically plagued the migrant farm labor market." *Beliz,* 765 F.2d at 1332 (relating to the AWPA's predecessor, the FLCRA). By reason of this purpose, "it ought not to be cheaper to violate the Act and be sued than to comply." *Id.* at 1332–33. This court agrees that awards must be adequate to encourage workers to assert their statutory rights.[64] All of these factors, as well as the precedent for awarding the maximum statutory penalties for the specific violations committed by Case Farms,[65] were considered in assessing the proper amount of statutory damages in this civil action.

The violations of the AWPA that have been found in this civil action do warrant serious repercussions for Case Farms. In 1963, when Congress first attempted to protect migrant workers with the FLCRA, it was responding to evidence "that in many cases the contractor tends to exaggerate conditions of employment when he recruits workers in their home base or that he fails to inform them of their working conditions at all; tends to transport them in unsafe vehicles; fails to furnish promised housing or else furnishes substandard and unsanitary housing..." H. REP. NO. 93–1439, at 5 (1974). The AWPA was passed because the FLCRA had failed to right these wrongs. Unfortunately, judging from the facts of this civil action, such activities apparently have not ceased.

Case Farms failed to abide by even the most basic of the AWPA's requirements. It used an unlicensed farm labor contractor. It failed to give certain plaintiffs written disclosures. From these initial vi-

---

64. The plaintiffs persuasively remind the court that the AWPA's statutory damages range was established in 1983. Since then, the value of the dollar has decreased significantly. So, to achieve Congress' intent to both compensate wronged plaintiffs, and to deter agricultural employers from mistreating workers, courts may need to consider the changed consumer price index. Today, a $500 damage award might be necessary to achieve the same level of deterrence as $300 in 1983.

65. *See, e.g., Howard v. Malcolm,* 658 F.Supp. 423, 437–38 (E.D.N.C.1987) (substantive housing violations); *Davis v. Williams,* 622 F.Supp. 386 (W.D.N.Y.1985) (substantive housing violations, use of an unregistered farm labor contractor, misrepresenting the conditions of employment, failure to pay wages owed when due, and breach of working agreement); *Alzalde,* 580 F.Supp. at 1394 (failing to post conditions of housing); *Bertrand,* 672 F.Supp. at 1417 (failing to provide accurate pay statements).

olations, the problems compounded with each new step in the hiring process. Case Farms failed to follow its working agreements with many of the plaintiffs, and it knowingly gave plaintiffs false and misleading information about housing and transportation. Simply stated, some plaintiffs were subjected to grossly unsanitary, dangerous, and overcrowded housing and transportation. Moreover, Case Farms attempted to avoid liability for this mistreatment of its workers by shifting the focus of this litigation to its strategically placed intermediary, ATC. The Congressional history of this statute directly condemns such attempts:

> It is, therefore, the intent of the committee that any attempt to evade the responsibilities imposed by this Act through spurious agreements among such parties be rendered meaningless; to make clear that it is the economic reality, not contractual levels, nor isolated factors which is to determine employment relationships under this Act.

H.R. REP. NO. 97–885 (1982), *reprinted* in 1982 U.S.C.C.A.N. 4547.

The AWPA was designed not only to punish, but also prevent such behavior. Such purposes can only be fulfilled by stringent penalties for violation of the Act. As other courts have determined, some violations of the AWPA deserve a serious and deterrent statutory penalty:

> Violations of [the disclosure and misleading information] provisions are significant, substantive violations, not merely technical violations because one of the primary purposes of [the AWPA] was to provide agricultural workers with information concerning potential employment so they could make an intelligent and informed judgment about whether to accept employment.

*Smith v. Bonds,* 1993 WL 556781, *13 (E.D.N.C.1993).

In an attempt to mitigate any award of damages to the plaintiffs, Case Farms emphasizes that it did not believe it was subject to the AWPA at the time these plaintiffs worked at Case Farms. It is well settled, however, that the AWPA is not a "specific-intent" statute. *Castillo v. Givens,* 704 F.2d 181, 197–198 (5th Cir. 1983), *Rodriguez v. Carlson,* 943 F.Supp. 1263, 1271 (E.D.Wash.1996); *Saintida v. Tyre,* 783 F.Supp. 1368 (S.D.Fla.1992); *Howard v. Malcolm,* 658 F.Supp. 423 (E.D.N.C.1987). That is, neither Case Farms' ignorance, nor its stance that it is not covered by the law, can excuse its violations of the AWPA. Furthermore, even if the AWPA did not exist, it is indisputable that Case Farms failed to treat many of the plaintiffs with basic fairness and human dignity. Such behavior, under the AWPA, demands heavy sanction.

### B. The Assessment of Actual Damages

As an alternative to the $500 maximum statutory damages, the plaintiffs, in some instances, seek actual damages. Plaintiffs argue that actual damages should include compensation for their mental anguish, humiliation, and inhumane treatment, and that, therefore, such damages at times are higher than the $500 statutory maximum. Case Farms, however, maintains that there is no legal basis for including compensation for mental anguish and humiliation under the umbrella of "actual damages."

The AWPA itself does not define "actual damages." And, whether or not mental anguish and humiliation may be included their calculation seems to be an unresolved issue. The plaintiffs cite the Fifth Circuit's decision in *Johnson v. Department of Treasury,* 700 F.2d 971 (5th Cir.1983), for its determination that " 'actual damages' under the Privacy Act does indeed include damages for physical and mental injury for which there is competent evidence in the record, as well as damages for out-of-pocket expenses." *Id.* at 972. Case Farms counters, however, that this decision was based on the specific legislative history of the Privacy Act itself, and is not applicable generally to other statutes. Moreover, in

the process of considering the issue, the Fifth Circuit commented "that the term 'actual damages' has no plain meaning or consistent legal interpretation." *Id.* at 974.

It seems clear to this court, however, that the Migrant and Seasonal Agricultural Worker Protection Act was enacted, in part, to protect the dignity of a group of workers that has historically been treated in a demeaning and inhumane manner. The AWPA was expressly designed to "reverse the historical pattern of abuse and exploitation of migrant and seasonal farm workers," 1982 U.S.C.C.A.N. 4549. Emotional distress, humiliation, and mental anguish have been found to be components of "actual damages" under other federal laws that are designed to reverse historical patterns of abuse and exploitation, such as the Fair Housing Act, and the Fair Credit Reporting Act. *See Steele v. Title Realty Co.,* 478 F.2d 380, 384 (10th Cir.1973) (interpreting the 'actual damages' provision of the Fair Housing Act of 1968 to include emotional distress and humiliation); *Millstone v. O'Hanlon Reports, Inc.,* 528 F.2d 829, 834–35 (8th Cir.1976) (holding that actual damages under the Fair Credit Reporting Act include damages for "loss of sleep, nervousness, frustration and mental anguish").

*The Deluxe Black's Law Dictionary,* 6th Ed., defines "actual damages" as "compensation for actual injuries or loss." It goes without question that compensation for a broken leg would be part of a plaintiffs' "actual damages." The fact that an injury is suffered mentally, rather than physically, does not make the injury any less real. See *Ruiz v. Johnson,* 37 F.Supp.2d 855, 914–915 (S.D.Tex.1999). Without commenting on the factual issue of their actual damages at this point, it is found, as a legal proposition, that the calculation of actual damages under the AWPA may include compensation for mental anguish and humiliation.

## C. The Plaintiffs' Damages

### 1. Use of Unregistered Farm Labor Contractors

The 1996 plaintiffs proved, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1842, by using ATC, an unregistered farm labor contractor. As indicated above, in most instances, compliance with this threshold requirement would have ensured Case Farms' conformity with a number of the other provisions of the AWPA. Having considered all of the factors pertinent to an assessment of damages under the AWPA, and for the reasons discussed above, it is determined that Eloy Cantu, Gerardo Castillo, Edna Mae Chong (representing the estate of deceased plaintiff Josephine Tijerina), Efrain Leal, Rafael Gonzalez, Sergio Hernandez, Jose Guadalupe Estrada, Martin Hernandez, Esperanza Hernandez, Joseph Cooper, Hugo Hernandez, Jesus Mejia, Guadalupe Zamorano, Ricardo Zamorano, Raul Zavala, and Michelle Galvan are each entitled to statutory damages of $500.00 for Case Farms' violation of 29 U.S.C. § 1842.

The 1997 plaintiffs brought no claim under this section of the AWPA.

### 2. Failure to Provide Written Disclosures

As determined in Section II above, Case Farms violated 29 U.S.C. § 1821(a)'s requirement that agricultural employer disclose, in writing, certain information at the time of recruitment. Each of the 1996 plaintiffs proved, by a preponderance of the evidence, that they were not provided with the AWPA-required written disclosures. Having taken into consideration all of the factors previously mentioned, it is determined that each of the 1996 plaintiffs should be assessed the maximum statutory award available under the act. Thus, Eloy Cantu, Gerardo Castillo, Edna Mae Chong (representing the estate of deceased plaintiff Josephine Tijerina), Efrain Leal, Rafael Gonzalez, Sergio Hernandez,

Jose Guadalupe Estrada, Martin Hernandez, Esperanza Hernandez, Joseph Cooper, Hugo Hernandez, Jesus Mejia, Guadalupe Zamorano, Ricardo Zamorano, Raul Zavala, and Michelle Galvan are each entitled to statutory damages of $500.00 for Case Farms' violation of 29 U.S.C. § 1821(a).

Of the 1997 plaintiffs, only two, Aurora Navarro and Urbana Zavala, proved, by a preponderance of the evidence, that they were not provided with any written disclosures. These two plaintiffs, therefore, are also each entitled to statutory damages of $500.00.

Four other 1997 plaintiffs, Gustavo Caballero, Jose Guevara, Yolanda Leura (for the deceased plaintiff Daniel Leura), and Tomas Solis, proved, by a preponderance of the evidence, that Case Farms violated only item (8), relating to workers' compensation coverage, of 29 U.S.C. § 1821(a). In fact, Case Farms concedes this violation, but urges that it is a mere "technical" violation, and does not warrant substantial statutory damages for these plaintiffs. This court agrees. Hence, these four plaintiffs are awarded statutory damages for this technical violation of 29 U.S.C. § 1821(a), in the amount of $50.00 each.

### 3. Providing False or Misleading Information

As determined in Section III above, Case Farms violated 29 U.S.C. § 1821(f) by providing the 1996 plaintiffs with false or misleading information. The 1997 plaintiffs, however, failed to meet their burden of proof on this claim.

Case Farms' violations in this regard were particularly egregious. Based on the totality of the circumstances of this case, it is determined that each of the 1996 plaintiffs should be awarded the maximum statutory damages provided for by the AWPA. Thus, Eloy Cantu, Gerardo Castillo, Edna Mae Chong (representing the estate of deceased plaintiff Josephine Tijerina),

Efrain Leal, Rafael Gonzalez, Sergio Hernandez, Jose Guadalupe Estrada, Martin Hernandez, Esperanza Hernandez, Joseph Cooper, Hugo Hernandez, Jesus Mejia, Guadalupe Zamorano, Ricardo Zamorano, Raul Zavala, and Michelle Galvan are each entitled to statutory damages of $500.00 for Case Farms' violation of 29 U.S.C. § 1821(f).

### 4. Failure to Comply with the Terms of the Working Agreement

It has further been determined, by a preponderance of the evidence, that Case Farms failed to comply with the terms of its working agreement with each of the 1996 plaintiffs, in violation of 29 U.S.C. § 1822(c). For the reasons outlined above, it is determined that Eloy Cantu, Gerardo Castillo, Edna Mae Chong (representing the estate of deceased plaintiff Josephine Tijerina), Efrain Leal, Rafael Gonzalez, Sergio Hernandez, Jose Guadalupe Estrada, Martin Hernandez, Esperanza Hernandez, Joseph Cooper, Hugo Hernandez, Jesus Mejia, Guadalupe Zamorano, Ricardo Zamorano, Raul Zavala, and Michelle Galvan are each entitled to statutory damages of $400.00 for Case Farms' violation of 29 U.S.C. § 1822(c).

None of the 1997 plaintiffs, however, met their burden of proving Case Farms' violation of 29 U.S.C. § 1822(c).

### 5. Failure to Comply with Housing Health and Safety Codes

A number of the 1996 plaintiffs proved, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(a), by failing to ensure that the housing complied "with substantive Federal and State safety and health standards applicable to that housing." The housing provided to the 1996 plaintiffs was particularly shameful and shocking, especially the housing provided to plaintiff Martin Hernandez and his sister Esperanza.[66] It is deter-

---

66. Martin Hernandez broke down on the stand as he recounted the shame of having brought his sister into a situation in which she would have to sleep on the stairs to escape the stench of the raw sewage in his apartment.

mined that Gerardo Castillo, Edna Mae Chong (representing the estate of deceased plaintiff Josephine Tijerina), Efrain Leal, Rafael Gonzalez, Jose Guadalupe Estrada, Hugo Hernandez, Jesus Mejia, Guadalupe Zamorano, Ricardo Zamorano, Raul Zavala, and Michelle Galvan are each entitled to statutory damages of $500.00 for Case Farms' violation of 29 U.S.C. § 1823(a). It is further determined that, due to the horrendous conditions they endured, and the obvious mental anguish it has caused them, Martin Hernandez and Esperanza Hernandez should be awarded actual damages in the amount of $1,000.00 each. The remaining three 1996 plaintiffs, Eloy Cantu, Sergio Hernandez, Joseph Cooper, have no claim under 29 U.S.C. § 1823(a).

None of the 1997 plaintiffs met their burden of proving Case Farms' violation of 29 U.S.C. § 1823(a).

### 6. Failure to Secure the Certificate of Occupancy

As determined above in Section VI, a number of 1996 plaintiffs proved, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1823(b), by failing to secure a certificate of occupancy from "either a state or local health authority, or other appropriate agency, stating that the housing meets applicable safety and health standards." Once again, if Case Farms had complied with this threshold requirement, the egregious violations of the AWPA's housing provisions could not have occurred. It is determined that Gerardo Castillo, Edna Mae Chong (representing the estate of deceased plaintiff Josephine Tijerina), Efrain Leal, Rafael Gonzalez, Jose Guadalupe Estrada, Martin Hernandez, Esperanza Hernandez, Hugo Hernandez, Jesus Mejia, Guadalupe Zamorano, Ricardo Zamorano, Raul Zavala, and Michelle Galvan are each entitled to statutory damages of $400.00 for Case Farms' violation of 29 U.S.C. § 1823(b). The remaining three 1996 plaintiffs, Eloy Cantu, Sergio Hernandez, and Joseph Cooper, have no claim under 29 U.S.C. § 1823(b).

None of the 1997 plaintiffs met their burden of proving Case Farms' violation of 29 U.S.C. § 1823(b).

### 7. Failure to Post the Terms and Conditions of Housing Occupancy

Similarly, as determined above in Section VII, a number of the 1996 plaintiffs proved, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1821(c), by failing to post in a conspicuous place a statement of the terms and conditions of occupancy of the housing. Based on the egregiousness of the subsequent housing violations, it is determined that Gerardo Castillo, Edna Mae Chong (representing the estate of deceased plaintiff Josephine Tijerina), Efrain Leal, Rafael Gonzalez, Jose Guadalupe Estrada, Martin Hernandez, Esperanza Hernandez, Hugo Hernandez, Jesus Mejia, Guadalupe Zamorano, Ricardo Zamorano, Raul Zavala, and Michelle Galvan are each entitled to statutory damages of $300.00 for Case Farms' violation of 29 U.S.C. § 1821(c). The remaining three 1996 plaintiffs, Eloy Cantu, Sergio Hernandez, Joseph Cooper, have no claims under 29 U.S.C. § 1821(c).

The 1997 plaintiffs met their burden of providing Case Farms violation of 29 U.S.C. 1821(c), as well. Thus, it is determined that Gustavo Caballero, Estela Carreon, Carlos Gonzalez, Jose A. Guevara, Juan A. Jimenez, Yolanda Leura (representing the estate of her deceased son plaintiff Daniel Leura), Aurora Navarro, Carlos Reyna, Tomas Solis, Israel Trevino, and Urbana Zavala are each entitled to statutory damages of $300.00 for Case Farms' violation of 29 U.S.C. § 1821(c).

### 8. Failure to Insure and Inspect Vehicles

The same group of 1996 plaintiffs proved, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1841(b), by failing to ensure that the vehicles used to transport the plaintiffs were properly insured and inspected. The evidence adduced at trial revealed that

plaintiffs were subjected to overcrowded, uncomfortable, and dangerous transportation conditions. It is, therefore, determined that Gerardo Castillo, Edna Mae Chong (representing the estate of deceased plaintiff Josephine Tijerina), Efrain Leal, Rafael Gonzalez, Jose Guadalupe Estrada, Martin Hernandez, Esperanza Hernandez, Hugo Hernandez, Jesus Mejia, Guadalupe Zamorano, Ricardo Zamorano, Raul Zavala, and Michelle Galvan are each entitled to statutory damages of $400.00 for Case Farms' violation of 29 U.S.C. § 1841(b). The remaining three 1996 plaintiffs, Eloy Cantu, Sergio Hernandez, Joseph Cooper, have no claim under 29 U.S.C. § 1841(b).

As detailed above in Section VII, several of the 1997 plaintiffs met their burden of proving Case Farms' violation of 29 U.S.C. § 1841(b). It is determined that these plaintiffs, Gustavo Caballero, Carlos Gonzalez, Yolanda Leura (representing the estate of her deceased son, plaintiff Daniel Leura), and Tomas Solis, are each entitled to statutory damages for Case Farms' violation of 29 U.S.C. § 1841(b). Given the *de minimus* nature of the violation, however, their award shall be limited to $50.00 each.1997 plaintiffs Estela Carreon, Jose A. Guevara, Juan A. Jimenez, Aurora Navarro, Carlos Reyna, Israel Trevino, and Urbana Zavala failed to meet their burden on this claim, and cannot recover statutory damages.

### 9. Failure to Provide Proper Pay Statements

A number of the 1996 plaintiffs proved, by a preponderance of the evidence, that Case Farms violated 29 U.S.C. § 1821(d)(2), by failing to make, and provide to each of them a proper pay statement for each period. The 1997 plaintiffs did not bring such a claim. It is determined that Gerardo Castillo, Edna Mae Chong (representing the estate of deceased plaintiff Josephine Tijerina), Efrain Leal, Rafael Gonzalez, Jose Guadalupe Estrada, Martin Hernandez, Esperanza Hernandez, Hugo Hernandez, Jesus Mejia, Guadalupe Zamorano, Ricardo Zamorano, Raul Zavala, and Michelle Galvan are each entitled to damages of $50.00 for Case Farms' *de minimus* violation of 29 U.S.C. § 1821(d)(2). The remaining three 1996 plaintiffs, Eloy Cantu, Sergio Hernandez, Joseph Cooper, have no claim under 29 U.S.C. § 1821(d)(2).

### 10. Failure to Provide Wages When Due

The 1996 plaintiffs failed to meet their burden of proving, by a preponderance of the evidence, that Case Farms failed to pay them wages when due. The 1997 plaintiffs did not bring a claim under 29 U.S.C. § 1822(a). Case Farms, therefore, has no liability under this provision of the AWPA.

### PART IV

### ALLEGED VIOLATIONS OF THE FLSA

### I. The Fair Labor Standards Act

In addition to their AWPA-based allegations, a number of the migrant worker plaintiffs [67] claim that Case Farms violated the minimum wage provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et. seq.* The FLSA was first enacted in 1938 to "eliminate low wages and long hours" and to "free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers." 29 U.S.C. § 201; *see Brennan v. Veterans Cleaning Service, Inc.,* 482 F.2d 1362, 1368 (5th Cir.1973). The FLSA established a minimum wage, regulations concerning maximum hours, record keep-

67. Only fifteen of the twenty-seven plaintiffs raised claims under the Fair Labor Standards Act. The 1996 plaintiffs who did so are Michelle Galvan, Esperanza Hernandez, Martin Hernandez, Efrain Leal, Josephine Tijerina, and Raul Zavala. The 1997 plaintiffs who did so are Gustavo Caballero, Estela Carreon, Carlos Gonzalez, Jose Guevara, Juan Jimenez, Daniel Leura, Tomas Solis, Israel Trevino, and Urbana Zavala.

ing and reporting requirements, child labor provisions, and a system of civil and criminal penalties for violation of its provisions. 29 U.S.C. § 201, *et seq.* Originally exempting agricultural workers from its protections, the FLSA was amended in 1966 to extend its minimum wage protections to some agricultural workers. *See* S. REP. No. 89–1487 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3002. It is uncontested that the plaintiffs in this civil action are protected by the FLSA.

Perhaps the most well-known provisions of the FLSA are its minimum wage directives. The FLSA requires certain employers [68] to pay to each of its employees wages of "not less than $4.25 an hour during the period ending on September 30, 1996, not less than $4.75 an hour during the year beginning on October 1, 1996, and not less than $5.15 an hour beginning September 1, 1997." 29 U.S.C. § 206(a)(1).

At issue in this civil action is whether Case Farms fulfilled its legal obligation to pay minimum wage to some of the plaintiffs. As one might expect, this question is complicated considerably by the fact that Case Farms made certain deductions from the plaintiffs' pay, for requisite tools and safety gear, as well as for housing and transportation. Thus, to determine whether a minimum wage violation has occurred under the FLSA, this court must make reference to the web of statutory, and judicially-developed, rules that govern the role of such deductions in the calculation of a workers' hourly rate of pay.

## II. The Rules for Calculating Minimum Wage Violations

The most basic theorem of FLSA's minimum wage requirements is that a workers' wages be paid "free and clear:"

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicksback" directly or indirectly to the employer or another person for the employer's benefit the whole or part of the wage delivered to the employee.

29 C.F.R. § 531.35. That is, the FLSA prohibits employers from taking certain self-serving deductions from a worker's pay. The plaintiffs in this civil action allege that the transportation deductions made from the 1996 plaintiffs' pay were illegal because both Case Farms and ATC, acting on Case Farms' behalf, directly and indirectly profited from the transaction.

The requirement that wages be paid "free and clear," does not mean, however, that deductions from a workers pay are *per se* illegal. Deductions for necessary equipment or supplies are illegal when such deductions deprive a worker of the federally mandated minimum wage or overtime pay. The FLSA-derived regulations, promulgated by the United States Department of Labor, provide that

> [I]f it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid to him [or her] under the Act.

29 C.F.R. § 531.35. It is the contention of some of the plaintiffs in this civil action that Case Farms' deductions for "tools of the trade" [69] lowered their hourly wages to below FLSA's minimum wage.

Deductions for housing may, in some instances, also be legally made by an

---

68. It is undisputed that Case Farms is obligated to pay its employees minimum wage. Case Farms is a business engaged in commerce or the production of goods for commerce and had at all relevant times annual gross sales of at least $500,000.

69. Among these "tools of the trade" listed by the plaintiffs are hair nets, earplugs, safety glasses, plastic hats, gloves, aprons, and work boots.

employer. The FLSA expressly allows an employer to count as wages "the reasonable cost . . . to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging or other facilities are customarily furnished by such employer to . . . employees." 29 U.S.C. § 203(m). An employer may not, however, deduct from wages money for housing when that housing is seriously substandard.[70] *Osias v. Marc,* 700 F.Supp. 842, 845 (D.Md.1988). "Facilities furnished in violation of any Federal, State, or local law, ordinance or prohibition will not be considered facilities 'customarily' furnished" for the purpose of the FLSA. 29 C.F.R. § 531.31.

It is in the context of these rules of calculation, that the plaintiffs in this civil action bring two types of FLSA claims. First, some of them (a subset of the 1997 plaintiffs) allege that once certain illegal deductions are considered, they were paid less than minimum wage. Second, another group (made up of subsets of both the 1996 and the 1997 plaintiffs) argues that certain illegal deductions from their wages create violations of the FLSA's overtime provisions.

### III. Case Farms' Alleged Minimum Wage Violations

Only some of the 1997 plaintiffs claim that Case Farms violated the (non-overtime related) minimum wage provisions of the FLSA. Plaintiffs Gustavo Caballero, Estela Carreon, Carlos Gonzalez, Jose Guevara, Yolanda Leura, Tomas Solis, and Urbana Zavala complain that once deductions are considered, their pay stubs reflect below-minimum-wage payments. Pl. Ex. 42.

In making these calculations, plaintiffs used the following formula:

*actual gross pay received = net pay received + authorized/legal deductions*

Then, to determine the hourly rate paid a given plaintiff in a given workweek, the plaintiffs used the following formula:

*hourly rate paid = actual gross pay received ÷ hours worked*

These formulas, in theory, are applicable to the case at hand. Generally speaking, the actual damages due to a plaintiff who suffers a minimum wage violation is the amount of the unpaid minimum wages, which is equal to the applicable minimum wage multiplied by the hours worked minus the actual gross pay received. 29 U.S.C. § 216(b).

As plaintiffs acknowledge, however, they "have calculated both their minimum wage and overtime claims based on the assertion that any deductions from plaintiffs' pay for substandard housing, [and] for necessary supplies, . . . to be illegal." It has previously been determined that, as to the 1997 plaintiffs, Case Farms did not furnish housing. Rather, Case Farms made deductions to be paid to a third party on behalf of the 1997 plaintiffs. Such a practice is permitted under the FLSA, and does not amount to a violation or "waiver"[71] of the FLSA. *Brennan v. Veterans Cleaning Service,* 482 F.2d 1362 (5th Cir.1973). Hence, Case Farms was within its authority to make housing deductions, as to the 1997 plaintiffs, if the plaintiffs consented to the deductions.

It is found that, with one exception, consent can be implied for the housing deductions as to the 1997 plaintiffs. The

---

**70.** Under Case Farms' failed "third party"-payment theory, the issue of whether the housing was substandard would be immaterial. Because Case Farms itself customarily provided the housing to the 1996 plaintiffs, however, the housing conditions become relevant to the propriety of the Case Farms' deductions from some plaintiffs' wages.

**71.** It is beyond question that workers cannot waive their rights under the FLSA, even by agreement. *Mireles v. Frio Foods, Inc.,* 899 F.2d 1407, 1411 n. 4 (5th Cir.1990). Of course, "when the employer is the creditor, payment may not be made by paycheck deductions which reduce net pay below minimum wage, even where the employee apparently consents to such an arrangement." *Veterans Cleaning Service,* 482 F.2d at 1370.

only 1997 plaintiff (bringing overtime violation allegations) who did not confer with either Case Farms or Garcia at the Texas Workforce Commission prior to beginning her employment at Case Farms was Urbana Zavala. She was not, then, put on notice of Case Farms' plan to reimburse a third party. Case Farms concedes, therefore, that she is entitled to FLSA damages of $73.20, which includes liquidated damages.

If the remainder of the 1997 plaintiffs' wages are recalculated without deducting the housing charges, it appears that they were not deprived of the minimum wage, and cannot recover the FLSA minimum wage damages that they seek. Hence, Gustavo Caballero, Estela Carreon, Carlos Gonzalez, Jose Guevara, Yolanda Leura, and Tomas Solis have failed to meet their burden of proving Case Farms violated FLSA's non-overtime minimum wage provisions.

## IV. Case Farms' Alleged Overtime Wage Violations

A different group of Case Farms workers, made up of both 1996 and 1997 plaintiffs, allege that Case Farms violated the FLSA by failing to provide them with the law's minimum overtime wages. The FLSA requires employers to pay workers at least "time-and-a-half" for time they work over forty hours per week.[72] 29 U.S.C. § 207(a)(1). Utilizing a similar equation as the one described above, Estela Carreon, Michelle Galvan, Carlos Gonzalez, Jose Guevara, Esperanza Hernandez, Martin Hernandez, Juan Jimenez, Efrain Leal, Tomas Solis, Josephine Tijerina, I. Tevino, Raul Zavala, and Urbana Zavala maintain that illegal deductions bring their salaries below FLSA's minimum requirements.

It appears, however, that, as Case Farms points out, the plaintiffs made a fundamental error in the formula they used to reach their conclusions. The gross wage actually received by a plaintiff was calculated using the following formula:

*actual gross wage received = net pay received + authorized/legal deductions* According to the plaintiffs, if the actual gross wage received by a plaintiff was less than the gross wage due the plaintiff, an overtime violation occurred.

The regulations, however, indicate that "[i]t is the Administrator's opinion that deductions may be made, however, on the same basis in an overtime workweek as in a nonovertime workweek (see § 531.36), if their purposes and effect are not to evade the overtime requirements of the Act or other law." 29 C.F.R. § 531.37. In completing their calculations, the plaintiffs ignored an employer's right to make deductions from the straight time portion of the employee's wages as long as those deductions do not bring the employee below the minimum wage. That is, if a worker's straight time salary is more than minimum wage, that "extra" payment creates, in effect, a buffer for deductions by an employer.

For example, in a situation where $1.60 an hour is the applicable minimum wage, if an employee is employed at a rate of $1.65 an hour (5 cents in excess of the minimum wage) the maximum amount which may be deducted from his wages in a 40-hour workweek for items... which are not "facilities"...is 40 times 5 cents or $2. Deductions in excess of this

---

**72.** The FLSA regulations governing overtime wage calculations state:

If the employee is employed solely on the basis of a single hourly rate, the hourly rate is his [or her] "regular rate." For his [or her] overtime work he [or she] must be paid, in addition to his [or her] straight time hourly earnings, a sum determined by multiplying one-half the hourly rate by the number of hours worked in excess of 40 in the week. Thus a $6 hourly rate will bring, for an employee who works 46 hours, a total weekly wage of $294 (46 hours at $6 plus 6 [hours] at $3). In other words, the employee is entitled to be paid an amount equal to $6 an hour for 40 hours and $9 an hour for the 6 hours of overtime, or a total of $294.

29 C.F.R. § 778.110(a).

amount for such articles are illegal in overtime workweeks as well as in non-overtime workweeks.

Plaintiffs' calculations did not take into consideration the fact that the plaintiffs, in many instances, appear to have been paid a base-rate, straight time wage that was higher than the minimum wage, thus creating a "buffer" for deductions by Case Farms.

## A. The 1996 Plaintiffs' Overtime Allegations

■ It is clear that Case Farms made unauthorized deductions for housing from the 1996 plaintiffs wages, because deductions were taken for substandard housing.[73] And, as stated previously, it is beyond argument that much of the housing provided to the plaintiffs was in violation of federal health and safety codes. It is unclear, however, whether these deductions—once consideration is given to Case Farms' right to make deductions from money earned in excess of minimum wage—brought these plaintiffs' hourly wages below minimum wage.

The damages calculations made by plaintiffs for the 1996 plaintiffs must be adjusted to reflect the fact that Case Farms could make deductions so long as the regular-hour pay rate did not fall below minimum wage. Thus, the following findings are made:

**Michelle Galvan.** Plaintiff Galvan worked three overtime weeks at Case Farms during February, 1996. For the week of February 3, 1996, Galvan worked 58.94 hours, at a regular wage rate of $5.50/hour. She was therefore owed $220 straight pay wages and $156.26 for her overtime work, a total of $376.26. She was paid $339.26. According to the plaintiffs' calculations, the difference between those two numbers ($37.00) is owed for the illegal deductions taken that week. Pl.Ex. 4, 6, 42,

43. However, because the minimum wage at the time was $4.25/hour, and she was paid $5.50/hour for the regular 40–hour week, Case Farms has a $1.25/per hour of work "buffer" for which deductions are not illegal. This comes to $50.00 per week. In other words, Case Farms is not in violation of the FLSA unless it unless it made more than $50 dollars in deductions in a given week. Because Case Farms, for Galvan, made deductions of $37.00, $5.00, and $17.28, in the three weeks she worked, Galvan has not met her burden of showing a violation of the FLSA overtime provisions by Case Farms.

**Edna Mae Chong (for the estate of Josephine Tijerina).** The same reasoning applies to the plaintiffs' calculations of overtime damages for the estate of plaintiff Tijerina. She was paid $5.50 or, eventually, $6.25/hour for her work. Case Farms is only liable for illegal deductions that would bring her pay below the minimum wage at the time of $4.25. Such was not the case, as the deductions taken from Tijerina's paycheck were for $37.00, $6.87, $22.62, and $17.99. Pl.Ex. 4, 6, 15, 42, 43. Chong, for Tijerina, has therefore not met her burden of showing a violation of the FLSA overtime provisions by Case Farms.

**Esperanza Hernandez.** 1996 plaintiff Esperanza Hernandez worked nine overtime weeks at Case Farms. Pl.Ex. 42. She was paid a base-rate $5.50/hour for three of those weeks and $6.25/hour for six of those weeks. During the weeks in which she made $5.50/hour ($1.25 more than minimum wage), Case Farms was entitled to make up to $50.00 in deductions without violating the FLSA. During those weeks, the deductions never exceeded $50. Pl.Ex. 42. During the weeks in which she made

---

73. For the purposes of the FLSA, it is found that housing was "customarily" furnished to the 1996 plaintiffs by Case Farms through its agents. This court begins, therefore, with the presumption that Case Farms may make housing deductions from the 1996 plaintiffs wages for housing-a presumption quickly overcome by the substandard housing provided to these plaintiffs.

$6.25/hour ($2.00 more than minimum wage), Case Farms was entitled to take up to $80.00 in deductions without violating the FLSA. During those weeks, on one occasion, the week of February 3, 1996, Case Farms deducted $127.94 from her paycheck. See Pl.Ex. 4, 14, 15 42, 43. Thus, this plaintiff's paycheck fell below the level of minimum wage. As a result, Case Farms violated the FLSA. Hernandez's actual damages would therefore be $47.94. Actual and liquidated damages for this violation come to $95.88.[74]

**Martin Hernandez.** Plaintiff Martin Hernandez, brother of Esperanza Hernandez, worked six overtime weeks at Case Farms. He was paid a base-rate of $5.50/hour for three of those weeks and $6.25/hour for three of those weeks. During the $5.50/hour weeks, the deductions taken never exceeded $50.00, so Case Farms did not. violate the FLSA. During one of the other weeks, Hernandez worked (an astonishing) 114.76 hours and $128.68 in deductions were taken. See pl. Ex. 4, 14, 42, 43. Because Case Farms could only legally take $80.00 in deductions, Hernandez has proven actual damages of $48.68. Actual and liquidated damages for this violation come to $97.36.

**Raul Zavala.** 1996 plaintiff Zavala worked one overtime week, the week of February 3, 1996, when the minimum wage under the FLSA was $4.25/hour. He was paid $5.50 an hour, giving Case Farms a $50.00 "buffer" for deductions before it would violate the FLSA. Only $37.00 in deductions were taken. See Pl.Ex. 4, 42, 43. Zavala has therefore not met his burden of showing a violation of the FLSA overtime provisions by Case Farms.

**Efrain Leal.** This 1996 plaintiff also worked only one overtime week, the week of March 9, 1996. He was paid a base-rate of $6.25/hour, which was $2.00 over the minimum wage at the time. Thus, Case Farms would not violate the FLSA unless it took more than $80.00 (40 hours times $2.00) in deductions. Only $14.34 in deductions were taken. Leal has therefore not met his burden of showing a violation of the FLSA overtime provisions by Case Farms.

No other 1996 plaintiffs brought overtime violation allegations. Thus the only damages to be awarded for violations of the FLSA by Case Farms are in the amount of $97.36 to Martin Hernandez, and in the amount of $95.88 to Esperanza Hernandez.

## B. The 1997 Plaintiffs' Overtime Allegations

While the housing was similarly atrocious and obnoxious for the 1997 plaintiffs, nevertheless, because Case Farms did not furnish it, such deductions as to the 1997 plaintiffs do not create FLSA violations, if they were consented to, as payments for a third party. As already mentioned, all of the relevant 1997 plaintiffs, except for Urbana Zavala,[75] can be said, for FLSA purposes, to have consented to such deduction for repayment to a third party. This fact, combined with the same formulaic problem as faced the 1996 plaintiffs, undermines the 1997 plaintiffs' overtime claims. It is therefore determined that Estela Carreon, Carlos Gonzalez, Jose Guevara, Juan Jimenez, Tomas Solis, and Urbana Zavala have not met their burden of proving, by a preponderance of the evidence, that Case Farms violated the overtime provisions of the AWPA. No 1997 plaintiffs, therefore, are entitled to damages under the FLSA.

74. The FLSA provides for an award of actual damages, plus an equal amount of statutory liquidated damages. 29 U.S.C. § 206(b).

75. Urbana Zavala's overtime claims are undermined by the same "buffer" problem that faced the 1996 plaintiffs' claims. She was, for all weeks but one, paid $2.00 over the minimum wage, giving Case Farms the right to make up to $80.00 in deductions per week before a FLSA violation would occur. No such violation occurred. See Pl.Ex. 16, 17, 18, 19, 42, 43.

## PART V

## ALLEGED VIOLATIONS
## OF STATE LAW

The plaintiffs also raised several state law claims against Case Farms-breach of contract, fraud, and negligent misrepresentation. Each of these claims, under Texas law, requires the plaintiffs to prove that Case Farms made a promise or representation to them that was either false when made or that was later breached. *See, American Tobacco Company, Inc. v. Grinnell,* 951 S.W.2d 420, 436 (Tex.1997).

As Case Farms acknowledges, "[t]hese three common law claims have the same factual basis as two of the AWPA violations alleged by Plaintiffs." Def. Post–Trial Brf., at 48. Section 1822, which prohibits the violation of the terms of a working arrangement, is analogous to a breach of contract claim. Section 1821, which bars an employer or farm labor contractor from "knowingly providing false or misleading information to workers," is generally analogous to a common law fraud claim. Finally, a negligent misrepresentation claim is similar to a fraud claim, except that the misrepresentation is negligent, rather than intentional.

### I. Case Farms' Alleged Breach of Contract

 To prove a breach of contract under Texas law, a plaintiff must show, by a preponderance of the evidence, (1) the existence of a valid contract, (2) the plaintiff's performance or tender of performance; (3) the defendant's breach; and (4) the plaintiff's damage as a result of the breach. *Hussong v. Schwan's Sales Enterprises,* 896 S.W.2d 320, 326 (Tex.App.-Houston [1st Dist.] 1995, n.w.h.). In the process of addressing plaintiffs' AWPA-based claims that Case Farms failed to comply with the terms of the working arrangement in violation of 29 U.S.C. § 1822(c), and that Case Farms provided the plaintiffs with false or misleading information in violation of 29 U.S.C. § 1821(f), this court has already made findings on each of the elements of a Texas breach of contract claim.

 The "working arrangement made by [the] contractor, employer, or association with any migrant agricultural worker" in regard to section 1822(c) represents a valid contract. The plaintiffs agreed to travel to Ohio, and to work for Case Farms. In return, Case Farms, or persons acting on its behalf, promised plaintiffs that they could work for Case Farms, that they would be paid for this work, and that suitable housing and transportation would be provided to them for at least the first month of their employment with Case Farms.

As previously outlined, the contracts arranged with the 1996 plaintiffs were significantly different from those arranged with the 1997 plaintiffs. While all the plaintiffs entered valid contracts (or "working arrangements") at recruitment, and both sets of plaintiffs generally performed, Case Farms was only found to have breached the agreement in regard to the 1996 plaintiffs. On the same factual bases, it is found that Case Farms breached its contract with the 1996 plaintiffs, but not with the 1997 plaintiffs.

Although it is found that Case Farms breached its contracts with the 1996 plaintiffs, it is also determined that an award of damages for breach of contract would be duplicative or the damages awarded for Case Farms' violations of the AWPA. No additional damages will be awarded to the plaintiffs under this claim.

### II. Case Farms' Alleged Negligence

 To prevail on their negligent misrepresentation claims under Texas law, the plaintiffs must prove that (1) Case Farms made some representation in the course of its business; (2) Case Farms supplied the false information for the guidance of others in their business; (3) Case Farms did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation. *Clardy Mfg. Co. v. Ma-*

*rine Midland Business Loans,* 88 F.3d 347, 359 (5th Cir.1996).

As inferred above, the negligent misrepresentation claims of all plaintiffs seek recovery for the same actions that support their AWPA claims alleging violation of 29 U.S.C. § 1822(c) (relating to alleged violations of the terms of the "working arrangements"), 29 U.S.C. § 1821(f) (relating to the alleged knowing provision of false or misleading information), and 29 U.S.C. § 1821(a) (relating to failure to provide written disclosures). Thus, it has already been determined that Case Farms, and its agent ATC, made representations to the plaintiffs in the course of Case Farms' business. It is also settled that Case Farms, through ATC, supplied the 1996 plaintiffs with false information. Such a finding has not been, and cannot be made as to 1997 plaintiffs, however. The 1997 plaintiffs negligent misrepresentation claims must, therefore, fail.

The 1996 plaintiffs have also established the third element of a negligent misrepresentation claim. ATC, acting on behalf of Case Farms, failed to exercise reasonable care in its recruitment process and in communicating information regarding work, housing, and transportation to the 1996 plaintiffs.

Thus, the final hurdle for the 1996 plaintiffs is to demonstrate that they have suffered pecuniary losses by their justifiable reliance on Case Farms' information.

Only two 1996 plaintiffs have presented such evidence, Michelle Galvan and Edna Mae Chong (for the estate of Josephine Tijerina). These two plaintiffs claim that, because of Case Farms' misrepresentations, they had to buy a car for $500. See Pl. Am. Post–Trial Brf, Tab 14. Case Farms responds that these two plaintiffs were paid by other workers for rides in that car. Furthermore, they enjoyed the use of the car for some period. The plaintiffs, however, failed to quantify the amount of money they received and the time they used the car. Thus, it is determined that they have failed to produce

evidence from which this court can reasonably estimate damages.

For the foregoing reasons, and based on the factual findings made in reference to the plaintiffs' claims under sections 1821(a), 1821(f), and 1822(c), none of the plaintiffs have met their burden of proving their claims of negligent misrepresentation against Case Farms.

## III. Case Farms' Alleged Fraud

██ Finally, the plaintiffs alleged that Case Farms defrauded them under Texas law. To recover for fraud, a plaintiff must prove that (1) a material representation was made; (2) it was false when made; (3) the speaker knew it to be false, or made it recklessly without knowledge of its truth and as a positive assertion; (4) the speaker made it with the intent that it should be acted upon; and (5) the party acted in reliance and suffered injury as a result. *Clardy Mfg. Co. v. Marine Midland Business Loans,* 88 F.3d 347, 359 (5th Cir. 1996). For the same reasons outlined above in reference to the plaintiffs' negligent representation claims, all the plaintiffs' have failed to prove that Case Farms defrauded them. That is, the 1997 plaintiffs claims fail because those plaintiffs failed to prove that they were provided with false information by Case Farms. The 1996 plaintiffs' claims fail because none of them have demonstrated that they suffered a quantifiable injury as a result of acting in reliance on Case Farms' false representations.

## CONCLUSION

Congress, through both the FLCRA and the AWPA, has made clear its intentions to provide mistreated migrant farm workers redress. An agricultural employer may not take advantage of migrant workers' diminished bargaining position by enticing them with false promises or subjugating them to unsafe, unsanitary, or unconscionable living and working conditions. Case Farms' deplorable treatment of the plaintiffs in this civil action repre-

sents precisely the mistreatment that the AWPA was enacted to prevent and punish. It is found, based on the evidence presented to this court, by a preponderance of the evidence, that Case Farms violated the law in its treatment of the plaintiffs, in the manners and ways set forth herein, and that plaintiffs should be awarded judgment therefor.